## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA
## SOUTHWESTERN DIVISION

CASEY VOIGT and JULIE VOIGT

      Plaintiffs,

    v.

COYOTE CREEK MINING COMPANY,
LLC, a North Dakota Corporation,

      Defendant.

Civil Action No. 1:15-CV-00109

### MEMORANDUM IN SUPPORT OF COYOTE CREEK'S MOTION TO DISMISS

Brian R. Bjella
Mark L. Stermitz
Gregory F. Dorrington
CROWLEY FLECK
100 West Broadway
Suite 250
Bismarck, ND 58501
Telephone:  (701) 223-6585
Fax: (701) 222-4853

*Counsel for Defendant*
Coyote Creek Mining Company, LLC

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

I.    BACKGROUND ..................................................................................... 3

    A.    Clean Air Act Permitting Requirements ............................................. 3

    B.    Factual Background ............................................................................. 6

II.   ARGUMENT ......................................................................................... 7

    A.    The Court Does Not Have Subject Matter Jurisdiction ......................... 8

        1.    A Collateral Attack on a State-Issued Permit is Not Authorized by 42 U.S.C. § 7604(a)(3). .................................................................... 8

        2.    Even if Subsection 7604(a)(3) Does Authorize this Claim, Abstention is Warranted under the *Burford* Doctrine. ........................... 13

    B.    The Complaint Fails to State a Claim against Coyote Creek ............................ 18

        1.    *Iqbal* Step One—Determining Which Factual Allegations are Well-Pleaded ...................................................................................... 18

            (a)    Erroneous Legal Conclusions Are Not Entitled to Presumption of Truth. .................................................................. 20

            (b)    Conclusory Allegations Contradicted by Documents Attached to the Plaintiffs' Complaint are Not Entitled to the Presumption of Truth. ................................................................. 25

            (c)    Pleading Central Factual Allegations on "Information and Belief" is Inadequate. ...................................................................... 27

        2.    *Iqbal* Step Two: Determining Whether the Well-Pleaded Factual Allegations Raise a Right to Relief Above the Speculative Level ......... 28

III.  CONCLUSION ...................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

CASES

*Alaska Dep't of Envtl. Conservation v. EPA*,
540 U.S. 461 (2004)...................................................................................................3

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010)......................................................................................27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................................... passim

*Ass'n to Protect Hammersley v. Taylor Res.*,
299 F.3d 1007 (9th Cir. 2002) ...................................................................................17

*Badgerow v. Honeywell Int'l*,
2002 U.S. Dist. LEXIS 25385, *4-5 (D. Minn. Dec. 9, 2002) .................................3

*Badgerow v. Honeywell Int'l*,
2002 U.S. Dist. LEXIS 25385 (D. Minn. Dec. 9, 2002)....................................19, 26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................................... passim

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ............................................................................ passim

*Brown v. Medtronic, Inc.*,
628 F.3d 451, 459-60 (8th Cir. 2010) ........................................................................6

*Burford v. Sun Oil Co.*,
319 U.S. 315 (1943)...................................................................................................14

*City of N.Y. v. Milhelm Attea & Bros., Inc.*,
550 F. Supp. 2d 332 (E.D.N.Y. 2008) ........................................................................2

*CleanCOAlition v. TXU Power*,
536 F.3d 469 (5th Cir. 2008) ............................................................................2, 9, 13

*Colorado River Water Conservation District v. United States*,
424 U.S. 800 (1976)...................................................................................................14

**TABLE OF AUTHORITIES**
(continued)

Page

*Dames & Moore v. Baxter & Woodman, Inc.*,
   21 F. Supp. 2d 817 (N.D. Ill. 1998) ....................................................................19

*Drevlow v. Lutheran Church, Missouri Synod*,
   991 F.2d 468 (8th Cir. 1993) .............................................................................11

*Ellis v. Gallatin Steel Co.*,
   390 F.3d 461 (6th Cir. 2004) ...........................................................................2, 17

*Envtl. Defense v. Duke Energy Corp.*,
   549 U.S. 561 (2007)..............................................................................................4

*Fayetteville Investors v. Commercial Builders, Inc.*,
   936 F.2d 1462, 1465 (4th Cir. 1991) ..................................................................19

*Hager v. Ark. Dep't of Health*,
   735 F.3d 1009 (8th Cir. 2013) ............................................................................18

*Heisen v. Pacific Coast Bldg. Prods., Inc.*,
   No. 93-16213, 1994 U.S. App. LEXIS 14337, 1994 WL 250029, *1 (9th Cir.
   Jun. 9, 1994) (unpublished) ................................................................................10

*Honess 52 Corp. v. Town of Fishkill*,
   1 F. Supp. 2d 294 (S.D.N.Y. 1998) ....................................................................19

*Like v. Carter*,
   448 F.2d 798 (8th Cir. 1971) ..........................................................................20, 23

*McDonough v. Anoka Cnty.*,
   __ F.3d __, 2015 U.S. App. LEXIS 14672 (8th Cir. Aug. 20, 2015) ...............24, 29

*Mississippi River Revival, Inc. v. EPA*,
   107 F. Supp. 2d 1008 (D. Minn. 2000)................................................................10

*Moore v. Bertsch*,
   No. 1:09-CV-027, 2009 U.S. Dist. LEXIS 63202 (D.N.D. July 1, 2009) .............26

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
   491 U.S. 350, 361 (1989)....................................................................................15

**TABLE OF AUTHORITIES**
(continued)

Page

*NRDC v. BP Prods. N. Am., Inc.*,
No. 2:08-CV-204, 2009 U.S. Dist. LEXIS 54363 (N.D. Ind. June 26, 2009) .........2, 14, 15, 16

*Ogden Projects v. New Morgan Landfill Co.*,
911 F. Supp. 863, 867-68 (E.D. Pa. 1996)...............................................................................10

*Olpin v. Ideal Nat. Ins. Co.*,
419 F.2d 1250 (10th Cir. 1969) ..............................................................................................19

*Parkhurst v. Tabor*,
569 F.3d 861 (8th Cir. 2009) ...................................................................................................28

*Perkins v. Silverstein*,
939 F.2d 463 (7th Cir. 1991) ...................................................................................................19

*Quackenbush v. Allstate Ins. Co.*,
517 U.S. 706, 716 (1996)..........................................................................................................14

*Richter v. Fannie Mae*,
553 Fed. Appx. 655 (8th Cir. 2014)..........................................................................................27

*Sazerac Co. v. Falk*,
861 F. Supp. 253, 257 (S.D.N.Y. 1994)....................................................................................19

*Sierra Club v. Otter Tail Power Co.*,
615 F.3d 1008 (8th Cir. 2010) ......................................................................................... passim

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293, 1295-96 (9th Cir. 1998) ............................................................................19, 26

*Sugarloaf Citizens Ass'n v. Montgomery County*,
1994 U.S. App. LEXIS 21985 (4th Cir. 1994) ........................................................................17

*Thompson v. Ill. Dep't of Prof'l Regulation*,
300 F.3d 750, 754 (7th Cir. 2002) ...........................................................................................26

*United States v. AM Gen. Corp.*,
34 F.3d 472, 475 (7th Cir. 1994) .............................................................................................11

*Velocity Express Corp. v. Bayview Capital Partners, L.P.*,
2002 U.S. Dist. LEXIS 8522 (D. Minn. May 9, 2002)...............................................................8

# TABLE OF AUTHORITIES
(continued)

Page

*Vollmer v. Fed. Home Loan Mortg. Corp.*,
  555 Fed. Appx. 634 (8th Cir. 2014).........................................................27

*Weiler v. Chatham Forest Prods.*,
  392 F.3d 532 (2d Cir. 2004).................................................................13

*Williams v. Gusky (In re President Casinos, Inc.)*,
  502 B.R. 841 (Bankr. E.D. Mo. 2013)...................................................19

*Yellen v. Hake*,
  437 F. Supp. 2d 941 (S.D. Iowa 2006) .................................................26

## STATUTES

42 U.S.C. § 7409.......................................................................................3

42 U.S.C. § 7410.......................................................................................3

42 U.S.C. § 7470.......................................................................................4

42 U.S.C. § 7471....................................................................................5, 9

42 U.S.C. § 7475(a) ...............................................................................4, 28

42 U.S.C. § 7479(1) ..................................................................................4

42 U.S.C. § 7604(a)(3)........................................................................ passim

N.D.C.C. § 23-01-36...........................................................................11, 12

## OTHER AUTHORITIES

40 C.F.R. § 51.166(b)(20).........................................................................20

40 C.F.R. § 52.21 ............................................................................... passim

40 C.F.R. § 60.251(f)................................................................................21

73 FR 22901..............................................................................................21

74 FR 25304..............................................................................................21

## TABLE OF AUTHORITIES
(continued)

**Page**

Federal Rule of Civil Procedure 12(b)(1) ............................................................................... passim

Federal Rule of Civil Procedure 12(b)(6) .............................................................................. passim

http://www.epa.gov/air/urbanair/ ...................................................................................................23

http://www.epa.gov/airquality/particlepollution/ ...........................................................................23

http://www.legis.nd.gov/information/acdata/html/33-15.html ........................................................5

http://www.ndhealth.gov/aq/PTC.aspx ............................................................................................5

http://www.ndhealth.gov/EHS/FOIA/AQPermits/AQPermitOperating.aspx .............................22

N.D. Admin Code Chapter 33-15-14 ...................................................................................5, 9, 10

## <u>MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>

Plaintiffs Casey and Julie Voigt make much of their alleged inability to have a say in the construction of the Coyote Creek Mine, *see* DE 1 ¶ 11,[1] but they barely mention that the project would have been impossible without their consent. The Coyote Creek Mine is being built on the Voigts' land. The Voigts leased that land to Coyote Creek Mining Company, LLC ("Coyote Creek"), so that Coyote Creek would construct a coal mine on it, and that is exactly what Coyote Creek is doing. *See* DE 1 ¶ 5. Naturally, Plaintiffs knew of Coyote Creek's plans, and they have been apprised of the permitting situation throughout the pendency of Coyote Creek's Permit Application. Despite their prior awareness and involvement in the development of the mine, Coyote Creek's landlords filed a federal lawsuit against Coyote Creek, hoping to interfere with the Coyote Creek Mine's construction, under a provision of the Clean Air Act intended to protect the rights of ordinary citizens who otherwise might have no say with regard to construction projects in the neighborhood. Whatever their motives, there are better ways to resolve a landlord-tenant dispute.

Plaintiffs chose to sue Coyote Creek under Section 304(a)(3) of the Clean Air Act, which authorizes a citizen suit "against any person who proposes to construct or constructs any new or modified major emitting facility *without a permit* required under part C of subchapter I of this chapter (relating to significant deterioration of air quality)[.]" 42 U.S.C. § 7604(a)(3)[2] (emphasis added); DE 1 ¶ 30. But that is not really what Plaintiffs' claim is about. Coyote Creek is not constructing the Coyote Creek Mine without a permit, and Plaintiffs know that. Coyote Creek

---

[1] Throughout this brief, Coyote Creek will cite to record materials according to their Docket Entry (DE) number, and will pin-cite using paragraph numbers, where available, or page numbers, as they are stamped at the top of each document by CM/ECF.

[2] Section 304(a)(3) of the Clean Air Act is codified at 42 U.S.C. § 7604(a)(3). For ease of reference and research, Coyote Creek refers to various provisions of the Clean Air Act according to their codified section numbers throughout this brief.

applied for, and obtained, a Permit to Construct from the North Dakota Department of Health ("NDDH"), the agency tasked with administration of the Clean Air Act's permitting requirements in the State of North Dakota, *see* DE 1 ¶ 24, and it did so before it started construction on the Coyote Creek Mine. Indeed, Plaintiffs attached copies of both the Permit Application and the Permit to Construct as exhibits to their Complaint. *See* DE 1-1; DE 1-2. Coyote Creek is in full compliance with the permit, and Plaintiffs have not alleged otherwise.

Plaintiffs' real concern is that they believe the NDDH granted Coyote Creek the wrong *kind* of permit. They believe that the NDDH should have counted certain additional categories of fugitive emissions when determining the total potential emissions for the Coyote Creek Mine, and that if it had done so, NDDH would have seen that a Major Source Permit, rather than a Minor Source Permit, was required. DE ¶¶ 65-67. But that is not the sort of action that is authorized by 42 U.S.C. § 7604(a)(3), the enforcement provision on which Plaintiffs rely to establish this Court's jurisdiction. That is a collateral attack on a facially valid state-issued Permit to Construct, and this Court lacks the authority to hear it. *See Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010) ("*Otter Tail*"); *CleanCOAlition v. TXU Power*, 536 F.3d 469, 478-79 (5th Cir. 2008). Even if Subsection 7604(a)(3) does authorize this suit, the *Burford* abstention doctrine counsels strongly against resolution of the issue in this forum. *See Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 468, 480-81 (6th Cir. 2004); *NRDC v. BP Prods. N. Am., Inc.*, No. 2:08-CV-204, 2009 U.S. Dist. LEXIS 54363 (N.D. Ind. June 26, 2009). For the foregoing reasons, Coyote Creek respectfully requests a dismissal with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(1).[3]

---

[3] Although the abstention doctrines do not technically limit this Court's subject matter jurisdiction, courts have held that a motion to dismiss based on an abstention doctrine should be brought under Federal Rule of Civil Procedure 12(b)(1). *See, e.g., City of N.Y. v. Milhelm Attea & Bros., Inc.*, 550 F. Supp. 2d 332, 341-42 (E.D.N.Y. 2008).

Finally, even if this Court is persuaded that Subsection 7604(a)(3) does authorize this lawsuit *and* that this Court is the right forum to decide it, the Complaint should still be dismissed because it fails to state a claim. A number of Plaintiffs' legal conclusions—which are not entitled to the presumption of truth—are demonstrably incorrect. When those misstatements are corrected, it becomes clear that most of the categories of emissions which Plaintiffs believe should have been counted towards determining what sort of permit to grant to Coyote Creek in fact should *not* have been counted. Other allegations concerning emissions potential at the Coyote Creek Mine are flatly contradicted by the documents attached to Plaintiffs' Complaint, and Plaintiffs have not even tried to explain the difference. *See Badgerow v. Honeywell Int'l*, 2002 U.S. Dist. LEXIS 25385, *4-5 (D. Minn. Dec. 9, 2002) ("[i]f a document attached to the complaint contradicts the complaint's allegations, the document controls and the court need not accept as true the inconsistent allegations in the complaint."). The remaining factual allegations are pled solely on information and belief, where personal knowledge is required. Ultimately, the few relevant and well-pleaded factual allegations which *are* entitled to the presumption of truth do not "raise a right to relief above the speculative level[.]"*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing 5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1216, pp. 235-236 (3d ed. 2004)). The Complaint, therefore, does not state a claim under the test set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and Coyote Creek respectfully requests a dismissal with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

I.    **BACKGROUND**

   A.    **Clean Air Act Permitting Requirements**

Congress enacted the Clean Air Act Amendments of 1970 "to guarantee the prompt attainment and maintenance of specified air quality standards." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 469 (2004) (internal quotation omitted). Through 42 U.S.C.

§§ 7409 and 7410, it "directed EPA to devise National Ambient Air Quality Standards (NAAQS) limiting various pollutants, which the States were obliged to implement and enforce." *Envtl. Defense v. Duke Energy Corp.*, 549 U.S. 561, 566 (2007). North Dakota has discharged its responsibilities pursuant to the NAAQS Program. The entire State of North Dakota has reached "attainment" status for all criteria pollutants, meaning that there are no regions within the State that fail to satisfy the NAAQS. *See* DE 1 ¶ 16.

Reaching and maintaining attainment status does not mean that a state's responsibilities under the Clean Air Act are finished. "Merely setting emissions limits failed to improve air quality in those areas that had already attained the minimum standards of the NAAQS because polluters had no incentive to diminish emissions below the established limits." *Otter Tail*, 615 F.3d at 1011. So, Congress added the Prevention of Significant Deterioration ("PSD") Program to the Clean Air Act in 1977. The PSD Program is intended "to protect public health and welfare from any actual or potential adverse effect which in the Administrator's judgment may reasonably be anticipated to occur from air pollution … notwithstanding attainment and maintenance of all national ambient air quality standards[.]"42 U.S.C. § 7470.

The PSD Program is a part of the New Source Review ("NSR") Program, another addition to the Clean Air Act, which provides, *inter alia*, that no Major Emitting Facility may be constructed in an attainment area unless "a permit has been issued for such proposed facility in accordance with [the PSD Program] setting forth emission limitations for such facility which conform to the requirements of [the PSD Program.]" 42 U.S.C. § 7475(a)(1). A Major Emitting Facility, for the purposes of this lawsuit, is a stationary source with the Potential to Emit 250 tons or more per year of Particulate Matter. 42 U.S.C. § 7479(1). Just as they were tasked with

attainment and maintenance of the NAAQS, the states have been tasked with the implementation and oversight of the PSD and NSR Programs. 42 U.S.C. § 7471.

Again, North Dakota has discharged its duty. Article 33-15 of the North Dakota Administrative Code, and particularly Chapter 33-15-15,[4] incorporates by reference the federal rules for the PSD Program, as set forth at 40 C.F.R. § 52.21. But it also goes farther than the federal regulations. North Dakota has created an additional class of permit—applicable to "minor" sources, meaning those that do not qualify as a Major Emitting Facility under either state or federal law—and created a set of rules and emissions limitations applicable to those minor sources, which are otherwise not regulated. *See generally* N.D. Admin. Code §§ 33-15-14-01 *through* 33-15-14-07. The North Dakota Department of Health Air Quality Division is responsible for reviewing applications for Permits to Construct and Permits to Operate, and for determining whether a Permit Applicant should be issued a Minor Source or Major Source Permit.[5]

If NDDH determines that a Permit Applicant qualifies as a Major Source—that is, a Major Emitting Facility for purposes of the federal regulations, one with the Potential to Emit 250 tons or more per year of Particulate Matter—then the Permit Applicant will be granted a Major Source Permit, which includes all of the protections that are a part of the federal PSD Program, as those protections have been incorporated by the State of North Dakota. *See* N.D. Admin. Code §§ 33-15-15-01 *through* 33-15-15-02. If NDDH determines that a Permit Applicant does *not* qualify as a Major Source, then it will grant the Permit Applicant a Minor Source Permit, governed by the applicable provisions of North Dakota's State Implementation

---

[4] http://www.legis.nd.gov/information/acdata/html/33-15.html (accessed September 3, 2015).

[5] http://www.ndhealth.gov/aq/PTC.aspx (accessed September 3, 2015).

Plan ("SIP"), the set of state regulations enforcing and expanding upon the protections of the Clean Air Act in North Dakota.

### B.    Factual Background

In a motion to dismiss, the Court may consider the Complaint, as well as any documents attached to it. *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459-60 (8th Cir. 2010) ("documents attached to or incorporated within a complaint are considered part of the pleadings, and a court may look at such documents "'for all purposes,' including to determine whether a plaintiff has stated a plausible claim for relief."). Plaintiffs attached Coyote Creek's Permit Application (DE 1-1) and the Minor Source Permit granted by NDDH (DE 1-2) to their Complaint, and those materials are therefore part of the record for purposes of this motion.

The documents show that in August 2014, Coyote Creek applied to NDDH for a Permit to Construct the Coyote Creek Mine. DE 1-1. Coyote Creek explained, in detail and with reference to numerous legal authorities, which emissions categories were countable towards determining whether a Major Source (Title V) Permit or a Minor Source Permit was required, and which were not. DE 1-1 at 4-6, 9-14. Essentially, federal and state regulations do not count emissions from operations occurring at the "mine face," or from operations occurring between the mine face and the "coal preparation and processing plant." DE 1-1 at 9-13. They *do* count emissions produced by the operation of the "coal preparation and processing plant," however, which begins at the point where coal is loaded into the plant's hopper. *Id*.

The Permit Application also explains the technology that will be incorporated into that coal preparation and processing plant, and the impact that technology will have on the plant's emissions potential:

> [T]he coal is pushed via a dozer into a receiving pocket and apron feeder where it enters the coal processing facility. At this point it undergoes primary and

> secondary crushing, all within enclosed chutes and skirtboards that are considered a passive enclosure containment system (PECS).
>
> *     *     *
>
> Emissions from the coal processing equipment are subject to the control requirements of 40 CFR 60 Subpart Y and will be controlled by enclosures and PECS to mitigate dust formation in the process. Fogging will be used as necessary if it is determined that the PECS is not effective at mitigating dust formation. Effectively, no measureable particulate emissions are expected from the equipment as a result of using these control systems.

DE 1-1 at 5. In sum, the countable emissions potential at the Coyote Creek Mine is negligible. NDDH granted a Minor Source Permit on January 7, 2015. DE 1-2.

Now, Plaintiffs have sued Coyote Creek pursuant to 42 U.S.C. § 7604(a)(3), which authorizes a civil action "against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality [and PSD permits.])" DE 1 ¶ 30. Plaintiffs' invocation of Subsection 7604(a)(3) enforcement authority is misplaced, given that they are not so much concerned about Coyote Creek proceeding *without a permit* as they are about Coyote Creek proceeding with what they mistakenly believe is the *wrong kind of permit*. The Complaint features a series of allegations about the emissions potential at the Coyote Creek Mine. DE 1 ¶¶ 40-45. But the Plaintiffs' dispute is really with the NDDH's legal evaluation of the factual information provided in the Permit Application, not with Coyote Creek's failure to seek and obtain a Permit to Construct in the first place.

## II.   ARGUMENT

This lawsuit should be dismissed with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

First, this action is not authorized by 42 U.S.C. § 7604(a)(3). This is a collateral attack on a facially valid state-issued Permit to Construct, and this Court lacks the authority to hear it.

-7-

Second, even if Subsection 7604(a)(3) does authorize this suit, the *Burford* abstention doctrine counsels strongly against its resolution in this forum.

Third, Plaintiffs have failed to state a claim upon which relief may be granted. In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court promulgated a two-pronged approach to the consideration of a motion to dismiss: first, the Court determines which of Plaintiffs' allegations are actually entitled to the presumption of truth; then, it determines whether those allegations make out a plausible claim for relief. Very few of Plaintiffs' factual allegations are entitled to the presumption of truth, and the others are speculative, at best.

**A.      The Court Does Not Have Subject Matter Jurisdiction**

This Court lacks jurisdiction because this sort of collateral attack is not authorized by the Clean Air Act's citizen suit provisions. Even if it were, the *Burford* abstention doctrine counsels in favor of dismissal. Federal Rule of Civil Procedure 12(b)(1) authorizes the dismissal of a complaint over which the district court lacks subject matter jurisdiction.

**1.      A Collateral Attack on a State-Issued Permit is Not Authorized by 42 U.S.C. § 7604(a)(3).**

Plaintiffs claim jurisdiction under 42 U.S.C. § 7604(a)(3), a provision of the Clean Air Act which authorizes a civil action "against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality [and PSD permits.])" DE 1 ¶ 30. But it is the substance, not the form, of a plaintiff's claims that matters for purposes of determining jurisdiction. *Velocity Express Corp. v. Bayview Capital Partners*, *L.P.*, 2002 U.S. Dist. LEXIS 8522, *7 (D. Minn. May 9, 2002). Upon examination, the claim in this case is not what it pretends to be. It is a collateral attack on a facially valid Permit to Construct, over which this Court has no jurisdiction.

Coyote Creek applied to the NDDH for a Permit to Construct consistent with the requirements of state and federal law, based on its understanding of the emissions potential at the Coyote Creek Mine. That was the correct procedure. The NDDH is responsible for the implementation of the Clean Air Act's permitting requirements within the State of North Dakota. *See* 42 U.S.C. § 7471; N.D. Admin. Code § 33-15-15-01 *et seq.*; N.D. Admin. Code § 33-15-14-02. Ultimately, NDDH issued a permit that it believed was consistent with the requirements of state and federal law, based on the information provided by Coyote Creek. Plaintiffs do not contest that point. In fact, they concede it (DE 1 ¶ 67), and the permit is attached to the Complaint. DE 1-2. Plaintiffs are therefore not suing Coyote Creek for constructing the Coyote Creek Mine *without* a Permit to Construct; they are suing Coyote Creek for constructing the Mine *with* a Permit to Construct that is based on a legal interpretation by NDDH which Plaintiffs believe to be wrong. Plaintiffs believe that a permit application using *their* interpretation of the legal standard for calculating potential emissions would have triggered Major Source Permit requirements, and that the Minor Source Permit issued by NDDH is therefore deficient. DE 1 ¶¶ 66-67.

That is not a subsection (a)(3) lawsuit. Instead, it is a collateral attack on a facially valid state-issued Permit to Construct. And no part of the Clean Air Act authorizes such an action. In *CleanCOAlition v. TXU Power*, 536 F.3d 469, 478-79 (5th Cir. 2008), the Fifth Circuit explained:

> The district court held that § 7604(a)(3) does not authorize preconstruction citizen suits against facilities that have either obtained a permit or are in the process of doing so. Instead, the district court interpreted that section as authorizing citizen suits when an entity proposes to construct or constructs a facility *without a permit whatsoever.* We agree with the district court's interpretation. Appellants interpret the phrase "without a permit" to mean "without a permit that complies with the [Clean Air Act]." However, *we decline to rewrite the plain language of the statute.*

Here, not only has TXU applied for a permit, it has since successfully obtained one, though still subject to state judicial review.

Thus, it can hardly be said—as Appellants must in order for § 7604(a)(3) to apply—that TXU is proposing to construct or constructing a facility "without a permit." *See Ogden Projects v. New Morgan Landfill Co.*, 911 F. Supp. 863, 867-68 (E.D. Pa. 1996) (indicating that § 7604(a)(3) authorizes citizen suits when facility is proposing to construct plant without a permit at all); *see also Heisen v. Pacific Coast Bldg. Prods., Inc.*, No. 93-16213, 1994 U.S. App. LEXIS 14337, 1994 WL 250029, *1 (9th Cir. Jun. 9, 1994) (unpublished) (rejecting attempt to utilize § 7604(a)(3) to collaterally attack issuance of permit by alleging that facility submitted fraudulent information to obtain it). In short, we agree with the district court that *§ 7604(a)(3) does not authorize preconstruction citizen suits against facilities that have either obtained a permit or are in the process of doing so*.

*Id*. (emphasis added); *see also Mississippi River Revival, Inc. v. EPA*, 107 F. Supp. 2d 1008, 1015 (D. Minn. 2000) (holding that the Clean Water Act citizen suit provision, which was modeled after the Clean Air Act citizen suit provisions, "does not authorize jurisdiction for an action challenging the contents of a permit application").

The Eighth Circuit agrees with the Fifth Circuit. In *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010), the Eighth Circuit set forth two compelling reasons why a collateral attack on a facially valid, state-issued Permit to Construct cannot be filed in a federal district court.

*First*, the Eighth Circuit explained the procedural justification for the bar on collateral attacks: For individuals in the Plaintiffs' position, the exclusive remedy lies elsewhere. *Otter Tail*, 615 F.3d at 1020-1023. The state's Permit to Construct program for minor sources is a part of the EPA-approved State Implementation Plan for North Dakota. *See* N.D. Admin Code Chapter 33-15-14. Pursuant to that program, NDDH determined that the Coyote Creek Mine is a minor source and does not require a PSD permit. Plaintiffs could have challenged that decision during the administrative process, or they could have sought judicial review in the North Dakota

Courts. *See* N.D.C.C. § 23-01-36.[6] Plaintiffs are well aware of the procedures for seeking judicial review of administrative action in North Dakota. They are presently involved in a state-court lawsuit seeking to have Coyote Creek's Surface Coal Mining Permit rescinded or revoked. *See* Ex. B., Melchior Declaration, ¶¶ 6-7. But Plaintiffs failed to seek state-court judicial review with respect to the NDDH Permit to Construct, and the NDDH decision has therefore become final. Allowing the Plaintiffs to seek review of the NDDH determination *now*, in federal court, *after* the State review process has concluded, is the same kind of collateral attack that *Otter Tail* expressly prohibits. Because Plaintiffs did not avail themselves of the appropriate procedures for challenging the NDDH permitting decision, they cannot bring a collateral attack in federal court. *Otter Tail*, 615 F.3d at 1022.

*Second*, the Eighth Circuit explained the policy justification behind the bar on collateral attacks. To allow individuals to collaterally attack state-agency permitting decisions after the permits are already issued, the permitting process is closed, and construction has begun, would be uneconomical and would make the CAA division-of-labor scheme unworkable. "[S]uch a scheme could lead to simultaneous suits by multiple parties raising the same or similar issues … [which would] not only waste judicial resources, but could also result in inconsistent decisions." *Otter Tail*, 615 F.3d at 1022. Moreover, "to allow plaintiffs to raise issues resolved during the permitting process long after that process is complete would upset the reasonable expectations of facility operators and undermine the significant investment of regulatory resources made by state permitting agencies." *Id*. (citing *United States v. AM Gen. Corp.*, 34 F.3d 472, 475 (7th Cir.

---

[6] The Complaint tries to get around this point by alleging a lack of notice or an opportunity to comment, but Plaintiffs' pleas of ignorance are belied by the facts. The attached Exhibit A consists of emails exchanged by Plaintiffs' counsel with NDDH during the pendency of Coyote Creek's Permit Application. These emails show unequivocally that Plaintiffs had notice of proceedings before NDDH before any decision was made, and they are within the scope of this Court's review with respect to the jurisdiction question. *See Drevlow v. Lutheran Church, Missouri Synod*, 991 F.2d 468, 470 (8th Cir. 1993) (holding that a district court has the authority to consider matters outside the pleadings on a motion challenging subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)).

1994)). The Eighth Circuit refused to accept an interpretation of the Clean Air Act that led to such nonsensical and inefficient results. *Id*.

The policy justification for the *Otter Tail* ban on collateral attacks applies with special force in this case. Plaintiffs have intentionally sandbagged Coyote Creek. Plaintiffs clearly knew about Coyote Creek's plans for the Coyote Creek Mine even before the Permit Application was submitted: Plaintiffs are Coyote Creek's landlords. And Plaintiffs cannot possibly dispute that they knew the nature of the Permit Application and were familiar with its contents *before* NDDH granted the Permit to Construct, as evidenced by the attached correspondence from January 2015 between Plaintiffs' counsel and the NDDH regarding the Permit Application. *See* Ex. A. Yet Plaintiffs took *no* action to contest the Permit Application during the administrative review process, nor did they seek judicial review in State court within the time allotted by law. *See* N.D.C.C. § 23-01-36. Instead, they waited.

Now, Plaintiffs have suddenly decided they *do* have a problem with the NDDH decision to grant a Minor Source Permit to Construct, at a time when they acknowledge that construction of the Coyote Creek Mine in reliance on the validly-issued Minor Source Permit is already underway. DE 1 ¶ 57. They are right about that; Coyote Creek has already invested substantial resources on this project in reliance on the finality that the state permitting process is designed to provide. To date, it has spent approximately $121 million in constructing the surface coal mine and related facilities, and it anticipates spending approximately $58 million more between September 2015 and May 2016. Ex. B ¶ 13. Coyote Creek estimates it will expend approximately $180 million to fully construct the surface coal mine and related facilities. Ex. B ¶ 13. If *Otter Tail* stands for anything, it is the proposition that this sort of procedural gamesmanship is not within the purview of the citizen suit provisions of the Clean Air Act, and

for good reason. 615 F.3d at 1022. It would be inequitable to allow Plaintiffs to try to invalidate Coyote Creek's permit *after* the Permit to Construct has already been granted and construction in reliance on it has already begun, when they could easily have taken action much sooner and in a more appropriate venue.

To be sure, some cases suggest that Subsection (a)(3) claims *are* available to challenge an allegedly erroneously-issued Minor Source Permit, but those cases are neither binding nor persuasive here. *See, e.g., Weiler v. Chatham Forest Prods.*, 392 F.3d 532 (2d Cir. 2004). *Weiler*, for example, was decided several years before the Eighth Circuit took a clear position on the issue in *Otter Tail*, and it provides no rebuttal to the policy concerns underlying the Eighth Circuit's decision. *Otter Tail*, 615 F.3d at 1022. The Clean Air Act establishes a carefully balanced division of state and federal responsibilities for the issuance of construction permits, and the Complaint seeks to undermine the state's role in that balance while punishing Coyote Creek for its valid, legal and reasonable reliance on the results of the state permitting process. That is impermissible. *Otter Tail*, 615 F.3d at 1022.

In summary, Plaintiffs' collateral attack on NDDH's decision to issue a facially-valid Permit to Construct to the Coyote Creek Mine is not a Subsection (a)(3) claim. This Court therefore lacks subject matter jurisdiction. *See CleanCOALition*, 536 F.3d at 478 (holding failure to prove that case fell within bounds of § 7604(a)(1) or (a)(3) meant "that subject matter jurisdiction is lacking in this case"). Coyote Creek respectfully requests dismissal pursuant to Rule 12(b)(1).

### 2.    Even if Subsection 7604(a)(3) Does Authorize this Claim, Abstention is Warranted under the *Burford* Doctrine.

Even if the Court were to conclude that Subsection (a)(3) authorizes claims like this one, the Court should still refuse to hear this collateral attack on a facially valid state-issued Permit to

Construct because it raises serious federalism concerns. *NRDC v. BP Prods. N. Am., Inc.*, No. 2:08-CV-204, 2009 U.S. Dist. LEXIS 54363 (N.D. Ind. June 26, 2009), is instructive. The defendant there obtained a Minor Source Permit to Construct from the Indiana Department of Environmental Management ("IDEM") in advance of a modification to its oil refinery in Whiting, Indiana. NRDC and several other organizations called into question BP's emissions estimates during the permitting process, but IDEM granted the Minor Source Permit anyway. The district court followed *Weiler*[7] and held that NRDC's citizen suit was authorized by 42 U.S.C. § 7604(a)(3). *Id.* at *21-22. The district court then proceeded, however, to consider various abstention doctrines. It noted that "[t]he Supreme Court has 'held that federal courts may decline to exercise their jurisdiction, in otherwise exceptional circumstances, where denying a federal forum would clearly serve an important countervailing interest.'" 2009 U.S. Dist. LEXIS 54363 at *23-24 (citing *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996)). Those interests include considerations of proper constitutional adjudication, regard for federal-state relations, and judicial economy. *Id.* at *24.

The district court considered two separate abstention doctrines—*Burford*[8] and *Colorado River*[9]—and found that abstention was warranted under both. It ultimately dismissed the case. *Id.* at *52. The district court's *Colorado River* analysis is probably distinguishable because there is no pending state litigation proceeding parallel to this lawsuit.[10] But its *Burford* analysis is on

---

[7] *Otter Tail* had not yet been decided.

[8] Derived from *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

[9] Derived from *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).

[10] There is certainly *related* state-court litigation pending: Plaintiffs' challenge to Coyote Creek's Surface Coal Mining Permit in *Casey Voigt vs. North Dakota Public Service Commission and Coyote Creek Mining Company, L.L.C.*, Case No. 08-2015-CV-01056. Ex. B ¶ 7. And while the mining permit challenge is probably not "parallel" to this litigation in the technical Colorado River sense, the presence of related aspects of this same landlord-tenant dispute in state court weighs in favor of *Burford* abstention.

point, given the factual similarities between this case and that one. The judge began by noting the

Supreme Court's general test for *Burford* abstention:

> Where timely and adequate state-court review is available, a federal court sitting
> in equity must decline to interfere with the proceedings or orders of state
> administrative agencies: (1) when there are difficult questions of state law bearing
> on policy problems of substantial public import whose importance transcends the
> result in the case then at bar; or (2) where the exercise of federal review of the
> question in a case and in similar cases would be disruptive of state efforts to
> establish a coherent policy with respect to a matter of substantial public concern.

2009 U.S. Dist. LEXIS 54363 at *26-27 (quoting *New Orleans Pub. Serv., Inc. v. Council of*

*New Orleans*, 491 U.S. 350, 361 (1989) (quotation marks and citations omitted)). The judge then

noted that Indiana had "acted to achieve its own environmental goals" by enacting a scheme that

was even more comprehensive than the federal regulations—not least in that it included a new

category of permits, those issued to "minor" sources, which was entirely a creature of state law

and which had no federal-law analogue. *Id*. at *27-30. And Indiana had "concentrate[d] its

technical evaluation of pollution permit applications in an expert agency"—the IDEM. *Id*. at *29.

In short, "Indiana ha[d] devised a complex agency and judicial framework for evaluating permit

applications that [was] designed to both provide expert analysis of the applications and maintain

uniformity." *Id*.

Given the foregoing, the judge summed up the problem with NRDC's theory of the case:

> In the end, the NRDC wants me to second-guess the IDEM's expert application of
> Indiana law with respect to BP's permit request. This is nothing more than a
> collateral attack on the IDEM's permit decision.

2009 U.S. Dist. LEXIS 54363 at *30. And a collateral attack, as previously discussed, is

impermissible, for all of the policy reasons outlined by the Eighth Circuit in *Otter Tail*:

> To allow it would be to gut the carefully crafted system that Indiana has put in
> place. What is the point of having an expert agency appeals process—or a state
> court appeals process—if litigants can simply side-step it by turning to the federal
> courts?

-15-

*Id*. Ultimately, a plaintiff's disagreement with the result of the state-agency permitting process needs to be addressed in the appropriate state forum. It is not a matter for resolution in the federal courts:

> The bottom line is this: the NRDC thinks the IDEM got the call wrong. It may have. But the proper remedy is through the Indiana regulatory and state court process; otherwise there is an impermissible risk of disrupting the Indiana's attempt to ensure uniformity.
>
> \*       \*       \*
>
> [A]ny attempt to litigate those issues here and now would smother the delicate federalism concerns that underlie *Burford*. So I believe the best course is to restrain from exercising my jurisdiction.

*Id*. at \*30-32 (internal citations and markup omitted).

Thus, whether the Court decides that this action is an impermissible collateral attack barred by *Otter Tail*, or it finds that abstention is warranted as the district court did in *BP Products*, the same federalism considerations call for the dismissal of this case. Plaintiffs have given no indication why the state-court judicial or administrative review processes would have been insufficient. And Plaintiffs are asking this Court to decide that the NDDH—the State's expert on the subject matter—was: (1) *wrong* to agree with Coyote Creek about which emissions should and should not be counted in determining whether the Coyote Creek Mine is a major source; (2) *wrong* in determining the volume of the emissions it did count; and (3) *wrong* about what kind of Permit to Construct to issue under a complicated regulatory scheme designed by the State of North Dakota specifically for implementation by NDDH, and by no other entity or agency.  Plaintiffs do so even though they leased the surface and coal to Coyote Creek's parent company, yet are pursuing state court litigation to invalidate Coyote Creek's mining permit.  Ex. B ¶¶ 3, 7.

The question is not whether this Court is *capable* of answering those questions. Surely, it is. The question is whether this Court *should* be answering those questions, or if they are better left to state administrative and judicial processes. The answer under the *Burford* doctrine is clear: federal courts will not hear collateral attacks on facially valid state-issued permits.

Finally, although the district judge deciding *BP Products* has provided the most straightforward language on this issue, that is not the only case holding that *Burford* abstention is warranted under the circumstances. The Sixth Circuit reached the same conclusion when faced with a Subsection (a)(3) attack on a "non-PSD" permit in *Ellis v. Gallatin Steel Company*, and similarly concluded that *Burford* abstention was warranted. *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 468, 480-81 (6th Cir. 2004). It acknowledged *Weiler*, and other cases standing for the proposition that a citizen may sue any person who constructs a major emitting facility without first obtaining *any* permit, but differentiated cases in which a state permitting authority affirmatively determined that only a state-law Minor Source Permit was required:

> [T]he question in this case is not whether citizens may sue companies that fail to obtain a PSD permit; they may and *Burford* abstention rarely will present an obstacle to those claims. The question here is *whether a PSD permit was required (and what type of permit was required)* in the setting of these associated plants. All we thus decide in this unusual context—where the state has supplied a concentrated and comprehensive review process that is currently addressing the very subject of these federal claims—is that *Burford* counsels abstention. Neither *Weiler* nor [*Ass'n to Protect Hammersley v. Taylor Res.*, 299 F.3d 1007 (9th Cir. 2002)] rejected, let alone considered, *Burford*'s application in this setting.

*Ellis*, 390 F.3d at 481 (emphasis added); *accord Sugarloaf Citizens Ass'n v. Montgomery County*, 1994 U.S. App. LEXIS 21985 (4th Cir. 1994) (ruling reported at 33 F.3d 52) (engaging in a similar *Burford* analysis in a Clean Air Act suit). Like *Ellis*, this is a case where "the question … is whether a PSD permit was required (and what type of permit was required)[.]" 390 F.3d at 481. Coyote Creek is spending many millions of dollars to construct a coal mine

pursuant to permits issued by state regulators, to supply coal to a power plant in the state of North Dakota.  Like *Ellis*, this is a case where *Burford* abstention is warranted.

### B.      The Complaint Fails to State a Claim against Coyote Creek

The Complaint must also be dismissed under Federal Rule of Civil Procedure 12(b)(6), because it fails to state a claim upon which relief can be granted. As noted earlier, the Supreme Court has set forth a "two-pronged approach" to evaluating a Rule 12(b)(6) motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). First, a court should "identify[] the allegations in the complaint that are not entitled to the assumption of truth." *Id.* at 680. Those allegations are discarded. Then, "[w]hen there *are* well-pleaded factual allegations, a court should assume their veracity and … determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679 (emphasis added).

The Complaint in this case is long on speculation and legal conclusions, but short on well-pleaded factual allegations. Indeed, *none* of the central factual allegations qualifies as well-pleaded. Even when the Complaint is stripped down to the few allegations that come close, and when those allegations are assumed true, the Complaint does not "raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citing 5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1216, pp. 235-236 (3d ed. 2004)).

### 1.      *Iqbal* Step One—Determining Which Factual Allegations are Well-Pleaded

The first step in the *Iqbal* analysis is to identify the allegations in the Complaint that are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 680. That includes legal conclusions, whether couched as factual allegations or standing alone. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). It also includes any "formulaic recitation of the elements of a cause of action," as well as

any "factual allegations [which are] so indeterminate that they require 'further factual enhancement' in order to state a claim." *Braden*, 588 F.3d at 594 (quoting *Iqbal*, 556 U.S. at 667; *Twombly*, 550 U.S. at 557). Courts may likewise disregard pleadings that do not rise above the level of "labels and conclusions" or "naked assertions." *Iqbal*, 556 U.S. at 667. And, finally, "[i]f a document attached to the complaint contradicts the complaint's allegations, the document controls and the court need not accept as true the inconsistent allegations in the complaint." *Badgerow v. Honeywell Int'l*, 2002 U.S. Dist. LEXIS 25385, *4-5 (D. Minn. Dec. 9, 2002) (citing *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991); *Sazerac Co. v. Falk*, 861 F. Supp. 253, 257 (S.D.N.Y. 1994)).[11]

When the foregoing principles are applied to the Complaint in this case, the absence of a valid basis for this lawsuit becomes clear. Many of Plaintiffs' allegations are legal conclusions, and some of those legal conclusions are flat wrong. Because of that, a number of Plaintiffs' factual allegations concerning potential emissions are irrelevant to determining whether or not the Coyote Creek Mine requires a Major Source Permit. Furthermore, none of the factual allegations concerning potential emissions which *are* relevant are well-pleaded. One is directly contradicted by the documents attached to the Complaint, which provides no justification for the discrepancy. Others are pleaded solely on information and belief where personal knowledge is required. In short, the allegations are insufficient to withstand a plausibility analysis.

---

[11] *See also Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998); *Perkins v. Silverstein*, 939 F.2d 463, 469 n.4 (7th Cir. 1991); *Olpin v. Ideal Nat. Ins. Co.*, 419 F.2d 1250, 1255 (10th Cir. 1969); *Honess 52 Corp. v. Town of Fishkill*, 1 F. Supp. 2d 294, 300 (S.D.N.Y. 1998); *Dames & Moore v. Baxter & Woodman, Inc.*, 21 F. Supp. 2d 817, 823 (N.D. Ill. 1998); *Williams v. Gusky (In re President Casinos, Inc.)*, 502 B.R. 841, 848 (Bankr. E.D. Mo. 2013).

(a)     **Erroneous Legal Conclusions Are Not Entitled to Presumption of Truth.**

The Complaint includes a number of erroneous legal conclusions, some standing alone and some alleged as though they are facts. Two in particular bear on the issue at the heart of the Complaint: whether or not the Coyote Creek Mine is a Major Emitting Facility under the Clean Air Act and analogous North Dakota rules and regulations, and whether the NDDH should therefore have granted Coyote Creek a Major Source Permit to Construct.

The first is found in Paragraph 29:

> Pursuant to 40 C.F.R. § 52.21(b)(1)(iii)(aa), fugitive emissions from all facilities located at [a coal preparation and processing plant that processes more than 181 megagrams (Mg) of coal per day] (including but not limited to open storage piles, coal crushing plants, conveyer belts, transfer points, trucks at the source, and loading and unloading operations at the source) must be calculated in a facility's Potential to Emit.

DE 1 ¶ 29. A statement about what the federal regulations do and do not require is not a factual allegation. It is a legal conclusion. *See Like v. Carter*, 448 F.2d 798, 802 (8th Cir. 1971) (categorizing "the interpretation … of … state and federal statutes and regulations" as "questions of law"). That means it is not entitled to the presumption of truth. *Braden*, 588 F.3d at 594.

Indeed, Plaintiffs' legal conclusion is incorrect. The regulation cited by Plaintiffs simply provides that "fugitive emissions"[12] from certain categories of operations at a stationary source shall be counted, along with all other relevant potential emissions, in determining whether that stationary source qualifies as a Major Emitting Facility. *See* 40 C.F.R. § 52.21(b)(1)(iii). One of those categories is operations at a "coal preparation and processing plant." 40 C.F.R. §

---

[12] 40 C.F.R. 51.166(b)(20) defines "fugitive emissions" as "those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening."

52.21(b)(1)(iii)(aa).[13] Thus, "fugitive emissions" generated by operations at the coal preparation and processing plant located at the Coyote Creek Mine must be counted for purposes of determining whether the Coyote Creek Mine is a Major Emitting Facility requiring a Major Source Permit to Construct. That is unremarkable. DE 1-1 at 11. [14]

But Plaintiffs depart from the regulations—and attempt to create more favorable law out of thin air—with their parenthetical list of particular operations for which fugitive emissions must be calculated. Many of those operations occur *before* coal is loaded into the hopper for the coal preparation and processing plant, and thus are contrary to what the regulations actually say. The regulations provide that operations at the mine face are not a part of the coal preparation and processing plant. 40 C.F.R. § 60.251(f) ("Equipment located at the mine face is not considered to be part of the coal preparation and processing plant."). Likewise, operations, transportation, and storage that occur *between* the mine face and the point-of-entry to coal processing machinery are not a part of the "coal preparation and processing plant," either. To the contrary, the EPA has said that the coal preparation and processing plant begins wherever "coal unloading that involves conveying coal to plant machinery" takes place. DE 1-1 at 12 (quoting US EPA, "Standards of Performance for Coal Preparation and Processing Plants (40 CFR 60 subpart Y); Response to Comments Received on Proposed Amendments (Published April 28, 2008; 73 FR 22901) and Supplemental Proposal (Published May 27, 2009; 74 FR 25304)," September 2009). Or, put

---

[13] The cited regulation provides that fugitive emissions are countable for "[a]ny other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act," and that includes coal preparation and processing plants, which are regulated under Subpart Y.

[14] The primary activity at Coyote Creek Mine is mining, and coal mining is not on the list of operations for which fugitive emissions should be counted. 40 C.F.R. § 52.21(b)(1)(iii). But the EPA has made clear that although the principal activity of a stationary source may not be covered by a listed source category, fugitive emissions shall be included from those units within the source that *are* covered by a listed source category. DE 1-1 at 6 (citing March 6, 2003, letter from Ms. Cheryl Newton of US EPA to Ms. Janet McCabe of Indiana Department of Environmental Management). Coyote Creek therefore agrees with the Plaintiffs that fugitive emissions from the coal preparation and processing plant must be counted.

another way, the coal preparation and processing plant begins at the point of "coal unloading into the first hopper 'downstream' from any form of transportation[.]" DE 1-1 at 13 (quoting the same document).

The Plaintiffs have offered *no* legal authority for including fugitive emissions before the point-of-entry to the "coal preparation and processing plant," like those allegedly emanating from open storage piles prior to hopper loading, in the calculation of total potential emissions produced by that "coal preparation and processing plant." That is because no such legal authority exists. In contrast, it is not as though the interpretation of the law followed by Coyote Creek and the NDDH was unusual, innovative, or unexpected. To the contrary, *all* of the coal mines in North Dakota are constructed or operated with Minor Source Permits for the exact same reasons.[15] The Court is free to disregard Plaintiffs' misstatement of the law, and to apply the settled law correctly. *Braden*, 588 F.3d at 594.

The *only* factual allegations in the Complaint that clearly pertain to fugitive emissions occurring *in* the coal preparation and processing plant, as that term is actually defined by the EPA in regulations and interpretive rulings, are found in Paragraphs 41 (unloading operations into the coal preparation and processing plant), 44 (primary crusher and secondary crusher), and 45 (conveyer belts and transfer points). *See* DE 1 ¶¶ 41, 44-45. Paragraphs 40, 42 and 43 on the other hand, appear to pertain to activities taking place at the open storage pile, or between the open storage pile and the unloading point, which is where the coal preparation and processing plant actually begins. *See* DE 1 ¶¶ 40, 42-43; DE 1-1 at 12. They are therefore irrelevant, and alleged fugitive emissions produced by those activities have nothing to do with whether or not the Coyote Creek Mine is a Major Emitting Facility requiring a Major Source Permit to

Synthetic Minor Source Permit to Operate); Permit No. O81011 (Beulah Coal Mine's True Minor Source Permit to Operate); and Permit No. O85004 (Freedom Mine's Synthetic Minor Source Permit to Operate) (all accessible through the search function at http://www.ndhealth.gov/EHS/FOIA/AQPermits/AQPermitOperating.aspx).

Construct. With the irrelevant emissions amounts alleged in Paragraphs 40, 42 and 43 removed from the total calculated by Plaintiffs in Paragraph 46, Plaintiffs have alleged that total uncontrolled fugitive emissions at the Coyote Creek Mine will be between 701.47 tons per year and 3911.8 tons per year—a substantially smaller figure than Plaintiffs originally alleged. *See* DE 1 ¶¶ 41, 44-45 (figures added together).

Another misstatement of the law occurs in Paragraph 22. Plaintiffs state that "Particulate Matter ('PM'), Particulate Matter equal to or less than 10 microns ('$PM_{10}$'), and Particulate Matter equal to or less than 2.5 microns ('$PM_{2.5}$') are three separate and distinct Regulated NSR Pollutants." DE 1 ¶ 22. Again, Plaintiffs state a legal conclusion without any supporting citation. What is and is not a separate and distinct Regulated NSR Pollutant under the Clean Air Act is a question of statutory and regulatory interpretation, and is therefore a question of law. *Like*, 448 F.2d at 802. And again, Plaintiffs are giving this Court the wrong impression. PM, $PM_{10}$, and $PM_{2.5}$, in the way Plaintiffs have described them, are "separate and distinct" pollutants only in the way that polygons, rectangles, and squares are separate and distinct shapes. Every unit of $PM_{2.5}$ is subsumed within a unit of $PM_{10}$ and PM, and every unit of $PM_{10}$ must also be a unit of PM.

In truth, "Particulate Matter" is one of the six Criteria Air Pollutants for which National Ambient Air Quality Standards (NAAQS) have been set.[16] The EPA groups Particulate Matter into two categories: "Indelible coarse particles," which Plaintiffs call $PM_{10}$, are larger than 2.5 microns and smaller than 10 microns in diameter—*not* simply smaller than 10 microns in diameter;[17] "Fine particles," which Plaintiffs call $PM_{2.5}$, are 2.5 micrometers in diameter and

---

[16] http://www.epa.gov/air/urbanair/ (last accessed 8/25/2015).

[17] http://www.epa.gov/airquality/particlepollution/ (last accessed 8/25/2015).

smaller.[18] When the EPA sets out standards to govern emissions from the two categories, it makes clear that indelible coarse particles and fine particles are both *subsets* of the category "Particulate Matter"; they are *not* "separate and distinct."[19]

Thus, even under a *proper* understanding of the relationship between the three categories, to count a unit of $PM_{2.5}$ emissions, or a unit of $PM_{10}$ emissions, as a unit *additional to* any total measure of PM emissions would be a mistake, for purposes of calculating the weight or volume of total Particulate Matter emissions. That is because a total measure of "PM" emissions *is* a measure of total Particulate Matter emissions, including both $PM_{10}$ and $PM_{2.5}$, and to count a unit from either subcategory as additional emissions would be double-counting. Moreover, Plaintiffs' version of the scheme—which is *not* proper—creates even more potential for error. Because Plaintiffs do not understand the 2.5-micron lower bound on the size of a particle of $PM_{10}$ pollution, any $PM_{2.5}$ pollution is liable to be *triple*-counted when Plaintiffs calculate "total PM emissions."

Unsurprisingly, Plaintiffs provide no detail at all to support their conclusory allegations concerning the amount of potential PM emissions attendant to various operations at the Coyote Creek Mine. DE 1 ¶¶ 40-45. That makes it impossible for this Court to excise any potentially deficient allegations founded on Plaintiffs' erroneous understanding of the PM categories. But it does make Plaintiffs' PM emissions estimates inherently suspect, which will be germane to the eventual plausibility analysis. *McDonough v. Anoka Cnty.*, __ F.3d __, 2015 U.S. App. LEXIS

---

[18] *Id.*

[19] *See, e.g.*, 40 C.F.R. § 52.21(b)(23)(i), which defines "significant" emissions potential, in the context of particulate matter, to mean 25 tpy of total particulate matter emissions, 15 tpy of $PM_{10}$ emissions, or 10 tpy of direct $PM_{2.5}$ emissions. The figures show the relationship between the categories. 10+15=25, which is reflective of the fact that a measure of total PM emissions will *already* account for all $PM_{10}$ and $PM_{2.5}$ emissions. There is no need to count them separately.

14672, *40 (8th Cir. Aug. 20, 2015) ("courts must assess the plausibility of plaintiffs' grounds for relief by drawing on their own 'judicial experience and common sense.'" (citing *Iqbal*)).

**(b)**     **Conclusory Allegations Contradicted by Documents Attached to the Plaintiffs' Complaint are Not Entitled to the Presumption of Truth.**

The most baffling assertion in the Plaintiffs' Complaint appears in Paragraph 44. There, Plaintiffs allege that "uncontrolled PM from the primary crusher and secondary crusher will be between 700.8 tons per year and 1,927.2 tons per year." DE 1 ¶ 44. This assertion is flatly contradicted by the documents attached to the Complaint. In its Permit Application, Coyote Creek explained:

> Once the coal is brought to the processing facility, it is unloaded onto an open storage pile. From the pile the coal is pushed via a dozer into a receiving pocket and apron feeder where it enters the coal processing facility. At this point it undergoes primary and secondary crushing, all within enclosed chutes and skirtboards that are considered a passive enclosure containment system (PECS). After crushing, the coal is transferred to a conveyer belt that is owned and operated by Coyote Station, at which point it is no longer considered part of the CCMC permit.

*     *     *

> Emissions from the coal processing equipment are subject to the control requirements of 40 CFR 60 Subpart Y and will be controlled by enclosures and PECS to mitigate dust formation in the process. Fogging will be used as necessary if it is determined that the PECS is not effective at mitigating dust formation. Effectively, no measureable particulate emissions are expected from the equipment as a result of using these control systems.

DE 1-1 at 5. Thus, the potential for PM emissions from "the primary crusher and secondary crusher" will not "be between 700.8 tons per year and 1,927.2 tons per year." DE 1 ¶ 44. It will be zero.

Rather than confronting this fact in their Complaint and alleging that the planned PECS will be inadequate, or alleging that Coyote Creek's statements about the PECS were somehow misleading, Plaintiffs say nothing about the PECS in their Complaint (despite attaching the

-25-

Permit Application to their pleading). They simply ignored it. It is well-settled that documents attached to a complaint "may be considered for all purposes, including determining whether the complaint states a claim for relief." *Moore v. Bertsch*, No. 1:09-CV-027, 2009 U.S. Dist. LEXIS 63202, *15 n.7 (D.N.D. July 1, 2009) (citing *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002) (court may consider documents attached to a complaint that indicate the plaintiff has no claim)). And when conclusory allegations are contradicted by those documents, "the document controls[.]" *Badgerow*, 2002 U.S. Dist. LEXIS at *4-5; *see also Yellen v. Hake*, 437 F. Supp. 2d 941, 954 (S.D. Iowa 2006) (citing *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998)); FN 9, *supra*.

Plaintiffs' claim that the primary and secondary crusher at the Coyote Creek Mine coal preparation and processing facility will produce astronomical PM emissions figures is a textbook "conclusory allegation." It is made solely upon "information and belief," and the figures come with no explanation whatsoever. That claim is also contradicted by Plaintiffs' own attachments. The Paragraph 44 allegation should therefore be discarded, and for purposes of this motion the potential emissions from that phase of the operation should be assumed to be zero, as Plaintiffs' uncontroverted exhibits show. With the Paragraph 44 emissions removed from the total PM emissions calculations in Paragraph 46, all that remains is a claim that the Coyote Creek Mine should have obtained a Major Source Permit to Construct because the coal preparation and processing plant will produce between *0.67 and 1,984.6 tons per year* in total uncontrolled PM emissions (the threshold is 250 tons).[20] DE 1 ¶¶ 41 and 45 (added together). Those amounts are alleged solely on "information and belief," not on personal knowledge. And, given the Plaintiffs'

---

[20] As demonstrated by the documents attached to the Complaint, Coyote Creek has concluded that emissions of PM from the processing plant will be far less than 250 tons per year, and NDDH found that this conclusion was accurate. Under *Iqbal*, a conclusory allegation in the pleading is not enough to overcome the detail findings and conclusions reflected in the permit materials attached to the Complaint.

faulty understanding of the relationship between PM, $PM_{2.5}$, and $PM_{10}$, some or all of that amount may be double- or triple-counted.

> **(c)     Pleading Central Factual Allegations on "Information and Belief" is Inadequate.**

Plaintiffs' remaining factual allegations concerning emissions—indeed, *all* of Plaintiffs' factual allegations concerning emissions—are pled solely on the basis of "information and belief." *See* DE 1 ¶¶ 40-46. In other words, none of them is based on personal knowledge. In the Eighth Circuit, after *Iqbal*, it is not sufficient to plead critical factual allegations on the basis of information and belief. *See, e.g., Richter v. Fannie Mae*, 553 Fed. Appx. 655, 657 (8th Cir. 2014); *Vollmer v. Fed. Home Loan Mortg. Corp.*, 555 Fed. Appx. 634, 635 (8th Cir. 2014). Some courts have created an exception to this rule where the facts pled on information and belief are in the exclusive possession of the defendant. *See, e.g., Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). But this is not one of those cases. Plaintiffs' estimates of emissions clearly have nothing to do with the information held by Coyote Creek, as evidenced by Plaintiffs' unfounded Paragraph 44 contradiction of the information in the Permit Application. The court is therefore left to assume this Complaint is crafted from mere speculation.

To summarize the foregoing:

(1) Plaintiffs' emissions estimates in Paragraphs 40, 42 and 43 are irrelevant. Their relevance was based on Plaintiffs' erroneous legal conclusion, in Paragraph 29, that fugitive emissions occurring *prior* to the point at which coal is unloaded into the hopper at the coal preparation and processing plant should be counted. They should not, and this Court need not adopt Plaintiffs' legal mistake.

(2) Plaintiffs' erroneous understanding, in Paragraph 22, of the relationship between PM, $PM_{10}$, and $PM_{2.5}$ is a legal error that this Court need not accept and which suggests that Plaintiffs' emissions estimates are subject to double- and triple-counting errors.

(3) Plaintiffs' allegation, in Paragraph 44, that uncontrolled PM emissions from the primary crusher and secondary crusher will be between 700.8 tons per

year and 1,927.2 tons per year is flatly contradicted by the Permit Application which Plaintiffs themselves attached to the Complaint, and Plaintiffs have provided no justification for their failure to address the PECS discussed therein. The Court need not accept Plaintiffs' figures from Paragraph 44, and the document controls. PM emissions from the primary and secondary crusher will be approximately zero.

(4) Plaintiffs' remaining factual allegations concerning emissions potential are inadequate because they are based solely on information and belief. Even if they were not, however, they would claim a total potential to emit of between 0.67 and 1,984.6 tons per year in total uncontrolled emissions, *see* ¶¶ 41 and 45, prior to any correction for double- or triple-counting.

Next, taking the factual allegations that are well-pleaded and assuming their veracity, it is clear that they do not plausibly give rise to an entitlement to relief. *Iqbal*, 556 U.S. at 679. Technically, given the paucity of personal knowledge in this Complaint, *none* of Plaintiffs' factual allegations concerning potential PM emissions are well-pleaded. Nevertheless, even if the Court determines that Paragraphs 41 and 45 are well-pleaded (despite standing solely on information and belief), those allegations do not "raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555.

### 2. *Iqbal* Step Two: Determining Whether the Well-Pleaded Factual Allegations Raise a Right to Relief Above the Speculative Level

This Complaint falls short of the line between possibility and plausibility. *Twombly*, 550 U.S. at 557; *see also Parkhurst v. Tabor*, 569 F.3d 861, 865 (8th Cir. 2009) (to survive a motion to dismiss, a complaint must contain factual allegations sufficient to raise a right to relief above the speculative level). Plaintiffs claim that Coyote Creek is in violation of the Clean Air Act because it commenced construction of a Major Emitting Facility without a Major Source Permit to Construct. A necessary element of that claim is proof that the source is, in fact, a Major Emitting Facility. In order for the Coyote Creek Mine to qualify as a Major Emitting Facility subject to major source permitting requirements, it must have the potential to emit at least 250 tons of PM per year. *See* 42 U.S.C. § 7475(a). If the Coyote Creek Mine's potential to emit is

*less* than 250 tons of PM per year, then the Mine is, in fact, a Minor Source, which is just what the North Dakota Department of Health decided.

The only well-pleaded, legally relevant factual allegations in the Complaint claim that the Coyote Creek Mine is a Major Emitting Facility because it has a Potential to Emit something between 0.67 and 1,984.6 tons per year in total, countable, uncontrolled PM emissions. DE 1 ¶¶ 41 and 45. That is simply not good enough. It would be patently ridiculous for a police officer to ticket an individual for going "somewhere between 0 and 100" in a 65 mph zone. Yet that is a perfect analogy for what the Plaintiffs are trying to do. The only allegations that count, for purposes of the *Iqbal* analysis, do not even necessarily establish that a violation of the law has occurred. "Maybe you were speeding, maybe you weren't," is not enough to sustain a speeding ticket, and "maybe it's a major source, maybe it's a minor source" is not enough to sustain a violation of the Clean Air Act's permitting requirements, especially when the state agency lawfully vested with the authority to determine the answer to that question has already done so.

Besides, Plaintiffs' emissions estimates are inherently suspect. Courts are free to apply their judicial experience and common sense to the plausibility analysis. *McDonough*, 2015 U.S. App. LEXIS at *32. Plaintiffs' only relevant factual allegations that are not flatly contradicted by the documents attached to the Complaint set forth a *vast* range of potential values for the Coyote Creek Mine's Particulate Matter emissions potential. It may be virtually nothing (0.67). Or, it may not (1,984.6 tons per year). It is natural to question the science behind an estimate that simultaneously posits both a huge range *and* precision down to two decimal places, especially when Plaintiffs acknowledge the estimate is based on "information and belief," not on any personal knowledge. The problem is exacerbated by the high likelihood, based on Plaintiffs' apparent misunderstanding of the relationships between the two categories of regulated

Particulate Matter, that whatever method was involved double- or triple-counted potential PM emissions. Simply put, these are "factual allegations [which are] so indeterminate that they require 'further factual enhancement' in order to state a claim." *Braden*, 588 F.3d at 594 (quoting *Iqbal*, 556 U.S. at 667; *Twombly*, 550 U.S. at 557). After *Iqbal*, that is not enough to withstand a motion to dismiss.

## III.   CONCLUSION

For the reasons stated herein, Coyote Creek respectfully requests a dismissal with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Respectfully submitted,

/s/ *Mark L. Stermitz*
Brian R. Bjella
Mark L. Stermitz
Gregory F. Dorrington
CROWLEY FLECK
100 West Broadway
Suite 250
Bismarck, ND 58501
Telephone:  (701) 223-6585
Fax: (701) 222-4853

*Counsel for Defendant*
Coyote Creek Mining Company, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2015, the foregoing was served via CM/ECF upon all parties who have appeared in the docket.

/s/ *Mark L. Stermitz*
Attorney for Coyote Creek