**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Casey Voigt and Julie Voigt, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **ORDER GRANTING MOTION** |
| vs. | ) | **TO AMEND COMPLAINT AND** |
| | ) | **DENYING MOTION TO DISMISS** |
| Coyote Creek Mining Company, LLC, | ) | |
| a North Dakota Corporation, | ) | |
| | ) | Case No. 1:15-cv-00109 |
| Defendant, | ) | |

Before the court are two motions.  The first is by defendant Coyote Creek Mining Company, LLC to dismiss on grounds of lack of subject matter jurisdiction and failure to state a claim.  The second is by plaintiffs Casey and Julie Voigt to amend their complaint that was filed after the motion to dismiss.

## I.  BACKGROUND

### A.  The parties

Defendant is a coal mining company.  At the time of the filing of this action, defendant had commenced construction of a new surface coal mine that would supply lignite coal to a nearby coal-fired electric generating plant (the "Coyote Station") owned by third parties.

Plaintiffs are ranchers.  They own or lease some 5,637 acres, a significant portion of which either underlies or is in close proximity to defendant's mine as permitted by state authorities pursuant to North Dakota's laws governing surface mining.

### B.  The Clean Air Act and North Dakota's implementation of the Act

Under the Clean Air Act ("Act" or "CAA") as amended, EPA has established national ambient air quality standards (NAAQS) for six pollutants: (1) particulate matter; (2) sulfur dioxide;

1

(3) nitrogen oxides (with sulfur dioxide as the indicator); (4) carbon monoxide; (5) lead; and (6) ozone.  E.g., Utility Air Regulatory Group. v. E.P.A., __ U.S. __, 134 S.Ct. 2427, 2435 (2014). Those areas of the country that meet the standards are classified as "attainment" areas and those that do not are "nonattainment" areas.  Id.  North Dakota is an attainment area for all of the regulated pollutants.

An important part of the CAA's scheme to achieve and maintain the NAAQS is its New Source Performance Standards (NSPS) program.  The NSPS provisions require EPA to implement technology-based performance standards to limit emissions from new major sources of pollution, including newly constructed facilities and modifications of existing ones that increase emissions. E.g., Sierra Club v. Otter Tail Power Co., 615 F.3d 1008, 1011 (8th Cir. 2010) ("Otter Tail Power").

As discussed in more detail later, Congress concluded that its NSPS program and the NAAQS were not enough because they did not prevent against the degradation of air quality in those areas of the country, like North Dakota, where the pollutant levels are lower than the NAAQS.  For this reason, Congress amended the CAA to include provisions for the prevention of significant deterioration of air quality (the "PSD" provisions) that are set forth in Part C of Subchapter I of the Act, codified at 42 U.S.C. §§ 7470-7492.  Id.  The PSD provisions are the primary focus of this action.

Among the PSD provisions is a requirement that a "major emitting facility" may not be constructed until it obtains a permit to construct that complies with certain requirements of Part C, including the source's use of best available control technology (BACT) for each regulated pollutant emitted from the facility. 42 U.S.C. §§ 7475(a) & 7479(1)-(3).  The Act defines a major emitting facility as any stationary source with the potential to emit ("PTE") 250 tons per year ("tpy") of any

air pollutant, except for certain listed sources for which the threshold limit is 100 tpy. 42 U.S.C. § 7479(1); see generally Alaska Dep't of Environmental Conservation v. E.P.A., 540 U.S. 461, 470-73 (2004) ("ADEC") (discussing the PSD program and the BACT requirement).  For purposes of the discussion that follows:  (1)  a major emitting facility may be referred to simply as a "major source," which is the term the State of North Dakota uses; (2) the requisite threshold for qualifying as a major emitting facility may be referred to as the "major source threshold;" and (3) the construction permit required for a major emitting facility under the federal and state PSD provisions may be referred to as the "major source construction permit" or simply "major source permit."

The CAA places primary responsibility upon the states for formulating detailed air pollution control strategies and carrying out the Act's provisions.  To accomplish this, the CAA requires that each state adopt and submit to EPA for approval a "State Implementation Plan" ("SIP") to implement and carry out the policies and goals of the Act.  ADEC, 540 U.S. at 470.

North Dakota has an approved SIP for much of the CAA's requirements, including administration of its PSD provisions.  See 40 C.F.R. §§ 52.1820 - 52.1837.  Thus, it is the permitting authority for new facilities that require a major source construction permit.  In addition, North Dakota has adopted regulations that impose its own requirements for new facilities that do not need a major source construction permit and for these it issues its own "minor source" construction permit.  See generally N.D.A.C. Art. 33-15 (North Dakota's air pollution control regulations).

The North Dakota Department of Health ("NDDOH") is the agency charged with the administration and enforcement of the CAA and North Dakota's air quality laws.  N.D.C.C. §§ 23-25-02 & 23-12-03.  This includes the responsibility for reviewing applications for permits to construct and determining whether a major or minor source permit is required.  Id.

**C.   NDDOH's issuance of a minor source permit**

In this case, defendant applied for and received a minor source construction permit from the NDDOH for its new coal mine.  Prior to issuing the permit, the NDDOH did not conduct a public hearing, nor did it give formal notice of the filing of defendant's application and invite public participation in the permitting process, either by providing an opportunity for requesting a hearing or the submission of comments.  Apparently, this was because the NDDOH's rules allow for the processing of minor source permits informally and without public notice.  (Doc. No. 1-3).

Finally, so far as the court can tell, the only record of what occurred before the NDDOH is defendant's permit application and the minor source permit issued by the NDDOH, both of which plaintiffs attached to the initial complaint as exhibits.  (Doc. Nos. 1-1 & 1-2).  And, while defendant's application provides an explanation for why the coal mine would be a minor source and, for that reason, did not need to satisfy the CAA's PSD requirements, including obtaining a major source construction permit, there is nothing in the permit that was issued that indicates why the NDDOH apparently agreed.

The fact that the NDDOH processed defendant's permit informally and without creating much, if any, contemporaneous record explaining its decision for why defendant's mine will be a minor source and not a major one has consequences for what follows.

**D.   This case**

Plaintiffs claim in this action that defendant needed to obtain a major source permit and comply with the CAA's and North Dakota's PSD requirements.  This is because, according to plaintiffs, the coal mine as designed will have a PTE (potential to emit) for particulate matter ("PM") of 250 tpy or more, which is the requisite major source threshold in this instance.

Plaintiffs bring this action pursuant to the "citizen suit" provisions of 42 U.S.C. § 7604(a)(3) as well as 28 U.S.C. § 1331 (federal question jurisdiction).  Plaintiffs seek: (1) a declaration that the coal mine is a major source; (2) injunctive relief enjoining construction and operation of the mine until a major source permit is obtained; and (3) civil penalties for defendant having proceeded with construction without obtaining a major source permit.

Defendant has responded to plaintiffs' complaint by filing a motion to dismiss claiming lack of subject matter jurisdiction and failure of the complaint to state a cause of action.  More particularly, defendant contends the court lacks jurisdiction under the citizen suit provisions of 42 U.S.C. § 7604 because it has a permit in hand, albeit a minor source permit.  Alternatively, defendant argues this court should abstain from exercising jurisdiction on the grounds that this action is nothing more than a collateral attack on the NDDOH's determination that defendant's coal mine is not a major source, hence only a minor source construction permit was required, and that plaintiffs have an adequate remedy under state law to challenge the legality of this determination. As for its alternative grounds, defendant contends that plaintiffs' complaint fails to plead sufficient facts to state a claim and that, even if it does, there is no claim as a matter of law because the coal mine is not a major source based on what has been pled.

Following the filing of defendant's motion to dismiss, plaintiffs moved to amend their complaint.  In their proposed amended complaint, plaintiffs have alleged more detail in an attempt to overcome defendant's lack-of-specificity objections.  Defendant opposes the motion to amend on the jurisdictional grounds previously alleged as well as contending that, even if amended, the complaint would fail to state a claim so the motion to amend should be denied on grounds of futility.

II.     **PLAINTIFFS' MOTION TO AMEND THE COMPLAINT**

Plaintiffs' proposed amended complaint differs from the original in three ways.  First, it alleges with more certainty that the PTE for fugitive emissions of PM from that portion of defendant's coal mine that crushes the coal (defendant's coal processing facility) will exceed the major source threshold and for that reason the entire mine required a major source construction permit.  In fact, at various points, the amended complaint references an accompanying affidavit by an engineer for support.  It appears these changes were made to address defendant's contention that the allegations in the original complaint based upon information and belief were insufficient under the applicable pleading standards to state a claim for relief.

The second principal change is the addition of an allegation that the impact of certain controls built into the design of defendant's coal processing facility cannot be considered in making the determination of whether the mine is a major source because defendant's minor source permit lacks a "federally enforceable" emissions limit.  The third change is that, unlike the complaint, the amended complaint no longer has attached to it as exhibits defendant's application for its minor source permit and the minor source permit issued by the NDDOH.

Generally speaking, leave to amend a complaint pursuant to Fed. R. Civ. P. 15(a)(2) should be freely granted "[u]nless there is a good reason for denial, 'such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment[.]'" Becker v. Univ. of Neb. at Omaha, 191 F.3d 904, 907-08 (8th Cir. 1999) (quoting Brown v. Wallace, 957 F.2d 564, 566 (8th Cir. 1992)).  In this case, the court will allow plaintiffs to amend the complaint given that the case is still in its infancy, the changes are by no means frivolous, and the interests of justice support

6

making the determination of whether plaintiffs have pled a viable claim based on the allegations of the amended complaint.[1] Nevertheless, the court will consider defendant's permit application and the minor source permit in ruling on the motion to dismiss since both are public records and the fact that they were attached as exhibits to their initial complaint.

## III.   DEFENDANT'S JURISDICTIONAL CHALLENGES

### A.   Defendant's argument that the court lacks jurisdiction because it obtained a permit to construct, albeit a minor source one

Plaintiffs rely upon the following language of the CAA's citizen suit provisions of 42 U.S.C. § 7604 not only as a basis for the court's jurisdiction but also for their cause of action that defendant failed to get a major source construction permit as required by Part C of subchapter I of the CAA (the PSD provisions):

> **(a)  Authority to bring civil action; jurisdiction**
> Except as provided in subsection (b) of this section any person may commence a civil action on his own behalf –
> > * * * *
> > (3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment) or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

42 U.S.C. § 7604(a)(3).

Defendant contends that § 7604(a)(3) does not apply because defendant obtained a permit to construct from the NDDOH.  The permit that defendant obtained, however, is not a major source construction permit required by the CAA's PSD requirements as adopted by the NDDOH, but rather is only a minor source construction permit that was issued to satisfy other state regulatory

---

[1]  In what follows, the court will refer to the proposed amended complaint as simply the amended complaint even though it does not become effective until it is has been properly filed and served.

7

requirements.  In fact, defendant took the position in its permit application that it did not have to obtain a major source construction permit because it was not a major source and the NDDOH apparently agreed when it issued the minor source construction permit.  Given that, defendant's arguments for why jurisdiction is lacking are essentially policy arguments for why § 7604(a)(3) should not be construed to permit suits that, according to defendant, amount to nothing more than a collateral attack upon a determination that a major source permit is not required.

The problem for defendant's policy arguments, however, is the plain language of § 7604(a)(3); it clearly permits citizens to bring an action against a major source for beginning construction without having a major source construction permit and does not contain an exception for when a state has determined one is not required and issued a minor source permit to satisfy state requirements.  As the Eighth Circuit has cautioned:

> Still, as with any question of statutory interpretation, the court begins its analysis with the plain language of the statute, United States v. I.L., 614 F.3d 817, 820 (8th Cir.2010). As we recently noted, "[t]he Supreme Court has 'stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.' " Id. (quoting in part Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' " Id. (quoting in part Germain, 503 U.S. at 254, 112 S.Ct. 1146).

Owner-Operator Independent Drivers Ass'n, Inc. v. Supervalu, Inc., 651 F.3d 857, 862 (8th Cir. 2011).

Given the plain language of § 7604(a)(3), it is not surprising that those courts that have squarely addressed the argument, that the issuance by a state permitting agency of minor source permit based upon a determination that a major source permit is not required precludes the exercise of federal jurisdiction pursuant to § 7604(a)(3), have rejected it.   E.g., Weiler v. Chatham Forest Products, Inc., 392 F.3d 532, 537-39 (2d Cir. 2004) (Weiler) (state-issued minor source construction

8

permit did not foreclose a suit pursuant to § 7604(a)(3) alleging that a major source permit was required); Ellis v. Gallatin Steel Co., 390 F.3d 461, 481 (6th Cir. 2004) ("Ellis") (same); Northwest Environmental Defense Center v. Cascade Kelly Holdings, LLC, __ F.Supp.3d __, 2015 WL 958175, at **16-19 (D. Ore. Dec. 30, 2015) ("Cascade Kelly Holdings") (same); Citizens for Pennsylvania's Future v. Ultra Resources, Inc., 898 F.Supp.2d 741, 746 (M.D. Pa. 2012) ("Citizens for Pennsylvania's Future") (same); Natural Resources Defense Council, Inc. v. BP Products North America, Inc., No. 2:08–CV–204, 2009 WL 1854527, at *8 (N.D. Ind. June 26, 2009) ("BP Products") (same).

For its argument to the contrary, defendant relies primarily upon two cases, neither of which are on point here. The first is the Fifth Circuit's decision in CleanCOAlition v. TXU Power, 536 F.3d 469 (5th Cir. 2008). In particular, defendant points to that portion of the decision where the court stated that "§ 7604(a)(3) does not authorize preconstruction citizen suits against facilities that have either obtained a permit or are in the process of doing so." Id. at 478-79.

The problem with defendant's reliance upon that statement, however, is that the "permit" the Fifth Circuit likely was referring to was a major source permit. This is because what was at issue in CleanCOAlition was a challenge to the substance of a major source construction permit that had been issued and not the failure to have obtained one. And, in rejecting the argument that § 7603(a)(3) allows for a substantive challenge to a major source construction permit based on the contention that a permit that is substantively deficient is the equivalent of not having one, the Fifth Circuit gave no indication when it made the statement defendant relies upon that it meant also to say that possession of a minor source construction permit precludes suit under § 7603(a)(3).

The second case that defendant relies upon is the Eighth Circuit's decision in Otter Tail

9

Power, supra.  This case is also not on point.  The claims that Otter Tail had not obtained major source construction permits for a series of modifications made to its power plant over the years were all dismissed as being time-barred.  Otter Tail Power, 615 F.3d at 1013-19.  The only other claim in the case was that an amendment to Otter Tail's Title V operating permit violated an NSPS performance standard and what the Eighth Circuit had to say about that claim being an impermissible collateral attack on Otter Tail's permit is not applicable here.  The reason why requires some explanation.

Congress amended the CAA in 1990 to require that each major source obtain a comprehensive operating permit (often referred to as "Title V permit")  that sets forth all of the CAA's standards applicable to the source in one document.  Generally speaking, however, Title V permits do not impose new emission limits.  Id. at 1012 (describing the Title V permitting requirements).[2]

For Title V permits, the CAA provides additional provisions for EPA oversight and federal court review in 42 U.S.C. §§ 7607(b) & 7661d(b).  Among other things, these sections require EPA to review Title V operating permit applications and object to those that do not comply with the CAA's requirements.  If EPA fails to object, a private party can file a petition with EPA asking that it do so.  Then, if EPA continues not to object, the private party can seek review of that decision in the appropriate federal court of appeals. This pathway for citizen-initiated review requires, however,

---

[2]   In North Dakota, if a facility is a major source, it must first obtain a major source construction permit in order to begin construction.  Following construction, it then needs to obtain a Title V permit to operate.  This permit is also issued by the NDDOH since North Dakota has an EPA approved program for issuing Title V permits.  See N.D.A.C. ch. 33-15-14 (setting forth North Dakota's implementation of the Title V permitting requirements).  In this case, so long as defendant's mine is not a major source, it does not have to obtain a Title V operating permit.  However, it will have to acquire a minor source permit to operate that is separate from the construction permit it has acquired. See N.D.A.C. § 33-15-14-03.

that the subject of the federal challenge must have been first presented to the state permitting agency. 42 U.S.C. § 7661d(b)(2) ("The petition [to the EPA Administrator] shall be based solely on objections to the permit that were raised with reasonable specificity during the public comment period provided by the permitting agency . . . . ").

In <u>Otter Tail Power</u>, the Eighth Circuit concluded that the Sierra Club, which was the party claiming the Title V permit violation, could have raised its claim that Otter Tail's operating permit violated the NSPS before the state permitting agency and that its failure to do so not only foreclosed the federal review pursuant to §§ 7607(b) & 7661d(b) but also to any relief under the citizen suit provisions of § 7604(a) for the same violation because, according to the Eighth Circuit, Congress intended that the former be the exclusive remedy in that situation.  <u>Otter Tail Power</u>, 615 F.3d at 1019-23.  It was in this context that the Eighth Circuit concluded that the Sierra Club's NSPS claim was an impermissible collateral attack.  The court did not address the question here of whether the state issuance of a minor source permit deprives the federal court of jurisdiction under § 7604(a)(3) for a claim that a major source permit was required instead, much less conclude that there must be an exhaustion of both state administrative and court remedies before such a claim could be brought even when no formal notice or invitation to participate in the underlying state administrative process has been given.[3]

In summary, the court concludes that it has jurisdiction under 42 U.S.C. § 7604(a)(3) and

---

[3] If anything, <u>Otter Tail Power</u> hurts more than it helps defendant  in this case both with respect to its argument here as well as its argument for abstention that is addressed in the next section.  This is because, when the Eighth Circuit rejected the Sierra Club's NSPS claim for not having first raised it before the state permitting agency, the court expressly concluded that the Sierra Club "could have" pursued its NSPS claim there because the state permitting agency had given "public notice of the proposed amendment and had invited comment in accordance with South Dakota's SIP." <u>Otter Tail Power</u>, 615 F.2d at 1020.  In this case, when the NDDOH considered and acted upon defendant's minor source permit, no such notice or invitation was extended to the public.

that defendant's arguments to the contrary are without merit.

### B.      Defendant's alternative argument for abstention

#### 1.      Introduction

In the alternative, defendant argues that this court should abstain from exercising jurisdiction. This presents a more difficult question for two reasons. First, the abstention doctrine that defendant relies upon is the one derived from the seminal case of Burford v. Sun Oil Co., 319 U.S. 315 (1943). And, unfortunately, this category of abstention cases defies easy description and there does not appear to be one formulaic test for determining when dismissal under Burford is appropriate. See Quackenbush, 517 U.S. at 727-78; see generally C. Wright, A Miller, E. Cooper, & V. Amar, Federal Practice and Procedure: Jurisdiction 3d § 4244 (2007).

Second, the few cases that have addressed arguments for Burford abstention in § 7604(a)(3) cases have reached different results, albeit under different circumstances. Compare Ellis, 390 F.3d at 479-81(abstaining on Burford abstention grounds); BP Products, 2009 WL 1854527, at **8-18 (abstaining under both Burford and Colorado River abstention grounds) with Citizens for Pennsylvania's Future, 898 F.Supp.2d at 749-51 (Burford abstention not appropriate); cf. Cascade Kelly Holdings, 2015 WL 9581754, at **16- 19 (while not addressing Burford abstention per se, rejecting arguments (1) that the exercise of jurisdiction under § 7604(a)(3) is an impermissible collateral attack on a state issued minor source permit and (2) that state court remedies must first be exhausted).

In what follows, the court will apply the principles underlying Burford abstention to the circumstances of this case. After that, the court will address the few § 7604(a)(3) cases where courts have decided to abstain on Burford abstention grounds and explain why they are distinguishable.

2.  **Burford** abstention

Federal courts have a "strict duty to exercise jurisdiction that is conferred upon them by Congress." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996) ("Quackenbush").  While this duty is not absolute, the kinds of cases where the Supreme Court has found abstention to be appropriate are few and very narrowly applied.  See id; In re Otter Tail Power Co., 116 F.3d 1207, 1215 (8th Cir. 1997) ("Abstention is an extraordinary and narrow exception to the virtually unflagging obligation of federal courts to exercise the jurisdiction given them.")  (internal quotation marks omitted).

In New Orleans Public Service, Inc. v. Council of City of New Orleans, 491 U.S. 350 (1989) ("NOPSI"), the Supreme Court discussed the primary precedent up to when that case was decided and then summarized the principles underlying Burford abstention. The Court stated:

> In Burford v. Sun Oil Co., supra, a Federal District Court sitting in equity was confronted with a Fourteenth Amendment challenge to the reasonableness of the Texas Railroad Commission's grant of an oil drilling permit. The constitutional challenge was of minimal federal importance, involving solely the question whether the commission had properly applied Texas' complex oil and gas conservation regulations. Id., at 331, and n. 28, 63 S.Ct., at 1106, and n. 28. Because of the intricacy and importance of the regulatory scheme, Texas had created a centralized system of judicial review of commission orders, which "permit[ted] the state courts, like the Railroad Commission itself, to acquire a specialized knowledge" of the regulations and industry, id., at 327, 63 S.Ct., at 1104. We found the state courts' review of commission decisions "expeditious and adequate," id., at 334, 63 S.Ct., at 1107, and, because the exercise of equitable jurisdiction by comparatively unsophisticated Federal District Courts alongside state-court review had repeatedly led to "[d]elay, misunderstanding of local law, and needless federal conflict with the state policy," id., at 327, 63 S.Ct., at 1104, we concluded that "a sound respect for the independence of state action requir[ed] the federal equity court to stay its hand," id., at 334, 63 S.Ct., at 1107.
>
> We applied these same principles in Alabama Pub. Serv. Comm'n v. Southern R. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), where a railroad sought to enjoin enforcement of an order of the Alabama Public Service Commission refusing permission to discontinue unprofitable rail lines. According to the railroad, requiring continued operation of the lines amounted to confiscation of property in violation of federal due process rights. Under Alabama law, a party dissatisfied with a final order of the Public Service Commission had an absolute right of appeal to the Circuit Court of Montgomery County, which was "empowered to set aside any Commission order found to be contrary to the substantial

weight of the evidence or erroneous as a matter of law." Id., at 348, 71 S.Ct., at 767. This right of statutory appeal "concentrated in one circuit court" which exercised "supervisory" powers was, we found, "an integral part of the regulatory process under the Alabama Code." Ibid. Taking account of the unified nature of the state regulatory process, and emphasizing that "adequate state court review of [the] administrative order [was] available," id., at 349, 71 S.Ct., at 768, and that the success of the railroad's constitutional challenge depended upon the "predominantly local factor of public need for the service rendered," id., at 347, 71 S.Ct., at 767, we held that the District Court ought to have abstained from exercising its jurisdiction, id., at 350, 71 S.Ct., at 768.

From these cases, and others on which they relied, we have distilled the principle now commonly referred to as the "Burford doctrine." Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." Colorado River Water Conservation Dist. v. United States, supra, 424 U.S., at 814, 96 S.Ct., at 1245.

491 U.S. at 360.  Then, in Quackenbush, supra, the Court addressed the same cases as well as

NOPSI,  stating:

These cases do not provide a formulaic test for determining when dismissal under Burford is appropriate, but they do demonstrate that the power to dismiss under the Burford doctrine, as with other abstention doctrines, . . . derives from the discretion historically enjoyed by courts of equity. They further demonstrate that exercise of this discretion must reflect "principles of federalism and comity." Growe v. Emison, 507 U.S. 25, 32, 113 S.Ct. 1075, 1080, 122 L.Ed.2d 388 (1993).  Ultimately, what is at stake is a federal court's decision, based on a careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the "independence of state action," Burford, 319 U.S., at 334, 63 S.Ct., at 1107, that the State's interests are paramount and that a dispute would best be adjudicated in a state forum. See NOPSI, supra, 491 U.S., at 363, 109 S.Ct., at 2515 (question under Burford is whether adjudication in federal court would "unduly intrude into the processes of state government or undermine the State's ability to maintain desired uniformity"). This equitable decision balances the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining "uniformity in the treatment of an 'essentially local problem,' " 491 U.S., at 362, 109 S.Ct., at 2515 (quoting Alabama Pub. Serv. Comm'n, supra, at 347, 71 S.Ct., at 767), and retaining local control over "difficult questions of state law bearing on policy problems of substantial public import," Colorado River, 424 U.S., at 814, 96 S.Ct., at 1244. This balance only rarely favors abstention, and the power to dismiss recognized in Burford represents an " 'extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.' " Colorado River, supra, at 813, 96 S.Ct., at 1244 (quoting County of Allegheny, 360 U.S., at 188, 79 S.Ct., at 1063).

517 at 727-28.

### 3.   Inapplicability of __Burford__ abstention in this case

#### a.   Additional background

Before addressing the principles enunciated in NOPSI and Quackenbush, some additional

discussion of the CAA's PSD program is helpful, even at the expense of being repetitive of what was

outlined earlier.

In the years immediately following the establishment of the NSPS program in 1970 and the

development of the NAAQS, Congress concluded that merely setting emissions limits had not done

enough to improve air quality in those areas of the country that met the minimum standards of the

NAAQS.  Consequently, Congress amended the CAA again in 1977 to adopt the PSD program in

order to prevent the significant deterioration of air quality in those areas of the country that are

attainment areas. See, e.g., ADEC, 540 U.S. at 470-71.

The cornerstone of the PSD program is the imposition of certain requirements on major

sources, particularly the BACT standard.  And with respect to these requirements, the CAA provides

the definitions of what is a major source (*i.e.*, major emitting facility) and what BACT is.  42 U.S.C.

§§ 7479(1)&(3).  Then, in addition to what the CAA itself requires, EPA has promulgated detailed

regulations for the administration of the PSD program and has required that the states include these

provisions as part of their state SIPS as a condition of being able to administer the PSD

requirements.  See 42 U.S.C. § 7471 (requiring each SIP to implement the PSD program); 40 C.F.R.

§§ 51.166 & 52.21; see generally ADEC, 540 U.S. at 471; Otter Tail Power, 615 F.3d at 1011-12

("States have broad discretion in designing their SIPs, but the plans must include certain federal

standards and are subject to EPA review and approval.").  The net result of all of this is that not only

15

are the general parameters of the PSD program federally created, so also are most of the implementing regulations, including those adopted by the states with federally approved PSD programs, like North Dakota. See 40 C.F.R. §§ 51.1820 - 51.1837 (North Dakota's SIP); N.D.A.C. ch. 33-15-15 (setting forth North Dakota's PSD requirements and incorporating by reference substantial portions of 40 C.F.R. § 52.21).

Also, while Congress has made the states the front line regulators of the CAA and encouraged them to adopt their own programs for air pollution control (including imposing controls not required by the the CAA as well as requiring that certain non-major sources obtain state-created minor source permits), Congress was not content to leave the enforcement of the PSD provisions entirely up to the state environmental agencies and then to the state courts if there were questions as to whether the state agencies were doing their job properly. Rather, Congress enacted several provisions imposing federal supervision, including: (1) the ability of the EPA Administrator to issue a stop construction order and, if necessary, to bring a civil action in federal district court for injunctive relief if a major source has not complied with the CAA's PSD provisions, 42 U.S.C. § 7413(a)(5) & 7477; (2) providing for citizen suits in federal courts to ensure compliance with the key PSD requirements, including that a major source obtain a major source construction permit prior to commencing construction, 42 U.S.C. § 7604(a)(3); (3) requiring the EPA Administrator to review Title V operating permit applications and, when necessary, object to the issuance of permits that fail to comply with PSD requirements, 42 U.S.C. § 7661d(a)-(b); and (4) provisions requiring that the public be allowed to participate in the Title V permitting process and allowing persons who do participate the right to petition the EPA Administrator to object to the issuance of permits and seek

16

judicial review in the appropriate federal courts of appeals if the EPA administrator fails to take action, 42 U.S.C. §§ 7607 & 7661d(b)(2).

There are several reasons why Congress wanted to ensure that the states are properly implementing the key PSD requirements.   One is that Congress was concerned not only about the impact of emissions from new and modified major sources on air quality within the states where the sources are located, but also on neighboring states, national parks, wilderness areas, and other recreational and historical areas of importance, given that air pollution is not a respecter of jurisdictional boundaries.  See 42 U.S.C. § 7470; see also ADEC, 540 U.S. at 486.   Another reason, as suggested by the legislative history, is that Congress believed that, without some uniform standards and enforcement, the prospects were very real for those states imposing stringent controls to lose industry to those states that did not as well as industries holding states hostage for more favorable treatment, including pitting one against another, when making decisions on where new plants would be located or which old ones would be abandoned.  ADEC, 540 U.S. at 486 (reciting the legislative history).

> **b.**     **The absence in this case of any questions of purely state law**

The first type of case that may be appropriate for Burford abstention according to NOPSI is when there are difficult issues of state law of substantial public import that would have to be untangled in order to decide the federal case.  While nominally some of the law that applies in this case are state regulations governing air pollution control, these regulations, for the most part, simply restate the substance of provisions of the CAA or EPA's regulations.

This is true for North Dakota's definition of "major source."  It is the same as that set forth

in the CAA and in EPA's PSD regulations for "major emitting facility."  Compare, e.g., 42 U.S.C. § 7479(1); 40 C.F.R. §§ 51.166(b)(1)(i)(a) & 52.21(b)(1)(i)(a) with N.D.A.C. §§ 33-15-14-06(q)(2) (defining major source for purposes of North Dakota's Title V permitting program) & 33-15-15-01.2 (incorporating by reference EPA's definition of major source in 40 C.F.R. § 52.21(b)(1)(i)).

Likewise, the same is true for other key provisions in this case.  North Dakota's list of sources for which fugitive emissions must be counted toward determining whether the threshold for being a major source has been met is the same as EPA's and, relevant here, does not include coal mines but does include stationary sources regulated under section 111 of the CAA.  Compare 40 C.F.R. §§ 51.166(b)(1)(iii) & 52.21(b)(1)(iii) with N.D.A.C. § 33-15-14-06(q)(2).  As detailed later, the significance of this is that one of the stationary source categories for which performance standards have been adopted by EPA pursuant to the authority granted by Section 111 is "coal preparation and processing plants."  And, Subpart Y of 40 C.F.R. Part 60, which governs coal preparation and processing plants and is of particular importance later, has been adopted in whole by N.D.A.C. §§ 33-15-12-01.1 & 33-15-12-02.  Finally, as noted earlier, North Dakota has adopted all of EPA's PSD regulations that are relevant to the issues in dispute in this case.

Further, if there was any remaining doubt about the fact that the fighting issues in this case involve primarily questions of federal law, one need look no further than to defendant's application for its minor source permit.  The explanation contained in the application for why a major source permit was not required references almost exclusively the relevant provisions of the CAA and EPA's PSD and NSPS Subpart Y regulations.  (Doc. No. 1-1, pp. 9-12).

Morever,  the same is true for defendant's two arguments for why plaintiffs' lawsuit fails on

18

its face.   As detailed later, one of the points that defendant claims plaintiffs  have gotten wrong is their contention that the potential fugitive emissions from defendant's coal pile and the unloading of coal to the pile need to be counted in determining whether defendant's mine is a major source. And, what defendant relies upon for why this is wrong are EPA's NSPS Subpart Y regulations and what defendant claims is the relevant EPA guidance with respect to how those regulations should be applied.

The second point that defendant claims plaintiffs have gotten wrong is their contention that the fugitive emissions from defendant's coal processing equipment that must be counted for the major source determination are what the fugitive emissions would be if defendant was not using its passive containment system that surrounds the equipment.  The authority that defendant relies upon for its argument for why that is not correct (including the subsidiary question of what is meant by "federally enforceable") is limited to EPA's PSD regulations that North Dakota has adopted, EPA guidance, and federal case law construing EPA's regulations.

In short, the situation here does not even come close to what was involved in cases like Burford and Alabama Pub. Serv. Comm'n, supra, where the federal constitutional challenges cases required construction of difficult questions of purely state law.

        **c.**      **Balancing the federal interest for a federal forum against North Dakota's interests**

The second type of case in which Burford abstention may be appropriate is when federal review would be disruptive of efforts to establish a coherent state policy with respect to matters of primarily local concern.  According to NOPSI and Quackenbush, this requires examining (1) the

19

strength of the federal interests that are furthered by providing a federal forum, (2) the degree to which the problem is truly local, and (3) whether there are substantial benefits accruing to the states by having their courts be the principal adjudicators, and then balancing the relative interests.

Arguably, Congress has already decided how this balance should be struck.  The CAA allocates what are federal responsibilities and what are state responsibilities and then, against that backdrop, provides a federal cause of action in § 7604(a)(3) for when a major source begins construction without having first obtained a major source permit along with a *specific* grant of federal court jurisdiction.  Also, when enacting these provisions, Congress did not impose conditions precedent to being able to seek relief under § 7604(a)(3) like those found elsewhere in the CAA before citizens can seek relief in federal court for noncompliance with its requirements.  See Citizens for Pennsylvania's Future, 898 F.Supp.2d at 750 ("it would be improper to abstain from exercising jurisdiction when Congress has clearly established a cause of action for citizens suits").

But, even if Congress's creation of the federal remedy in § 7604(a)(3) does not foreclose Burford abstention - a point that need not be decided in this case, it surely limits it to truly exceptional cases.  In Colorado  River Construction Water Conservation District v. United States, 424 U.S. 800 (1975 ("Colorado River"), the Supreme Court noted that the mere presence of federal question jurisdiction over diversity jurisdiction "may raise the level of justification needed for [Buford] abstention."  Id. at  815 n.21.  The same reasoning applies in spades here with respect to the specific grant of federal jurisdiction and creation of a federal cause of action in § 7604(a)(3) over the exercise of general federal question jurisdiction.

But, even assuming there being no difference, the federal interest in insuring that major

sources are properly identified and classified as such is strong since it is the cornerstone of the PSD program.  Further, the problems the PSD provisions are attempting to address are at least as much national as they are local for the reasons discussed earlier, *i.e.,* the interstate nature of air pollution and Congress's concern about the lack of national uniformity creating economic pressures upon the individual states to not be as tough as they should be.

On the other hand, in examining North Dakota's interests, the particular question here of whether defendant's coal mine is a major source is obviously not purely a matter of state law. Further, while North Dakota as the front line regulator does have an interest in seeing that persons and entities within its borders are treated the same, it does not appear that any perceived need for local uniformity outweighs the federal interests in this instance, particularly since uniformity of treatment can also be achieved by federal courts helping to insure that there is uniformity of treatment nationally with respect to what are major sources.[4]  Finally, North Dakota's interest in preserving the integrity of its administrative processes and not having the NDDOH's time wasted by federal second guessing is not particularly strong  in this case (or at least not strong enough to outweigh the federal interests) given: (1) the degree to which the CAA already allows for EPA Administrator and federal court second guessing; (2) the fact that the NDDOH did not in this instance build an extensive administrative record; and (3) the intrusion upon North Dakota's interests is mitigated to a degree by the allocation of the burden of proof on the plaintiffs to prove

---

[4] Defendant contends that North Dakota has a strong interest in treating all of its lignite coal mines the same. North Dakota is not the only surface coal mining state, however.  Nor is it the only state that has lignite coal mines that supply nearby ("mine mouth")  electric generating stations.  An internet search using terms such as lignite and  coal mines reveals that Texas, for example, has similar mines.

that a major source permit was required as well as this court giving appropriate consideration to what the NDDOH decided - a subject that will be addressed in more detail later, cf. ADEC, 540 U.S. at 488-95.

Particularly instructive here are two Supreme Court cases.  The first is the Supreme Court's decision in ADEC. While not an abstention case per se, it addressed the same balancing of federal versus state interests with respect to enforcement of CAA's PSD provisions by the EPA Administrator.

What was at issue in ADEC was not the overarching (and presumably more important) issue of whether the source in that case was a major one; the state agency had concluded that it was and had issued a major source permit that imposed emission limitations based on its determination of what BACT required in that particular instance.  Rather, the issue in ADEC was whether the state permitting agency had made the correct BACT determination.  EPA concluded it had not and had issued a stop construction order pursuant to the authority discussed earlier.  540 U.S. at 474- 80. ADEC, the petitioner on appeal, contended that, because it had been delegated the authority to make the BACT determination (since it had an approved SIP incorporating the PSD requirements), the CAA should be construed as requiring that EPA must first challenge its decision in the state courts if EPA was dissatisfied with the decision.  In so urging, ADEC made many of the same arguments that defendant makes in this case for why the principles of cooperative federalism built into the CAA should not permit EPA's collateral attack.  Id. at 488-95.  The Supreme Court, however, rejected those arguments, concluding that EPA's construction of the CAA, which was that the EPA Administrator could second guess the state agency's determination of BACT and issue a stop

22

construction order without first having to go state court, was not an unreasonable one given the federal interests at stake. Id. at 496-502.

Granted, ADEC is a different case in that the party making the challenge there was EPA and the collateral attack was made pursuant to different statutes.  However, when one reads the Court's extended discussion about why the CAA could reasonably be construed to grant EPA the authority that it determined it had under the Act, including the provisions that were included in the CAA to insure that the PSD program would be applied nationally with some uniformity, it is difficult to conclude here that the local interests are so great that Burford abstention is required with respect to the threshold determination of whether defendant is a major source - particularly in this case given the apparent lack of availability of timely and adequate direct state court review for the reasons discussed in the next section.

The other Supreme Court case that is particularly instructive is NOPSI itself.  In NOPSI, the Federal Energy Regulatory Commission ("FERC") had made an allocation to NOPSI (the electric utility serving the City of New Orleans) of its share of costs in a failed nuclear power project for purposes of recovering the costs in its rates.  The City Council, while deferring to FERC's finding that the initial decision to participate in the nuclear project was reasonable, took the position that full rate relief was not warranted because NOPSI was negligent in failing to diversify its power supply by selling off a part of its interests in the project after it became apparent there might be problems. NOPSI, 491 U.S. at 353-58.

Seeking to overturn this decision and after other proceedings not relevant here, NOPSI filed both an action in federal court seeking relief and a petition in state court seeking review of the City

23

Council's decision.  NOPSI then proceeded to make the same two arguments in both forums.  One was that FERC's decision was preemptive.  The other was that the City's Council articulated reason for not allowing full rate relief, that NOPSI had not acted prudently after it should have known of the problems with the nuclear project, was unwarranted and pretextual.  Id. at 357-58, 362-63.

The Supreme Court concluded in NOPSI that Burford abstention was not appropriate.  In so holding, the Court first observed that the case "did not involve a state-law claim, nor even an assertion that the federal claims are in anyway entangled in a skein of state-law that must be untangled before the federal case can proceed."  Id. at 361 (internal quotation marks omitted).  As already discussed, that appears to be true in this case.

The Court then went on to address whether the federal adjudication in that case would disrupt "the State's attempt to ensure uniformity of treatment of an essentially local problem."  Id. at 362 (internal quotation marks omitted).  In addressing that question, the Court first observed that, "[w]hile Burford is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a potential for conflict with state regulatory law or policy."  Id. (internal quotation marks omitted).  The Court then concluded that NOPSI's first grounds for attack presented only the facial question of federal preemption that could be resolved without having to look beyond the face of the City's rate order, so Burford abstention would not be appropriate for that issue.  As for NOPSI's second grounds of attack, the Court stated:

> Unlike the facial challenge, this claim cannot be resolved on the face of the rate order, because it hinges largely on the plausibility of the Council's finding that NOPSI should have, and could have, diversified its supply portfolio and thereby lowered its average wholesale

24

costs. See n. 2, <u>supra</u>. Analysis of this pretext claim requires an inquiry into industry practice, wholesale rates, and power availability during the relevant time period, an endeavor that demands some level of industry-specific expertise. But since, as the facts of this case amply demonstrate, wholesale electricity is not bought and sold within a predominantly local market, it does not demand significant familiarity with, and will not disrupt state court resolution of, distinctively local regulatory facts or policies. The principles underlying <u>Burford</u> are therefore not implicated.

<u>Id.</u> at 363-64. For essentially the same reasons, the principles underlying <u>Burford</u> are not implicated in this case; that is, the problems that the PSD program addresses are in significant part national and the resolution of whether or not the defendant's coal mine is a major source does not require familiarity with, nor is it likely to be *unduly* disruptive of, "distinctively local regulatory facts or policies" for the reasons set forth above.

### d.    Lack of availability of timely and adequate state court review

Finally, as noted by <u>NOPSI</u>, <u>Burford</u> abstention is only appropriate if there is an opportunity for timely and adequate state court review.  That does not appear to be the case here  for two reasons.  First, it is does not appear that plaintiffs had any right to direct state court review.  Second, even if they did, the administrative process that was followed by the NDDOH does not appear to have created a sufficient enough record for the adjudication of the issues that plaintiffs are raising with respect to their claim that defendant needed a major source permit.

 The reason why it was unlikely that plaintiffs could have sought direct review of the NDDOH's decision to require only a minor source permit is because N.D.C.C. § 23-01-36, which provides for direct review in state district court of NDDOH's permitting decisions, only allows review if the person seeking it participated in, or provided comments during, the NDDOH hearing process and then limits the review to only those issues actually raised before the NDDOH.  And

25

here, as already discussed, the NDDOH did not invite public participation in the administrative process of issuing defendant's minor source permit.

Defendant contends that plaintiffs should have attempted to intervene in the administrative process notwithstanding, claiming that they most certainly knew about it.  Plaintiffs have filed affidavit testimony, however, claiming they did not know that defendant had applied for a minor source construction permit until after it was issued.  While the court credits plaintiffs' affidavit testimony, the court does not believe it makes any difference with respect to the issue of abstention. Given the opportunity of citizens to file suit in federal court pursuant to 42 U.S.C. § 7604(a)(3) and claim that a pollution emitting source is a major one, it seems the very least North Dakota could have done, if it was so concerned about giving its own courts first crack at any review of the NDDOH's decision on the issue, would have been to require that the NDDOH give public notice prior to any major source determination, invite public participation, and create a suitable record for state court review if there is a challenge.  Likewise, if the NDDOH was so concerned about not having its decision second guessed here in federal court, it could have on its own in this instance given notice and provided an opportunity to be heard.

Defendant also contends that plaintiffs should have tried to appeal notwithstanding their lack of prior participation based on plaintiffs' acknowledgment that they were aware of the permit having been issued prior to the expiration of the thirty-day time period for seeking review under N.D.C.C. § 23-01-36.  Defendant contends that the state courts most likely would have excused their lack of prior participation on equitable grounds and allowed the appeal.  Defendant has not cited to any North Dakota case that has so held, however, and it seems more probable that the state courts would

26

take the view that no direct review is available in that instance based on the plain language of the statute.  Cf., O'Conner v. Northern States Power Co., 308 N.W.2d 365 (N.D. 1981).

But, even if an appeal would have been permitted, the only administrative record that appears to exist is defendant's permit application and the NDDOH's minor source permit, with the latter providing no explanation for why the NDDOH apparently agreed defendant's mine did not need a major source permit, much less a record that would have allowed full consideration of the arguments that plaintiffs advance in this case.  Further, it is highly questionable whether plaintiffs would have had the opportunity to create the necessary record in state district court upon direct review pursuant to N.D.C.C. § 23-01-36.  This is because that section incorporates by reference certain provisions of North Dakota's Administrative Practices Act, codified at N.D.C.C. ch. 23-32.  These provisions would  limit any review to the record that was created by the NDDOH.

While not conceding these points, defendant contends that plaintiffs had, and still have, the opportunity to commence a separate action in state district court pursuant to the North Dakota Environmental Act of 1975, which authorizes suits against state agencies and persons who violate any of the state's environmental laws.   While that may be, the court doubts that this is what the Supreme Court was referring to in NOPSI about the availability of timely and adequate state court review.  Rather, it appears that what the Court had in mind was the opportunity for timely state court review of an administrative process that had already provided an opportunity to participate in a meaningful way and that had created a record for the reviewing court to consider.

Finally, while probably not dispositive by itself, North Dakota does not channel appeals from NDDOH administrative decisions to one particular state court with special competence in the subject

27

matter, such as was in the case in <u>Burford</u> and <u>Alabama Pub. Serv. Comm'n</u>, <u>supra</u>.  <u>See</u> N.D.C.C. § 28-32-42(3)(a) (requiring that appeals from administrative orders be taken in the district court of the county where the hearing was held unless a specific statute provides otherwise and, if no hearing was held, then the appeal must be taken to the district court sitting in Burleigh County).

In conclusion, the unlikely opportunity for direct state court review and the probability it would have been inadequate in any event, at the very least militate against <u>Burford</u> abstention in this case and, in this court's view, forecloses it.

### e.  Cases relied upon by defendant are distinguishable

Defendant cites to several cases where courts have abstained in citizen suit cases pursuant to § 7604(a)(3).  These cases, however, are distinguishable.

One of the cases that defendant relies upon for abstention is <u>BP Products</u>, an earlier cited case out of the Northern District of Indiana.  In that case, BP Products sought and obtained a minor source permit from the Indiana Department of Environmental Management ("IDEM") for modifications it wanted to make to its oil refinery located in Whiting, Indiana.  Several environmental groups and individuals objected and sought review by the Indiana Office of Environmental Adjudication ("OEA"), contending that the IDEM had erred by not requiring a major source construction permit.  The court in <u>BP Products</u> described the OEA as being "Indiana's agency that handles appeals of that sort." 2009 WL 1854527, at *1.

The plaintiff in <u>BP Products</u>, the Natural Resources Defense Council (NRDC), had lodged the same objections with IDEM but took a different tack than the other objectors in terms of seeking review.  Rather than participating with the other objectors in the petition for review by the OEA

(even though represented by the same counsel), it filed suit in federal district court alleging several claims, including a claim pursuant to 42 U.S.C. § 7604(a)(3) for failure to have obtained a major source permit, contending one was necessary to satisfy both the Part C & D requirements of the CAA.  When the district court issued its decision in BP Products, the administrative case before the OEA was still pending but was in the "home stretch" according to the district court in that discovery had been completed and a "de novo" hearing scheduled.  In contrast, discovery had not begun in the federal action.  Id.

One of the arguments made by BP Products in defending against the federal law suit was that the court lacked jurisdiction over the § 7604(a)(3) claim because it had obtained a minor source permit.  While the district court rejected that argument, id. at **6-8, it did go on to conclude that abstention was proper under both the Burford and Colorado River abstention doctrines.   In concluding that Burford abstention was appropriate, the court reasoned that the law being applied was state law and not federal, citing to a number of provisions of Indiana's air pollution control regulations that the court stated applied as well as the fact that a minor source permit was issued to satisfy the requirements of Indiana law.  Id. at *11. The court then stated:

> In the end, the NRDC wants me to second-guess the IDEM's expert application of Indiana law with respect to BP's permit request. This is nothing more than a collateral attack on the IDEM's permit decision. To allow it would be to gut the carefully crafted system that Indiana has put in place. What is the point of having an expert agency appeals process—or a state court appeals process—if litigants can simply side-step it by turning to the federal courts? Take this case. There are multiple environmental groups fighting BP's permit tooth and nail. While the some of them tussle with BP in the state system, the NRDC is trying to take BP to federal court. But this gives the opponents of the permit multiple bites of the apple by allowing them to fight the battle on two fronts. This strikes me as terribly inefficient. And if for some reason this matter goes astray in the state system, the Clean Air Act provides for oversight by the EPA. See 42 U.S.C. § 7413(a)(5). See also Alaska DEC, 540 U.S. at 473–74.

> The bottom line is this: the NRDC thinks the IDEM got the call wrong. It may have. But the proper remedy is through the Indiana regulatory and state court process; otherwise there is an impermissible risk of disrupting the Indiana's attempt to ensure uniformity. See NOPSI, 491 U.S. at 362 (holding that abstention was inappropriate because the case was "[u]nlike a claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors"). And while the issues may ultimately wind up in federal court again, if they do, then at least the federal court will have the benefit of the full state analysis. But any attempt to litigate those issues here and now would smother the delicate federalism concerns that underlie Burford. So I believe the best course is to restrain from exercising my jurisdiction.

Id.  In addition, the BP Products court also took into consideration the fact that the administrative proceedings by the reviewing agency were still under way and that a simultaneous action in federal court on the same issues would be disruptive of that process.  Further, the court pointed to the fact that the reviewing agency was conducting its own "de novo" determination and that it had special expertise in the matter.  The court ultimately concluded:

> In any event, I believe that Indiana has sufficiently indicated its desire to create a special forum to regulate and adjudicate its air pollution permit requests. It has created a special administrative agency, the IDEM, with expertise in the field. It then channels appeals of the IDEM decisions to the OEA, who again applies its own expertise in evaluating the application in a de novo review. See Ind.Code §§ 13–15–6–3 & 13–15–7–1 et seq. So unlike International College of Surgeons, the IDEM's initial decision is not immediately reviewable by any state court. See 153 F.3d at 365. It first must go to the OEA for a de novo review. The OEA's review therefore "stand[s] in a special relationship of technical oversight or concentrated review," and consequently is the specialized proceeding necessary for Burford abstention under the Seventh Circuit. Id. at 364.

> What is clear from the case law is that abstention is appropriate when the "federal forum threaten[s] to frustrate the purpose of the complex administrative system" established by a State. Quackenbush, 517 U.S. at 725. Inserting this Court into the current fray creates precisely that risk. And the risk is intensified here, where the NRDC raises the exact same issues in this Court that are presently before the OEA. In the end, when I conduct my "careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the independence of state action," id. at 728 (quotation marks omitted), I am convinced that this is a prime case for Burford abstention.

Id. at *14.

While this court might disagree about some of the reasons expressed by the district court in

BP Products for why Burford abstention (as opposed to possibly Colorado River abstention) was a good fit - particularly its balancing of the federal versus state interests with respect to the threshold determination of whether a source is a major one and the extent to which it really is a question of state law, the situation before the court in BP Products was far different from the one here.  First, the administrative process before the IDEM was open to the NRDC and the NRDC had participated in it.  Second, the administrative process was still ongoing by virtue of a petition filed with the OEA (a reviewing agency with expertise in the matter) by others who were represented by the same attorneys as the NDRC, and a "de novo" hearing had been scheduled.

In this case, the public was not invited to participate in the administrative process before the NDDOH for the issuance of defendant's minor source permit. Also, the administrative process (*i.e.,* the determination by the front line regulators charged with enforcement of the cooperative federal-state scheme for regulating air pollution and having expertise in the matter) has been completed and any state court "review" would be by a court of general jurisdiction with no particular expertise and most likely would require the initiation of a completely new action, including creating the necessary record that could just as easily be created here.

Another case relied upon by defendant, as well as the district court in BP Products, is the Sixth Circuit's 2004 decision in Ellis, supra.  In that case, two industrial plants had commenced operation next door to each other.  One was a steel manufacturing plant owned by Gallatin Steel and the other was a related slag processing plant owned by the Harsco Corporation.  The Kentucky Division of Air Quality had determined the two facilities should be treated as separate sources for compliance and issued a minor non-PSD permit for Harsco's slag operation and a major source

permit for the steel plant.

The plaintiffs in <u>Ellis</u> filed two citizen suits in federal district court against both entities asserting a number of federal and state claims, including in one of the suits a claim that Harsco should have obtained a major source permit.  In addition, EPA instituted its own enforcement action in federal district court.  After these actions were commenced, the Kentucky Division of Air Quality reversed its decision that the two plants should be treated as a separate source and issued a revised major source permit to Gallatin Steel and instructed Harsco to submit an application for a major source permit.  Gallatin Steel and Harsco filed an appeal of that decision to another reviewing administrative agency.  This administrative appeal was pending when the federal district court dismissed the citizen suit claim against Harsco for not obtaining a major source permit as being an impermissible collateral attack against the permitting decision made by the Kentucky Division of Air Quality.  Also, it was still pending when the Sixth Circuit considered the case on appeal.

On appeal, the Sixth Circuit affirmed the district court's dismissal of the claim against Harsco, not because it was an impermissible collateral attack, but rather on <u>Burford</u> abstention grounds based on the unique circumstances presented by the case.   The court stated:

> And as in <u>Coalition for Health Concern</u>, "federal review at this juncture would be disruptive of Kentucky's efforts to establish a coherent policy" with respect to PSD permitting of emitting facilities, particularly as the state agency and courts were reviewing the precise issue raised by the Ellises' federal permit claims at the time of the district court's opinion. 60 F.3d at 1194; <u>see also</u> <u>Palumbo</u>, 989 F.2d at 160. Federal review also would be disruptive here because it would require the district court to revisit earlier decisions made by the Kentucky Division of Air Quality that Harsco's operations did not require a PSD permit and that Gallatin and Harsco are not a single "major stationary source"—an issue committed by the Clean Air Act to  state resolution. See 401 Ky. Admin. Regs. 51:017, §§ 1(25)(a) & 8; 55 Fed.Reg. 23547, 23548–49 ("In sum, states remain free to follow their own course, provided that state action is consistent with the letter and spirit of [their own state implementation plan].").

The Ellises' permit claims boil down to allegations that the Kentucky agency "failed to apply or misapplied [its] lawful authority under Kentucky law and under" the Clean Air Act by issuing Gallatin's PSD permit exclusive of Harsco's operations and by determining that a PSD permit was unnecessary with respect to Harsco. Coalition for Health Concern, 60 F.3d at 1195. As Coalition for Health Concern suggests, such administrative claims offer a classic explanation for applying Burford abstention. See also NOPSI, 491 U.S. at 362, 109 S.Ct. 2506 (identifying "claim[s] that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors" as warranting Burford abstention).

Nor, contrary to the Ellises' contention, do Weiler v. Chatham Forest Products, Inc., 370 F.3d 339 (2d Cir.2004), and Association to Protect Hammersley, Eld, and Totten Inlets v. Taylor Res., Inc., 299 F.3d 1007 (9th Cir.2002), point to a different conclusion. The cases addressed whether the Clean Air Act in one instance and the Clean Water Act in the other eliminated federal-court jurisdiction over citizen suits that challenge state administrative decisions that a permit is not required—a question that both cases answered in the negative, Weiler, 370 F.3d at 345–46; Hammersley, 299 F.3d at 1011–12. We do not dispute this conclusion. See 42 U.S.C. § 7604(a)(3) (allowing citizens to sue "any person who ... constructs any new or modified major emitting facility" without first obtaining a required PSD permit). But the question in this case is not whether citizens may sue companies that fail to obtain a PSD permit; they may and Burford abstention rarely will present an obstacle to those claims. The question here is whether a PSD permit was required (and what type of permit was required) in the setting of these associated plants. *All we thus decide in this unusual context—where the state has supplied a concentrated and comprehensive review process that is currently addressing the very subject of these federal claims—is that Burford counsels abstention. Neither Weiler nor Hammersley rejected, let alone considered, Burford's application in this setting.*

Id. at 480-81 (italics added).

Like BP Products, Ellis is distinguishable because there were ongoing state administrative processes addressing the permitting issue. See Citizen's for Pennsylvania's Future, 898 F.Supp.2d at 750 (distinguishing Ellis and another case cited by it, Sugarloaf Citizen Ass'n of Montgomery Cty, 33 F.3d 52 n.4 (4th Cir. 1994), as cases where the relevant state agencies "had either issued or were in the process of issuing Part C or D permits, bolstering the argument that federal intervention would add only confusion to the mix.").

33

### f.   Conclusions re <u>Burford</u> abstention

To be clear, what is not at issue in this case is whether, or to what extent, the state administrative decision-making must be final before a citizen suit can be brought pursuant to 42 U.S.C. § 7604(a)(3).  Also, what is not an issue in this case is whether, or to what extent, abstention (whether pursuant to <u>Burford</u> or some other abstention doctrine) would be appropriate if plaintiffs had fully participated in the state administrative process and then sought review in the state courts (either directly or collaborating with others as was the case in <u>BP Products</u>) as well as bringing a federal citizen suit in this court.  Finally, this case is not a collateral challenge to the substance or terms of the minor source permit issued by the NDDOH to enforce North Dakota's own air pollution control requirements.  Rather, the sole question here is whether defendant was required to obtain a major source construction permit and, if not, then this case ends.

The court concludes that <u>Burford</u> abstention is not appropriate in this case.  Further, even if the court is wrong in terms of the issue being primarily one of federal law and not uniquely state law or wrong about the predominance of the federal interests with respect to the determination of the threshold question of whether a pollution emitting source is a major one,  <u>Burford</u> abstention would not be appropriate here because of the apparent lack of timely and adequate state court review of the kind contemplated by the Supreme Court's abstention cases.

## IV.   **DEFENDANT'S MOTION TO DISMISS FOR FOR FAILURE TO STATE A CLAIM**

### A.   <u>Introduction</u>

Initially, defendant argued that the allegations contained in plaintiffs' complaint failed to state a claim for relief because, taken as a whole, they failed to satisfy the pleading standard set forth

in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Then, in response to the motion to amend, defendant's primary argument (aside from a renewal of its jurisdictional challenges) was that the proposed amendments were futile.

Upon review of the amended complaint, there is no question that it states a cause of action with its allegations that the PTE for fugitive emissions of PM from the mine facilities for which such emissions must be counted will collectively (if not in some cases individually) reach the major source threshold and that, as a consequence, plaintiffs are entitled to relief pursuant to 42 U.S.C. § 7604(a)(3) because defendant failed to obtain a major source construction permit. In addition, the amended complaint does more than make a threadbare allegation of a violation of § 7604(a)(3). It pleads facts, which the court is required at this stage to accept as true, that are sufficient to satisfy Iqbal's and Twombly's standard for stating a claim, which is simply one of facial plausibility. See Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."); Twombly, 550 U.S. at 556 ("Asking for plausible grounds . . . does not impose a probability requirement . . . . And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.") (internal quotations, citing authority, and footnote omitted).

The real question presented by defendant's motion to dismiss is not the technical sufficiency of the amended complaint, but rather whether defendant is correct that the allegations of plaintiffs' amended complaint misconstrue the applicable law in two respects critical to whether a viable claim has been stated. According to defendant, plaintiffs are clearly wrong when they claim that the

35

potential for fugitive emissions of PM from defendant's coal stockpile and the unloading of coal to it must be counted in determining whether defendant's mine reaches the threshold for it being a major source.  Defendant also contends that plaintiffs are wrong when they allege that the potential fugitive emissions from defendant's coal processing equipment that must be counted are those that potentially could be emitted in the absence of defendant's passive containment system.  Defendant contends that, if you back out from the amended complaint the alleged emissions attributable to these two erroneous conclusions, it is clear from the remaining allegations that the mine is not a major source needing a major source construction permit and the complaint fails to state a claim for that reason.

Since both parties have taken the position that the two issues raised by defendant can be resolved in their favor based on what is presently before the court and have extensively briefed the issues, the court will address them in the hope that, if nothing else, it will narrow what is in dispute. After that, the court will consider whether there remains a case to go forward. But first, some additional background is required.

**B.**    **Additional background**

**1.**    **Surface coal mines generally do not have to obtain a major source construction permit because "fugitive emissions" of PM from coal mines are not counted**

To reset the table, the CAA's PSD provisions require that any new major emitting facility must obtain a permit to construct.  42 U.S.C. § 7475(a).  Under the PSD provisions, a major emitting facility includes certain listed types of industrial sources that have a PTE of 100 tpy for any air pollutant.  42 U.S.C. § 7479(1); 40 C.F.R. §§ 51.166(b)(1)(i)(a) & 52.21(b)(1)(i)(a).  For example,

the list includes fossil fuel fired steam electric generating plants, petroleum refineries, steel mills, and copper smelters.  Surface coal mines are not on the list.  Id.

In addition to the listed types of sources, any other source that has a PTE of 250 tpy for any air pollutant is also a major emitting source.  42 U.S.C. § 7479(1); 40 C.F.R. §§ 51.166 & 52.21(b)(1)(i)(b) & 52.21(b)(1)(i)(b).  If there was no other limiting factor, defendant's coal mine would undoubtedly be a major source under this provision.  This is because "[m]ost surface coal mines of economically viable size have the potential to emit more than 250 tons of dust."  Natural Resources Defense Council, Inc. v. U.S. E.P.A., 937 F.2d 641, 643 (D.C. Cir. 1991) ("NRDC v. EPA") (citing EPA, Requirements for Preparation, Adoption and Submittal of Implementation Plans, 49 Fed. Reg. 43211, 43212 (1984)).

EPA concluded quite sometime ago, however, that it was bound by a court decision holding that the definition of a major emitting facility under 42 U.S.C. § 7479(1) is subject to the generic definition of "major stationary source" and "major emitting facility" under § 7602(j), which, in turn, was construed to exclude "fugitive emissions" from the threshold calculation of whether a plant is a  major source unless EPA has decided by rulemaking that fugitive emissions should be included for the particular source.  NRDC v. EPA, 937 F.2d at 643 (discussing the holding of Alabama Power Co. v. Costle, 636 F.2d 323, 369-70 (D.C. Cir. 1979)).  And, while EPA has promulgated a list of categories of sources for which fugitive emissions must be counted, it has not so far added surface coal mines to the list.  See 40 C.F.R. §§ 51.166(b)(1)(iii) & 52.21(b)(1)(iii).

As recounted in NRDC v. EPA, EPA had at one point considered adding surface coal mines to the list for which fugitive emissions would have to be counted but decided against it, recognizing

that the decision "not to consider fugitive emissions means that few, if any SCM's [surface coal mines] will be classified as major sources or major modifications." 937 F.2d at 643. EPA concluded that the costs of requiring fugitive emissions from coal mines to be counted were in excess of the potential benefits, particularly after considering that fugitive dust emissions were already subject to regulation by the Department of Interior ("DOI") under the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. ch. 25. See EPA, Requirements for Implementation Plans: Surface Coal Mines and Fugitive Emissions; Approval and Promulgation of Implementation Plans, 54 Fed. Reg. 48870 (1989) ("Requirements for Implementation Plans: Surface Coal Mines"). In reaching this conclusion, EPA considered, amongst other things, that: (1) a major percentage of the fugitive dust emitted by coal mines comes from haul roads and that alternatives to the dust suppression measures already required by SMCRA, such as paving haul roads, would be impracticable; (2) "the relatively low ambient particulate matter contribution from SCM's nationally;" (3) "the low background particulate matter concentrations around SCM's;" (4) "the limited distance from SCM's that ambient impacts occur;" and (5) "the general absence of populations exposed to SCM particulate matter," given the remoteness of most mine locations to population centers. Id. at 48,8873-79. In NRDC v. EPA, the D.C. Circuit upheld EPA's decision not to count fugitive emissions from coal mines, including the permissibility of it having weighed the costs versus the benefits when making the decision. 937 F.2d at 649.

The point here, which will be returned to later, is that EPA made a policy choice - one based on weighing benefits versus costs - when it decided not to adopt a rule that would require consideration of fugitive emissions of PM from coal mines for the purpose of determining whether

38

coal mines are major sources and the consequences flowing from that determination.

**2.    Fugitive emissions from defendant's coal preparation and processing plants must be counted**

While fugitive emissions from coal mines generally do not have to be counted toward determining whether they are major sources, fugitive emissions do have to be counted for coal preparation and processing plants. This is because EPA has included within the list of categories of sources for which fugitive emissions must be counted "[a]ny other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act." 40 C.F.R. §§ 51.166(b)(1)(iii)(aa) & 52.21(b)(1)(iii)(aa).

As noted earlier, Section 111 of the CAA established the NSPS program for new sources. And, while NSPS performance standards have not been established for coal mines, they have for coal preparation and processing plants that process more than 200 tons of coal per day. 40 C.F.R. Part 60, Subpart Y--Standards of Performance for Coal Preparation and Processing Plants.

In this case, defendant's mine has as one of its components a facility that crushes the coal after it has been removed from the ground and before it is delivered to its customer, the Coyote Station. Defendant's crushing facility falls within the definition of a "coal preparation and processing plant" that is subject to regulation under Subpart Y because it "processes" the coal and is capable of handling more than 200 tons of coal per day.

Coal preparation and processing plants (hereinafter simply "coal processing plants") are not something unique to coal mines nor do all coal mines necessarily have them. A number of industrial facilities that use coal either for fuel or as a feedstock may have coal processing plants, including,

for example, power plants, coke plants, Portland cement plants, synfuels plants, etc.  See, e.g., EPA, Model Plant Control Costing Estimates for Units Subject to the NSPS for Coal Preparation Plants (40 C.F.R. Part 60, Subpart Y) (Memo to Coal Preparation Docket (EPA-HG-QAR-2008-0260) by Christian Fellner, April 2008) ("Model Plant Control Costing Estimates Memo").  (Doc. No. 38-4).  In fact, in this case, the owners of the generating station and defendant undoubtedly could have structured their commercial relationship differently so that the only coal delivered by defendant would be unprocessed mine-run coal and the generating plant would do its own crushing.

Also, some coal processing plants are more elaborate and physically larger than defendant's coal crushing facility.  For example, unlike defendant's facility, some coal preparation plants may include a number of different structures and processes between which might run conveyors or haul roads within the processing plants.  Some also have elaborate facilities for loading the processed coal onto train cars, ships, etc.  See id.

The consequence of defendant's mine having a facility for crushing coal appears to be (and the parties are in agreement on this point) that, if the PTE for fugitive emissions of PM from the coal crushing facility meets or exceeds the 250 tpy threshold, then a major source permit is required not just for it but for the entire mine - even though one would not have been required if the mine did not have a coal processing facility and even though the mine in this case is clearly the primary enterprise.[5]

---

[5]  EPA has stated that the result of requiring a coal mine to be subject to major source requirements if fugitive emissions from the mine's coal processing plant meet the major source threshold is dictated by its other regulations that require regulated operations be aggregated as a single source if they have the same SIC two digit code, are located on adjacent or contiguous properties, and are under common control.  Requirements for Implementation Plans: Surface Coal Mines, 54 Fed. Reg. at 48880-882 (discussing the applicable regulations). While acknowledging that a strict construction

### 3.     Defendant's application for a minor source permit

### a.     The mine facilities

Defendant's application for its minor source construction permit describes the mine facilities

that will be built beginning with the facilities and equipment at the "mine face," *i.e.*, where the coal

is physically removed from the ground.  There, according to the application, the overburden will be

removed with a dragline and the exposed coal will be ripped, removed, and prepared for loading,

with the potential for some temporary storage at the mine face.  (Doc No. 1-1, p. 5).  The nearest

point of the mine face will be some three to four miles southwest of the Coyote Station.  (Id. at p.

---

of these same regulations might suggest that fugitive emissions from both sources should then be considered in determining whether the major source threshold is reached, EPA has stated it applies a "primary activity test" to determine which of the two is primary and, if it is the coal mine, which is an unlisted source, then fugitive emissions would continue not to be counted.  Id. at 48,881  In particular, EPA stated the following:

> Under this primary activity test, EPA or the permitting authority should review all the facts and circumstances of the particular case to determine what is the main purpose and function of the overall operation, and make an applicability determination based on the status (listed vs. nonlisted) and tonnage threshold (100 tons per year vs. 250 tons per year) of the primary activity. Thus, as SCM's continue to be a nonlisted source category, where coal mining is the primary activity, a mine's fugitive emissions are not considered in determining threshold applicability for a source consisting of the mine and some other collocated activity. In both of the final determinations cited above, EPA concluded that the coal mine was the primary activity, and EPA anticipates that this would be the case in most, if not all, future examples involving coal processing activities. In terms of both the purpose of the enterprise and the economic value of the newly mined coal as compared with the processed coal, it is the mining that is the focus of the overall effort.

Id.  While this may make some sense as far as it goes, what is puzzling is EPA's explanation for why the entire mine should be considered a major source based simply upon the secondary activity of the coal processing plant - particularly given EPA's policy choices for not considering fugitive emissions from the coal mine in the first instance.  That explanation was simply the following:

> The EPA believes that the structure and function of its regulations in the above examples are reasonable and appropriate under the Act. *Indeed, industry commenters have presented no evidence of adverse practical consequences from this view, because coal preparation plants and coal cleaning plants apparently do not usually exceed major source size thresholds.*

Id. (italics added).  Since that was written, EPA has concluded in a 2009 rulemaking discussed in more detail later that it would not establish PM emission limits for coal stockpiles and haul roads within coal processing plants because of the excessive costs of monitoring and the fact that the fugitive dust from these facilities are subject to dust suppression requirements imposed by SMCRA and the individual states.  With that, it arguably makes even less sense to subject a surface mine to major source requirements simply because the coal processing facility may be a major source.

41

4).

After the coal is loaded onto haul trucks, it will be transported from the mine face over a haul road that will be constructed to an open storage pile that will be located just outside of and physically adjacent to where defendant will construct a coal crushing facility, which, in turn, will be located next to the Coyote Station.  According to the application, the open storage pile will store approximately 180,000 tons of coal and will have a base area of roughly 700 feet by 500 feet, covering a surface area of approximately 350,000 square feet, or approximately 8 acres.  (Id. at p. 5).

According to the application, the stockpiled coal will then be pushed into a "receiving pocket and apron feeder" by dozers.  Upon entry of the coal into the receiving pocket, the apron feeder (which apparently is some sort of large auguring device) will convey the coal a short distance to where it will undergo both primary and secondary crushing.  After the coal is crushed, it will fall onto a conveyer operated by the generating station.  (Id.)

The application states that specially designed enclosures surrounding its coal processing and conveying equipment will control the dust, with fogging if necessary.  In air pollution control parlance, these enclosures are referred to as the PECS ("passive enclosure containment system"). The application states that no measurable particulate emissions to the atmosphere are expected with the use of these control systems.  (Id.).

According to the application, defendant expects to produce approximately 2.5 million tons of coal annually with the capability of being able to produce up to 3.2 million tons per year - the highest amount that will be processed without requiring additional approval from the NDDOH.

Defendant has submitted with its briefing a diagram (obviously not-to-scale) to illustrate the flow of the coal and layout of the mine facilities relative to each other. While outside of the complaint, plaintiffs also refer to the diagram in their supplemental brief and do not appear to contest the fact that it is representative of the general layout, contesting only defendant's conclusion as to what is the beginning of its coal processing facility.



(Doc. No. 38-6).

  **b.**  **The application's explanation for why a major source permit was not required**

  Defendant's application provides a detailed explanation for why the coal mine will not be a major source and, for that reason, only a minor source permit to construct is required to satisfy North Dakota's separate air pollution control requirements. Generally speaking, the application works its way through the applicable federal statutes and regulations previously described, noting in particular that: (1) the only pollutant that will be emitted from the coal mine is PM; (2) the only fugitive emissions that need to be counted for purposes of determining whether the mine is a major source are those from the mine's coal crushing facility; (3) the only emissions of PM from defendant's coal processing facility will be fugitive emissions because no emissions are mechanically vented; and (4) the fugitive emissions from defendant's coal crushers and conveying equipment are expected to be negligible based on the control imposed by the PECS. (Doc. No. 1-1, pp. 7-10).

  As for the PTE for fugitive emissions of PM from defendant's coal pile and the unloading of coal onto the pile, the application states that these were not counted because the coal pile and the unloading of coal to the coal pile are not part of the coal crushing facility subject to regulation under Subpart Y. Rather, according to defendant, they are merely part of the rest of the mine for which fugitive emissions do not count. In support of this conclusion, the application references the definition of "coal processing and conveying equipment" in 40 C.F.R. § 60.251(g) as well as what it contends is the applicable guidance from EPA. According to the application, EPA has taken the position that the beginning of a coal processing plant is the point where coal is first loaded into an

44

apparatus that receives coal for processing ("first hopper") and that, in this instance, this would be the receiving pocket of the coal crushing facility immediately downstream from the coal storage pile. (Id. at pp. 11-13).

### C.   Whether the PTE for fugitive emissions of PM from the coal pile and the unloading of coal to the pile  must be counted

#### 1.   The allegations in the amended complaint specific to the coal pile and the unloading onto the coal pile

Plaintiffs allege in their amended complaint the following as it relates to defendant's coal stockpile and the unloading of coal onto the pile:

- the PTE for uncontrolled emissions of PM from the haul truck coal unloading will be between 0.01 tons per year and 58.6 tons per year.

- the PTE for uncontrolled emissions of PM from the coal stockpile due to wind erosion will be between 188.4 tons per year and 227.9 tons per year.

- the PTE for uncontrolled PM from bulldozing activities at the open storage pile will be between 0.4 tons per year and 117.2 tons per year.

Plaintiffs allege that these PTE's are based on applicable emissions factors used by air quality engineers, but they reserve the right to amend these numbers based on information obtained during discovery.   (Doc. No. 11-1, ¶¶ 42-44, p. 12).[6]

#### 2.   EPA's promulgated regulations

In addressing the question of whether the PTE for fugitive emissions of PM from the coal

---

[6]  Plaintiffs also contend in their amended complaint that the PTE for fugitive emissions of PM from the coal haul trucks prior to any unloading have to be counted.  That does not appear to be the case from what follows even if the court relied upon what plaintiffs claim is the relevant EPA guidance.

storage pile and the unloading of coal to the pile must be counted for purposes of determining whether the threshold of 250 tpy of PM is reached, the court will consider first EPA's published regulations and then turn in the next section to what the parties contend is the relevant guidance from EPA.

Subpart Y of 40 C.F.R. Part 60 (§§ 60.250 through 60.256) contains most of the regulations governing coal processing plants, including setting performance standards for purposes of the CAA's NSPS program. Subpart Y includes the following definition for coal processing plants:

> (e) *Coal preparation and processing plant* means any facility (excluding underground mining operations) which prepares coal by one or more of the following processes: breaking, crushing, screening, wet or dry cleaning, and thermal drying.

40 C.F.R. § 60.251(e). In addition, Subpart Y also refers to "affected facilities" that are specifically listed as being the following:

> Thermal dryers, pneumatic coal-cleaning equipment (air tables), coal processing and conveying equipment (including breakers and crushers), coal storage systems, transfer and loading systems, and *open storage piles*.

40 C.F.R. § 60.250(d) (italics added).[7] As will be addressed in more detail later, the previous list of "affected facilities" was expanded in 2009 when Subpart Y was amended to include "open storage piles." The reason for the distinction in Subpart Y between the coal processing plant and "affected facilities" is that Subpart Y only imposes performance standards on "affected facilities" of the coal processing plant and not on the entire plant.

In addition to the definition of a coal processing plant and the list of affected facilities,

---

[7] The term "affected facility" is defined at the beginning of Part 60 in § 60.2 as follows:

> *Affected facility* means, with reference to a stationary source, any apparatus to which a standard is applicable.

several additional Subpart Y definitions are relevant.  They are:

> (f) *Coal processing and conveying equipment* means any machinery used to reduce the size of coal or to separate coal from refuse, and the equipment used to convey coal to or remove coal and refuse from the machinery.  This includes, but is not limited to, breakers, crushers, screens, and conveyor belts.  Equipment located at the mine face is not considered to be part of the coal preparation and processing plant.

> (h) *Coal storage system* means any facility used to store coal except for open storage piles.

> \* \* \* \*

> (m)  *Open storage pile* means any facility, including storage area, that is not enclosed that is used to store coal, including the equipment used in the loading, unloading, and conveying operations of the facility.

40 C.F.R. § 60.251(f),(h), (m).

Unfortunately, these regulations by themselves do not provide a clear answer as to whether the PTE for fugitive emissions of PM from the coal storage pile and the unloading of coal to it are in or out for purposes making the required PTE determination for whether the mine is a major source.  Under the statutory regime previously described, the source category for which fugitive emissions must be considered is "coal preparation and processing plants" and not "coal piles."  Consequently,  for the emissions from the coal storage pile in this case to be counted, it seems plain that the coal storage pile must be a part of the coal processing plant and not just another part of the mine.  This is further reinforced by the following provision that leads off Subpart Y:

> (a)  The provisions of this subpart apply to affected facilities *in* coal preparation and processing plants that process more than  . . . . (200) tons of coal per day.

40 C.F.R. § 60.250(a) (emphasis added).  And, while it appears that EPA has concluded that fugitive emissions from any facilities that are a part of a coal processing plant must be considered and not

47

just from those that Subpart Y has deemed to be "affected facilities," this provision supports the conclusion that the coal pile must be a part of (*i.e.*,"in") the coal processing plant because the regulations do not reasonably support a conclusion that coal processing plants have two kinds of coal piles, those that are affected facilities and those that are not.

But, while it appears plain that the coal pile must be a part of the coal processing plant for its fugitive emissions to be counted, this begs the question of exactly what is the coal preparation plant and whether it includes the coal storage pile in this instance. One plausible interpretation in light of the definitions of "coal preparation and processing plant" and "coal processing and conveying equipment" set forth above is that the coal processing plant only encompasses those structures that contain (or, in the case of some coal preparation plants that have multiple facilities and structures, boundaries that encompass) the equipment and facilities that prepare and process the coal, which, in this case, are the crushers together with the mechanical equipment that conveys the coal to and away from the crushers. Applying this construction, defendant's position that its coal processing plant begins at the point where the coal is deposited into the receiving pocket of the structure that contains the coal crushing and conveying equipment and would not extend to a stockpile of coal prior to that point (since the storage pile is not something that prepares coal by one or more of the following processes: "breaking, crushing, screening, wet or dry cleaning, and thermal drying") is within the text of Subpart Y.

Another plausible interpretation, however, is that a coal processing plant would include an area adjacent to where the physical processing takes place when it is used for stockpiling coal that is destined for processing within what would then be considered to be the remainder of the coal

processing plant.  Essentially, this is plaintiffs' interpretation.[8]

Still another plausible interpretation is that a pile of coal that exists simply to facilitate loading into what is otherwise the remainder of the coal processing plant is a part of the plant.  This appears to be plaintiffs' alternative argument.

### 3.    EPA guidance

Both parties point to statements made by EPA that they claim support their interpretation of the foregoing regulations and whether, in this instance, the coal pile is part of the coal processing plant or simply another part of the mine. In terms of making a decision in this case, any EPA guidance on the issue, if reasonable, is entitled to respect but not full Chevron deference, which only applies to a product of EPA's formal rulemaking.  ADEC, 540 U.S. at 487-88.

### a.    The applicable EPA guidance according to plaintiffs

Plaintiffs rely primarily upon EPA, New Source Performance Standards (NSPS) -- Applicability of Standards of Performance for Coal Preparation Plants to Coal Unloading Operations, 63 Fed. Reg. 53288 (Oct. 5, 1998) (hereinafter "1998 Coal Unloading Guidance"), which was issued before "coal piles" were added to the list of affected facilities by the amendments to Subpart Y in 2009.  The 1998 Coal Unloading Guidance addressed several issues only one of which is the focus of plaintiffs' argument.

---

[8]  Plaintiffs also point to the definition of coal processing and conveying equipment and its statement that equipment at the mine face is not included as part of the coal processing plant.  Plaintiffs argue this suggests that anything beyond the mine face should be considered part of defendant's coal processing plant - at least under the circumstances of this case.  The court disagrees.  More likely, this language was inserted in the definition in question to make clear that the handling of the coal at the mine face (which may involve some breaking, for example) would not be considered coal "processing" and subject to regulation under Subpart Y.

Before turning to the part of the <u>1998 Coal Unloading Guidance</u> that plaintiffs rely upon, it is helpful for what follows to consider the first issue that was addressed:  whether coal unloading at a coal processing plant falls within the definition of "coal processing and conveying equipment" (an "affected" facility under the definitions set forth above) so that emissions from coal unloading would be subject to Subpart Y's performance standards.  EPA answered this question by stating that unloading would generally fall within the "definition of coal processing and conveying equipment," but not if the coal was unloaded for storage.   More specifically, EPA stated:

> EPA concludes that coal unloading that involves conveying coal to plant machinery fits within the definition of "coal processing and conveying equipment." 40 CFR 60.251(g) defines "coal processing and conveying equipment" as "any machinery used to reduce the size of coal or to separate coal from refuse, and the equipment used to convey coal to or remove coal and refuse from the machinery. This includes, but is not limited to, breakers, crushers, screens, and conveyor belts." The key phrases are "the equipment used to convey coal to * * * machinery" and "but is not limited to." While the "equipment" involved in coal unloading varies from plant to plant (the definition is written broadly enough to accommodate the differences), what is important is that the equipment perform the function of conveying. It should be noted that if the coal is unloaded for the purpose of storage, then the unloading activity is not an affected facility under NSPS Subpart Y. The coal must be directly unloaded into receiving equipment, such as a hopper, to be subject to the provisions of NSPS Subpart Y.

<u>1998 Coal Unloading Guidance</u>, 63 Fed. Reg. at 53289.  And, while what was being addressed specifically was whether coal unloading was part of the affected facility of coal processing and conveying equipment, it also more broadly raises the question of what unloading activity is part of a coal processing plant itself, given the definitions for what is a coal processing plant and what constitutes coal processing and conveying equipment.  And, it is the parsing of these definitions that defendant in part relies upon for its conclusion that its coal storage pile is not regulated under Subpart Y.

50

The part of the <u>1998 Coal Unloading Guidance</u> that plaintiffs expressly rely upon addressed the issue of whether fugitive emissions from coal unloading must be counted in determining whether a coal preparation plant is a major source.  EPA concluded generally that they would (at least for Title V permitting purposes) and  gave two reasons for why that would be the case.  In the process of stating the second reason, it went on to offer that "coal unloading for *temporary* storage be treated no differently" than unloading that is considered to be part of the coal processing plant  because it is an "optional first step in the coal preparation process."  More specifically, EPA stated:

> EPA has determined by rule that fugitive emissions count towards the major source threshold for all sources that belong to the source category regulated by NSPS Subpart Y. 49 FR 43202, 43209 (October 26, 1984). Under the definition of source used in the 302(j) rulemaking, all types of coal unloading at coal preparation plants are covered. Coal unloading normally belongs to the same industrial grouping as other activities at coal preparation plants, is located on contiguous or adjacent property, and is under common control. Therefore, EPA concludes that all coal unloading at a coal preparation plant is part of the source belonging to the source category for coal preparation plants.
>
> Coal unloading of all types also fits within the NSPS source category. A survey of EPA Regional Offices indicated that the majority of the Regions treat coal unloading at a coal preparation plant as being within the NSPS source category. Coal unloading that is regulated under Subpart Y is clearly within the source category. *Common sense would dictate that coal unloading for temporary storage be treated no differently. It is performed at the same facility and is an integral part of the operations at that facility. The latter type of coal unloading is simply an optional first step in the coal preparation process.*

63 Fed. Reg. at 53290  (italics added).  Focusing on the second paragraph,[9] plaintiffs contend that it provides a direct answer to the question of whether the coal pile in this case must be counted.  This is because, according to plaintiffs, the unloading of coal onto defendant's coal storage pile is an

---

[9]  With respect to the first reason, if what is being suggested is that fugitive emissions must be counted for coal unloading outside of the coal processing plant if it is on contiguous or adjacent property and under common control, that arguably would not apply when such coal unloading is within a coal mine where the mining activity is primary and the coal processing secondary.  As noted in footnote 5 supra, EPA employs a primary activity test to determine whether the fugitive emissions from the coal mine generally must be counted in making the major source determination for coal mines that have coal processing plants.

integral part of the coal processing and preparation process and, in this instance, simply an optional first step.

While plaintiffs reading of this guidance is a plausible one, EPA has also said other things that cast some doubt on plaintiffs' contention that the foregoing guidance necessarily applies to the coal storage pile in this case and the unloading of coal to that pile, including that the beginning of a coal processing plant is the point where coal is unloaded into the "first hopper." And, depending upon how those statements should be construed, one *possible* construction of the portion of the <u>1998 Coal Unloading Guidance</u> that plaintiffs reference (which does not specifically mention coal piles) is that it applies only to unloading into a silo, bunker, or even a small coal pile for short term storage before the coal is processed but after it has already passed through a hopper or other unloading structure that EPA has otherwise suggested as being the beginning of a coal processing plant. And, it does appear that this is done in some coal processing plants.  In the EPA memorandum summarizing the study of the costs of controlling emissions from six different coal processing plants, the descriptions of several of the plants indicate that coal was stockpiled in those plants, either for short term or long term storage, after the coal had passed through a receiving structure.  In fact, in one of the plants, the coal was into three separate piles for later blending.  <u>See</u> <u>Model Plant Control Costing Estimates Memo</u>, <u>supra</u>.  (Doc. No. 38-4).

But, even putting that aside, the portion of the 1998 Guidance relied upon by plaintiffs appears to suggest that it would apply only to the unloading of coal for "temporary storage." And, unfortunately, no further guidance was given as to what was meant by "temporary" and, absent

something more, it probably would have to be determined on a case-by-case basis.[10]

> **b.      The applicable EPA guidance according to defendant**

As noted earlier, defendant's application for its minor source permit took the position that the upstream boundary of its coal processing facility is the point where coal is unloaded into the receiving pocket and that the coal pile and unloading of the coal onto the coal pile are upstream of this point and are simply part of the remainder of the coal mine.  In support of its argument, defendant cites to what it contends is the applicable EPA guidance, that being the number of instances in which EPA has stated that a coal processing plant begins where coal is unloaded at the "first hopper."

For example, the reference to "first hopper" appears in the preamble to the final rule adopting the 2009 amendments to Subpart Y,[11] which included "open storage piles" as affected facilities. EPA, Standards of Performance for Coal and Processing Plants; Final Rule, 74 Fed. Reg. 51950, 51952 (Oct. 8, 2009) ("A coal preparation and processing plant begins at the first hopper (i.e., drop point) used to unload coal").  Another example is in the EPA responses to comments made during the 2009 rulemaking.  EPA, Standards of Performance for Coal Preparation and Processing Plants (40 C.F.R. 60 Subpart Y), Response to Comments Received on Proposed Amendments and

---

[10]    While it may be for another purpose, the EPA cost study memorandum does differentiate between "short-term" and "long-term" coal storage piles and all of the coal piles described as being short-term in the study were of 0.5 acres in size or less and those that were described as being long-term were more than an acre in size with the smallest of the piles labeled long-term being 3 acres in size.  As noted earlier, defendant's application states that the coal pile in question in this case will be approximately 8 acres in size.  The size of the coal pile may not be the only relevant factor for purposes of determining what is temporary versus longer term storage.  Arguably, the capacity of the coal processing plant would also be a factor in terms of how long the coal would remain in the storage pile.

[11]    National Mining Ass'n v. U.S. E.P.A., 59 F.3d 135, 1355 & n.7 (D.C. Cir. 1995) (EPA's preamble to a final rule should be considered when interpreting it as appropriate).

Supplemental Proposal, at 79 (September 2009) ("EPA Comments to Proposed 2009 Amendments")

("EPA interprets coal unloading into the first hopper 'downstream' from any form of transportation

to be the beginning of the 'coal preparation plant.'") (Doc. No. 38-5).  Also, there is the statement

in the 1998 Coal Unloading Guidance referenced earlier:  "The coal must be directly unloaded into

receiving equipment, such as a hopper, to be subject to the provisions of NSPS Subpart Y."  63 Fed.

Reg. at 53289.

The term "first hopper" is not used by Subpart Y, but ordinarily one would associate this

term with a piece of equipment or a physical structure.[12]   And, another portion of the EPA

Comments to the 2009 Amendments that defendant relies upon is consistent with that.  The full text

of the comments and the response that defendant points to are the following:

### 3.4.1.1 Coal Unloading Activities - Subpart Y Proposal Contrary to EPA Policy

**Comment:** Many commenters (085, 086, 088, 095, 107, 108, 112, 115, 117, and 120) stated
that Subpart Y should not be applicable to coal unloading activities because of previous EPA
applicability determinations and current EPA policy. Commenters disagree with EPA's
rationale for its proposal to amend Subpart Y to include coal unloading activities. EPA
concluded that coal unloading, in general, and truck dumps, in particular, are NSPS affected
facilities at coal preparation plants based on (1) an "exceptionally strained" interpretation of
the term "conveying equipment," (2) a guidance manual for agency inspection of coal
unloading at coal preparation plants, and (3) a document that did not specifically address
coal unloading but nevertheless assumed that activity was regulated by Subpart Y. Review
of the record shows evidence that EPA never intended for coal unloading activities to be an
affected facility at coal preparation plants when Subpart Y was promulgated. Specific EPA

---

[12]   See, e.g., Oxford English Dictionary Online (last accessed May 28, 2016) ("3. In a corn or other grinding mill: a receiver like an inverted pyramid or cone, through which grain or anything to be ground passes into the mill.  4. Applied to similar contrivances for feeding any material to a machine, and, generally, to articles resembling a mill hopper in shape or use."); Random House Unabridged Dictionary (2d ed. 1993) ("5. a funnel-shaped chamber or bin in which loose material, as grain or coal, is stored temporarily, being filled through the top and dispensed through the bottom."); Webster's New World Dictionary (Third College Ed. 1988) p. 650 ("3 [so called from making the material "hop"] a box, tank, rail car, etc., often funnel-shaped from which the contents can be emptied slowly and evenly [the *hopper* of an automatic coal stoker]").

determinations cited by commenters concerning EPA's intentions for regulating coal unloading activities under Subpart Y include the following.

■   In 1980, EPA's first review of Subpart Y concluded that that coal unloading was not a Subpart Y affected facility.

■   In 1995, EPA Region VIII advised the Wyoming Department of Environmental Quality that "truck coal dump operations are not affected facilities subject to the NSPS Subpart Y regulations."

■   In 1998, EPA Headquarters published an interpretative ruling in the Federal Register stating that "coal unloading that involves conveying coal to plant machinery is regulated under Subpart Y" (63 FR 53288, dated October 05, 1998). EPA Headquarters "use[d] the term "coal unloading¨ to encompass "coal truck dumping" and "coal truck unloading¨ as well as dumping or unloading from trains, barges, mine cars, and conveyors." EPA explained its reasoning behind that 1998 interpretation, as follows: section 60.251(g) defines "coal processing and conveying equipment"as "any machinery used to reduce the size of coal or to remove coal and refuse from the machinery. This includes, but is not limited to, breakers, crushers, screens, and conveyor belts." The key phrases are "the equipment used to convey coal to . . . machinery" and "but not limited to."  Although the equipment involved in coal unloading varies from plant to plant (the definition is written broadly enough to accommodate the differences), what is important is that the equipment performs the function of conveying. It should be noted that if the coal is unloaded for the purpose of storage, then the unloading activity is not an affected facility under Subpart Y. The coal must be directly unloaded into receiving equipment, such as a hopper, to be subject to the provisions of Subpart Y (63 FR 53289).

■   Subpart OOO explicitly excludes truck dumping from NSPS control requirements (section 60.672(d)). Subpart OOO was just recently revised, 74 FR 19294 (April 28, 2009), and it continues to contain that NSPS-exclusion for truck dumping. Thus, in the absence of (1) representative data for achievable levels of controlled emissions from coal unloading and (2) associated documentation that the costs of such controls are reasonable, the obvious inference is that coal unloading should also remain excluded from NSPS.

**Response:**  As commentators noted, in 1998 EPA issued an interpretative ruling that states that "coal unloading" operations (which include both truck and rail car dumping) are regulated by Subpart Y.  This interpretative ruling has not changed in intervening years and thus remains, in effect.  In the interpretative ruling, EPA concluded:

> …that coal unloading that involves conveying coal to plant machinery fits within the definition of "coal processing and conveying equipment." 40 CFR 60.251(g) defines "coal processing and conveying equipment" as "any machinery used to reduce the size of coal or to separate coal from refuse, and the equipment used to

55

convey coal to or remove coal and refuse from the machinery. This includes, but is not limited to, breakers, crushers, screens, and conveyor belts." The key phrases are "the equipment used to convey coal to * * * machinery" and "but is not limited to." While the "equipment" involved in coal unloading varies from plant to plant (the definition is written broadly enough to accommodate the differences), what is important is that the equipment perform the function of conveying...*The coal must be directly unloaded into receiving equipment, such as a hopper, to be subject to the provisions of NSPS Subpart Y.* (see 63 FR 53288.)

*Thus, EPA interprets coal unloading into the first hopper "downstream" from any form of transportation to be the beginning of the "coal preparation plant."*

As the standards under Subpart Y are based on data obtained from subject facilities, the comparisons with subpart OOO have no meaning. As discussed below in response to comment 3.4.2.1, the central question is whether the standard set in this rule is appropriate not whether a standard set in a different rule was appropriate. Much of commenters' reasoning is based upon past applicability determinations that said unloading were not subject to Subpart Y. Such determinations were based on interpretations of the current rule language at the time. Thus, the determinations do not speak to Agency intent or policy regarding whether such regulation would be appropriate. Further, as noted, they were superseded by the 1998 interpretation, which was published in the <u>Federal Register</u>.

<u>EPA Comments to Proposed 2009 Amendments</u>, at 78-79 (italics added).

Finally, defendant points to other EPA responses to the comments to the 2009 rulemaking where EPA arguably applied the same dividing line to distinguish between haul roads located within a coal processing plant and those leading up to it but not a part of the coal processing plant. One example is the following:

**Comment:** Many commenters (082, 085, 086, 087, 088, 093, 095, 107, 109, 112, 114, 115, 120, 123, and 126) requested clarification regarding the plant roadways to which EPA intends Subpart Y to apply. EPA does not clearly explain what it means for a roadway to be "associated" with a preparation plant. Nor does EPA define the term "haul road." EPA should clarify that "roadways" such as haul roads that do not leave the plant property are not subject to Subpart Y. EPA needs to clearly define where the coal preparation plant begins and where the coal mine ends. Subpart Y is applicable only to affected facilities of a coal preparation plant. EPA should clarify that no facilities at a coal mine, even if the mine is contiguous to the property of the preparation plant, are covered under the provisions of Subpart Y. EPA must clearly define the term "haul roads" and should not, regulate under Subpart Y any roadways outside of the preparation plant. Other commenters (096 and 113) disagree with EPA's proposal to exclude roadways that do not leave the property (e.g., haul

56

roads at coal mines) from being subject to Subpart Y for the following reasons with specific examples cited: (1) road wetting can be accomplished in a manner that is easy to adjust with the re-routing of haul roads, including the use of water trucks and temporary sprayers; (2) certain coal preparation plants are already required to abate dust on their internal haul roads; (3) some states currently impose dust suppression requirements on all roads associated with coal preparation plants.

**Response:** As noted in the response to Comment 3.2 above, EPA, in both the air and water offices, has historically maintained the concept that *activities undertaken at or near the active mine face ("active mining area") would not be part of the "coal preparation plant" and that "coal preparation" involves separation of coal from impurities (i.e., "breaking" or "crushing"). As discussed in the response to the comment in section 3.4.1.1.1 above, EPA interprets the "beginning" of the "coal preparation plant" to be the first hopper (i.e., "drop point") for receipt of coal from any form of transportation. Thus, any haul roads between the "active mining area" and the first hopper of the "coal preparation plant" would not be subject to Subpart Y; rather they would be subject to the requirements of SMCRA or the specific State.* Similarly, roads occurring after the coal has been loaded for distribution would not be subject to Subpart Y.

Under the definition of "surface coal mining operations" contained in 30 CFR 70.5 (SMCRA), operations conducted within a coal preparation plant are covered under SMCRA:

> [quotations to specific SMCRA regulations that govern control of fugitive dust under SMCRA including those portions of coal mines that process or prepare coal]

Thus, SMCRA covers fugitive dust emissions from roads at coal preparation and processing plants at mine sites and requires a fugitive dust plan and other requirements to control air pollution from such sources (through similar measures as were included in the supplemental proposal for Subpart Y). *EPA believes that coal moving operations, once the coal enters the "coal preparation plant," will be by conveyor rather than by truck. Therefore, EPA believes that the requirements of SMCRA are sufficient to address air emissions from roadways that may be found within a coal preparation and processing plant at mine sites. For coal preparation and processing plants at end-user facilities, EPA believes that, again, once the coal enters the "coal preparation plant," coal moving operations will be by conveyor rather than by truck.* Therefore, EPA is withdrawing its proposed requirements for roadways.

Where fugitive coal dust emissions control plan requirements under Subpart Y for open storage piles overlap requirements under SMCRA or State regulations, those sources may submit the more stringent of the required monitoring plans to the Administrator or delegated authority as required by the final rule.

EPA Comments to Proposed 2009 Amendments at 93-95 (italics added).

Defendant contends that collectively the foregoing guidance makes clear that the beginning

of a coal preparation plant ("first hopper") is the first unloading point onto or into a piece of equipment or structure that is directly and physically connected to the conveying of the coal for processing and that this is consistent overall with definitions of "coal preparation and processing plant" and "coal processing and conveying equipment." And here, according to defendant, the only point where coal unloading onto or into such a piece of equipment or structure takes place is where the coal is bulldozed into the receiving pocket from which it is then conveyed by a mechanical augur to the point where it undergoes primary and secondary crushing.

While the court agrees this is a plausible reading of EPA's statements, it is by no means the only one. For one thing, while the foregoing does suggest that the "first hopper" is an identifiable piece of equipment or structure that is directly involved in the process of conveying coal for processing, EPA has also referred to the "first hopper" parenthetically as being a "dropping point." And, if that is all that EPA meant, then the first dropping point after the transportation of the coal to the processing plant would arguably be the unloading of coal onto defendant's coal storage pile.[13] Further, another possibility is that, when the references to the "first hopper" are considered in connection with what else EPA has said, including the 1998 Coal Unloading Guidance, a coal pile might in some cases be a sufficient structure ("first hopper") or an extension of one.

### c.      Summary re EPA guidance

Both parties claim that the relevant EPA guidance clearly supports their position as to whether the coal pile and unloading onto the coal pile are parts of defendant's coal preparation plant

---

[13] But, if that is all that EPA meant, the use of "first hopper" seems to be an odd choice of terms. Why not simply use "first dropping point" or "first unloading point."

or simply other parts of defendant's mine.  The court disagrees.  In the court's view, what EPA has said does not provide a clear answer one way or the other - at least based on the present facts.[14]

### 4.   Whether drawing the line between the coal preparation plant and the rest of the coal mine at the point where coal enters the receiving pocket would be an arbitrary application of Subpart Y

Plaintiffs contend that drawing the line between the coal processing plant and the rest of the mine where defendant has drawn it leaves the coal pile and the unloading onto the coal pile unregulated and this obviously could not have been what EPA intended.  The mere fact that these emissions would not be regulated under Subpart Y (and also that the coal mine would not be a major source if these emissions were the tipping point in terms of whether the major source threshold has been reached) does not mean that EPA must have intended a contrary result.  Quite the contrary, EPA's choices in terms of what emissions to regulate under the broad authority provided by the CAA as well as the decisions of Congress in terms of what is subject to the CAA in the first instance are all about line drawing.

Further, and more granularly here, EPA has decided not to count fugitive emissions of PM from coal mines in determining whether they are major sources based on the policy considerations addressed earlier.  Also, EPA has not even adopted NSPS standards for coal mines and only defendant's coal processing facility is subject to Subpart Y.  Finally, even for coal piles and haul roads that are undisputedly within a coal processing facility and clearly subject to Subpart Y, EPA

---

[14] That being said, the stockpiling of coal by the mine for the purpose of having sufficient storage to meet contractual delivery requirements during the times when active mining operations are suspended for some reason, arguably, is for a different purpose than coal processing.  And, the court has difficulty understanding why the placement of such a storage pile next to the coal processing facility rather than at the mine face would necessarily change that.

has decided not to impose the numerical emission limitations of PM that Subpart Y imposes on certain types of coal processing equipment or even the opacity standards that it requires be met by most of the rest of the coal processing plant. Rather, for coal piles, it has limited the control to imposing "work practice standards" for controlling fugitive dust that, for the most part, appear to be comparable to those already being imposed by SMCRA and the NDDOH[15] for all coal piles located within a mine, including those within a mine's coal processing facility. And, for dust from haul roads that are clearly within a coal processing facility, EPA decided not to go even that far, electing instead to simply rely upon the controls imposed by the DOI under SMCRA and by the individual states in their air pollution control programs. See 40 C.F.R. §§ 60.252 - 60.254; EPA Comments to Proposed 2009 Amendments at 81, 85, 95-96  In fact, one of the reasons that EPA gave for not imposing numerical limits on emissions or opacity standards for the coal piles and haul roads was that, "[a]t the current stage, EPA believes it difficult and prohibitively expensive to measure actual PM emissions from individual open storage piles or roadways." Standards of Performance for Coal and Processing Plants; Final Rule, 74 Fed. Reg. at 51954.

In short, the mere fact that the coal pile and the unloading to it may not be subject to Subpart Y regulation and the fugitive emissions also then not counted for purposes of determining whether the mine is a major source is not such an arbitrary or unreasonable result that this could not have

_____

[15]  N.D.A.C. ch. 33-15-17 sets forth North Dakota's regulations on fugitive emissions and, pursuant to the authority granted by that chapter, the NDDOH set forth a number of specific requirements for control of fugitive dust in defendant's minor source permit, including, when necessary, such things as frequent watering, addition of dust palliatives, etc. (Doc. No. 1-2, pp. 2-3). As part of their supplemental briefing, plaintiffs submitted photographs showing clouds of dust being emitted from what they claimed was defendant's haul road activity. While the court is not unsympathetic, plaintiffs can seek relief from the NDDOH as well as the state courts if defendant is violating its permit conditions with respect to dust control. Also, plaintiffs may have other remedies, such as a common law claim of nuisance.

been what EPA intended.  In fact, treating the coal pile in question and the unloading to it no differently from the rest of the mine (including similar unloading to and maintenance of coal piles that may be elsewhere in the mine) is arguably consistent with the policy choice that EPA has already made in deciding not to count fugitive emissions from coal mines for purposes of determining whether coal mines are major sources.

### 5.        Deference to the NDDOH's determination

Defendant argues that the court should give deference to what it claims was the NDDOH's decision on this point. The problem with that, however, is that the minor source permit that plaintiffs presented as an attachment to their original complaint does not state one way or the other what the NDDOH may have concluded about whether such emissions should be counted or not.  In an attempt to bridge this gap, defendant has offered under the guise of "supplemental authority:" (1) a letter written by plaintiffs to EPA in which they make the same arguments as here for why the NDDOH should have required a PSD construction permit; and (2) a letter written by the NDDOH to EPA, which, according to the text of the letter, was a follow up on a conference call held between EPA staff and NDDOH staff about the issues raised in plaintiffs' letter.  (Doc. No. 35-1).  These letters, however, are beyond the scope of the amended complaint.[16]

Nevertheless, the court agrees with the broader point.  While this court does not sit in review of the NDDOH's determination and is obligated to make its own decision, the court must give due

---

[16] Also, the NDDOH letter to EPA does not *expressly* state that it had concluded that the PTE for PM emissions from the coal pile and the unloading to the coal pile did not have to be counted.  And, while it may be a fair inference that the NDDOH in fact reached that conclusion from its statement to EPA that it considers the beginning of a coal processing facility to be the point were coal is unloaded into the first hopper (quoting from an EPA guidance relied upon by defendant here), this is not the appropriate stage of the proceeding to start drawing these inferences.

consideration to the NDDOH's application of the relevant statutory and regulatory requirements to the particular circumstances of this case.  See Cascade Kelly Holdings, 2015 WL 9581754, at **19-20 (discussing the deference that should be accorded the state agency determination); cf. ADEC, 540 U.S. at 490-94 (same albeit under different circumstances).

### 6.    Conclusion

The court is not prepared at this point to decide whether the PTE for fugitive emissions from the coal pile and the unloading of coal to it are totally in or totally out for several reasons.  First, given the foregoing, the court is not convinced that it has all of the necessary facts to render a proper decision.  Second, as discussed later, there is the possibility that the court may have to consider the PTE for PM emissions from the coal pile to the extent that it is part of the unloading of coal from it into the receiving pocket - a point not specifically addressed by defendant's application.  So, if there needs to be further factual development with respect to that issue, it seems prudent to develop the record with respect to the unloading of coal on to the coal pile and the coal pile itself.  Finally, it may be that a more developed record will make the whole question beside the point.  That is, even if the PTE for fugitive emissions of PM from the coal pile and the unloading to the coal pile are considered, it may not be enough to push the total PTE for fugitive PM up to the threshold limit.[17] Also, a determination that the storage of coal is for a longer period than what the EPA may consider to be "temporary" may be reason not to count the PTE for fugitive emissions from the coal storage pile and the unloading to it.

---

[17] Defendant claims in its briefing that the estimates of potential fugitive emissions set forth in the amended complaint have double or even triple counted the amount of PM that could be emitted for technical reasons that cannot be resolved now.

**D.**     **Whether the PTE from defendant's coal crushing and conveying equipment must be determined without consideration of the PECS**

**1.     Additional background**

As noted earlier, 42 U.S.C. § 7479(1) defines "major emitting facilit[ies]" as "any of the following stationary sources of air pollutants which emit, or have the potential to emit, one hundred tons per year or more of any air pollutant …" and that "[s]uch term also includes any other source with the potential to emit two hundred and fifty tons per year or more of any air pollutant."  While the statute does not define potential to remit, EPA has offered the following in 40 C.F.R. §§ 51.166(b)(4) & 52.21(b)(4):

> (4) *Potential to Emit* means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable.  Secondary emissions do not count in determining the Potential to Emit of a stationary source.

Defendant's application for its minor source permit states with respect to its coal crushing and conveying equipment:

> Once the coal is brought to the processing facility, it is unloaded onto an open storage pile. From the pile the coal is pushed via a dozer into a receiving pocket and apron feeder where it enters the coal processing facility. At this point it undergoes primary and secondary crushing, all within enclosed chutes and skirtboards that are considered a passive enclosure containment system (PECS). After crushing, the coal is transferred to a conveyer belt that is owned and operated by Coyote Station, at which point it is no longer considered part of the CCMC permit.

(Doc. No. 1-1, p. 5).  Then later, the application states the following with respect to the PTE for fugitive emissions of PM from this equipment:

> 2.1.1.1 Emission Calculations

> The only emission unit which would be considered for the stationary source PTE calculations is the coal processing equipment. However, no emissions are calculated for the coal processing equipment as it will be controlled by enclosures and PECS. Any emissions from the coal processing equipment are expected to be negligible and unquantifiable as the control equipment is known to be very effective in reducing particulate emissions from coal processing facilities.

(Id. at p. 13).[18]

Plaintiff's amended complaint, on the other hand, alleges the following with respect to this portion of defendant's coal processing facility:

- the PTE for uncontrolled emissions of PM from the primary and secondary crusher will be between 700.8 tons per year and 1,927.2 tons per year.

- the PTE for uncontrolled emissions of PM from equipment used to move coal through the coal crushing facility and to the Coyote Station, including conveyor belts and transfer points, will be between 0.66 tons per year and 1,926 tons per year.

(Doc. No. 11-1,¶¶ 47-48, p.13).

## 2.   Discussion

It is clear from the use of the word "uncontrolled" as well as other allegations of plaintiffs' complaint, including ¶ 45, that these allegations do not take into account the PECS that are part of the design of the coal processing facility as set forth in the application. As a consequence, defendant argues that these allegations should be given no consideration with respect to whether plaintiffs have stated a claim, contending that the effect of the PECS must be taken into account. In response, plaintiffs make several arguments for why the PECS should not be considered. Before addressing

---

[18] As will be discussed later, it does not appear that defendant's application addressed the PTE for any fugitive emissions that might be generated from the pushing of the coal from the coal pile into the receiving pocket.

those arguments, some discussion about federal enforceability and EPA's authorization of synthetic

minor permits is required.

As noted in the definition of PTE, its determination can take into account certain controls

and restrictions that limit the amount of a pollutant being emitted if the controls and restrictions are

"federally enforceable." EPA's published regulations set forth a definition of federal enforceability

which requires that the particular controls or restrictions be enforceable by the EPA administrator.

40 C.F.R. §§ 51.166(b)(17) & 52.21(b)(17). While this definition remains on the books, the part

requiring enforceability by the EPA Administrator was rendered inoperative for most purposes by

court decision. EPA now acknowledges it is sufficient if the controls or limitations can be "legally

and practicably" enforced by a state or local pollution control agency as noted by one of its more

recent statements on the subject:

> Following two court decisions, NATIONAL MINING ASSOCIATION V. EPA, 59 F.3d
> 1351 (DC Cir. 1995) and Chemical Manufacturers Ass'n v. EPA, No. 89-1514 (DC Cir.
> 1995), we clarified that the term "federally enforceable" should be read to mean "federally
> enforceable or legally and practicably enforceable by a state or local air pollution control
> agency." Release of Interim Policy on Federal Enforceability of Limitations on Potential to
> Emit, at 3 (Jan. 22, 1996).

EPA, Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule Step 3,

GHG Plantwide Applicability Limitations and GHG Synthetic Minor Limitations, 77 Fed. Reg.

14226, 14245 n.44 (March 8, 2012) (discussing 40 C.F.R. §§ 51.165(a)(1)(iii), 51.166(b)(4),

52.21(b)(4)).

Under EPA's definition of PTE, it is permissible in making the PTE determination for a

source that has a PTE over the major source threshold limit to avoid having to obtain a major source

permit by committing to operational limits or the use of add-on pollution control equipment in a

minor source construction permit that will keep the emissions below the major source threshold. In CAA parlance, such a permit is referred to as a "synthetic minor permit." And, for such permits, EPA has suggested that merely committing in the permit that the use of the operational limitations or add-on control equipment will result in the threshold not being reached is not enough. Rather, EPA has suggested that, to be practicably enforceable, the operational limits must be capable of being translated into numeric limits on emissions for a shorter period of time than a year (preferably no longer than on a monthly basis) along with commitments for monitoring. EPA, <u>Guidance on Limiting Potential to Emit in New Source Permitting</u> (Memorandum to Terrell Hunt and John Seitz, June 13, 1989) ("<u>1989 PTE Guidance</u>") (Doc. No. 38-3).

With this background, one of plaintiffs' arguments is that EPA's guidance requires that, before defendant can take the PECS into account it must satisfy the <u>1989 PTE Guidance</u> in terms of what should be required for synthetic minor source permits, *.i.e.,* the permit should contain a limit on emissions measured over a period of preferably a month or less along with a requirement for periodic monitoring. Plaintiffs contend, that since defendant's minor source construction permit contains neither an emissions limit of this type nor a provision for periodic monitoring, that any control imposed by the PECS cannot be considered in calculating the PTE.

The court disagrees with this argument. Neither the definition of PTE nor the <u>1989 PTE Guidance</u> requires what in effect would be a synthetic minor source construction permit for all minor sources where the source's physical structure is a limiting factor. Rather, the definition of PTE contemplates a determination of PTE after taking into account physical limitations that are a part of the design. And, if it is clear that the PTE for the source with its physical structures in place will

66

not exceed the major source threshold when operated at capacity, then the source is simply a minor one. In other words, this is different from when the source as physically built and operated at capacity will result in a PTE above or so very close to the major source threshold that add-on emission control equipment or limits on the source's operation are required to insure that the actual emissions will below the major source threshold. A fair reading of the definition of PTE and the 1989 PTE Guidance is that this is when numeric limits on emissions over some period of time less than a year may be required along with provisions for periodic monitoring.

Granted, the line between physical limitations that are an integral apart of a source and add-on pollution control equipment may not always be a clear one. In this case, the PECS are clearly an integral part of the facility's structure.[19]

Plaintiffs also contend that, aside from whether the defendant must meet the requirements for a synthetic minor source permit, there must be some numeric limitation on emissions of less than simply the major source threshold amount in order to make the commitment to use the PECS practically enforceable. Again, the court disagrees.

Defendant stated in its application for its minor source permit that, with the physical limitations of the PECS in place, any emission of PM would be negligible and the NDDOH apparently agreed with this assessment. And, assuming that the amount of PM emissions will in fact be so small that there is no reasonable probability of the requisite major source threshold being exceeded, the court has trouble understanding why the requirement contained in the permit that the

---

[19] If, for example, defendant employed a baghouse to capture the emissions, the situation might be different.

coal crushing facility be constructed and operated with the PECS in place is not sufficient. Certainly, this design commitment can practically be enforced based on the permit conditions that will be addressed in more detail in a moment.  But, even if something more is required, defendant has committed to an emissions limit; that is, the emissions will be negligible and unquantifiable.[20]

Finally, at one point in the briefing, plaintiffs suggested that the PECS could not be considered because of the lack of "federal" enforceability.  However, as discussed earlier, EPA no longer insists that the condition or limitation must be enforceable by the EPA Administrator and it is sufficient that the condition or limitation can be enforced by a state permitting agency.  In this case, that is not a problem with respect to either defendant's commitment in its application to employ the PECS or its representation that the emissions of PM from the coal crushing and conveying equipment will be negligible.  Among other things, defendant's minor source permit

---

[20]   Defendant acknowledged in its brief that this is a binding representation and not mere puffery when defendant stated:

> In any event, emissions from the use of the federally enforceable PECS were quantified as being well below the major source threshold. Coyote Creek's Permit Application provided that the operation of the PECS would result in "negligible" emissions from the coal conveyors and crushers at the Coal Processing Plant. Doc. 1-1 at 13 (explaining that "no emissions are calculated for the coal processing equipment as it will be controlled by enclosures and PECS.  Any emissions from the coal processing equipment are expected to be negligible and unquantifiable as the control equipment is known to be very effective in reducing particulate emissions from coal processing facilities."). And the Permit issued to Coyote Creek by NDDH makes clear that "[a]ny alteration, repairing, expansion, or change in the method of operation of the source which results in the emission of an additional type or greater amount of air contaminants" than the amount represented in the Permit Application "must be reviewed and approved by the Department prior to the start of such alteration, repairing, expansion or change in the method of operation." Doc. 1-2 at 5. Plaintiffs cannot meaningfully argue that the conditions of the Permit are not "federally enforceable," given the developments in the law discussed above. *Coyote Creek's permit therefore does include a federally enforceable limitation on total emissions from the crushers and conveyors at the Coal Processing Plant—they must be negligible*, which makes the Coal Processing Plant a minor source.

(Doc. No. **) (italics added). Having made this representation here, defendant would be judicially estopped from later claiming otherwise.  See, e.g., New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (discussing judicial estoppel); Hutterville Hutterian Brethren, Inc. v. Sveen, 776 F.3d 547, 556-57 (8th Cir. 2015) (same).

provides that:

> Any violation of a condition issued as part of this permit to construct as well as any construction which proceeds in variance with any information submitted in the application, is regarded as a violation of construction authority and is subject to enforcement action.

(Doc. No. 1-2, p. 4).  Also, it requires that:

> Operations at the installation shall be in accordance with statements, representations, procedures and supporting data contained in the initial application, and any supplemental information or applications(s) submitted thereafter.

(Id.).[21]   Further, there is no question that the NDDOH can enforce these provisions.  In addition to any action that may be authorized by its regulations, these permit terms and conditions can be enforced by the NDDOH in a civil action brought pursuant to N.D.C.C. § 23-25-10.  Also, a violation of the permit conditions as well as any false statement in the permit application can be the subject of a state criminal prosecution.  Id.

In short, the court rejects plaintiffs' argument that this court would be required to consider the PTE of the coal crushers and the conveying equipment assuming no containment by the PECS.

### E.     Why dismissal at that stage would be premature in any event

It appears from the supplemental briefing that plaintiffs are contending that, even with the PECS in place, the PTE for fugitive emissions of PM from the coal crushing and conveying equipment will be much greater than what defendant claims, potentially exceeding the threshold limit either by itself or when combined with other emissions that plaintiffs claim must be counted.

---

[21]   While the court in this instance does not believe there needed to be a requirement for periodic monitoring, the mine permit does give the NDDOH the right at any time to enter the premises, perform tests, and inspect defendant's equipment and records.  Also, this permit authorizes only construction and some operation until defendant obtains the required operating permit.  (Doc. No. 1-2, p. 3).

Plaintiffs argue that they need discovery to be certain but point to the earlier referenced cost study conducted of the six different coal processing plants in response to defendant's arguments of implausibility.  In particular, plaintiffs point to the fact that the estimated PTE of uncontrolled emissions of PM from the coal processing plant at the western (Powder River Basin) subbituminous mine in that study was 2,424 tpy and that the actual emissions with controls in place (including the use of enclosures) was 324 tpy.  Model Plant Control Costing Estimates Memo, at p. 14 & Table 9 (Doc. No. 38-4, pp. 14-16 ).  Plaintiffs claim that this coal processing plant is comparable because its rated capacity of being able to process up to 2,000 tons of coal per hour is the same as defendant's.[22]

Further, it appears plaintiffs are also contending that there are two other emission points that must be considered, even if the court excludes from consideration the unloading of coal to the coal pile and the maintenance of the coal pile.  One is at the point where the coal enters what defendant has defined to be its coal processing plant and the other is at the exit point.

As indicated by the excerpts from the 1998 Coal Unloading Guidance and the comments to

---

[22]   The court has its doubts.  Among other things, the western mine processes a different quality of coal, the layout of the plant may be different, and the enclosures referenced in the study may not be as effective as defendant's PECS.  Moreover, while the rated capacity of the crushing equipment for the western mine is the same as defendant's, the amount of coal processed on a yearly basis by the two mines is likely not the same.  The estimates of uncontrolled and controlled emissions of PM from the coal processing plant for the western mine of 2,424 tpy and 324 tpy, respectively, were based on the coal processing plant running for 7,848 hr/yr at rated capacity.  This amounts to an annual production of processed coal of just under 15.7 million tpy, which may be appropriate for a Powder River Basin mine from which coal is railed to multiple customers.  In this case, however, defendant stated in its permit application that its mine is expected to produce 2.5 million tpy to serve one customer and, in any event, is limited by the permit to an annual production limit of 3.2 million tpy.  That being said, plaintiffs are correct that, according to the study, the processing plant for the western coal mine did not include a coal storage pile and the point that plaintiffs may be making with respect to the emissions from its coal crushing equipment is that, even putting aside any differences between that facility and defendant's, the controlled emissions were not negligible.

the proposed 2009 Subpart Y rule changes set forth earlier, EPA has been more clear in its views that (1) the unloading of the coal into the receiving structure of a coal processing plant is part of the coal processing plant for purposes of regulation under Subpart Y, and (2) that the PTE for fugitive emissions from such unloading are to  be counted in making a determination of whether a source is a major one.  And here, there is nothing in defendant's application for its minor source permit which indicates that the PTE for fugitive emissions of PM from the loading of the coal from the coal pile into the receiving pocket was considered - including that resulting from the dozer activity required to push the coal into the receiving pocket.

Likewise, plaintiffs contend there may also be an issue with respect to the point where the coal is delivered to the Coyote generating station.  All the application states is that the coal will be dumped onto a conveyor that is owned and operated by the generating station, but does not describe how any fugitive dust in the system at the point of turnover is controlled.  While the court suspects the answer may be that any such dust is controlled by enclosures surrounding the generating station's conveyor at the point of turnover and for a distance thereafter so as to render any PTE of PM emissions from defendant's coal processing facility minimal, defendant's application and the minor source permit are devoid of any details.

While the court has substantial doubts about whether plaintiffs will be able to demonstrate that the PTE that might result from the unloading of coal from the coal pile into the receiving pocket coupled with any PTE from the coal crushing and conveying equipment calculated after assuming control by the PECS (including any PTE at the point of turnover to the generating station) would meet or exceed the 250 tpy threshold, the issue here is whether plaintiffs' amended complaint states

71

a claim and not whether the claim is a good one.  Consequently, even if the court resolved the issue of whether the PTE for fugitive emission s of PM from the coal pile and the unloading of coal to it in defendant's favor, it appears it would still be premature to grant defendant's motion to dismiss.

Finally, to close the loop about why the court is hesitant about making a final decision without a more complete record with respect to whether the PTE from the coal pile and the unloading to the coal pile need be considered, one of the concerns is whether there is any logical or reasonable line that can be drawn for purposes of calculating a PTE for  PM for the unloading of coal from the coal pile into the receiving pocket (the "first hopper" according to defendant), including, perhaps, any dozer activity on the pile to accomplish that, from the rest of the coal pile as well as the unloading of coal onto the pile.  Of course, this assumes that the unloading of coal into the receiving pocket must be considered as EPA guidance appears to suggest, a point that the court need not now decide, but which on its face does not appear to be unreasonable.

### F.   **The case going forward**

The normal allocation of the burden of proof in a civil case is on the plaintiff.  Further, in this case, we have a determination made by a state agency that is charged with implementation of both the federal and state air pollution control statutes and regulations.  And here, necessarily implicit from the State's regulatory scheme is that, when the NDDOH issued a minor source permit to defendant, it also determined that the coal mine would not be a major source and for that reason did not need a major source construction permit to satisfy the CAA's PSD requirements as implemented by the State.  For both of these reasons, it will be up to plaintiffs to demonstrate that defendant's coal mine is a major source with affirmative evidence and not simply point to a lack of

a preexisting record containing the evidence and reasoning to support the determination that was made.  See, e.g., Cascade Kelly Holdings, 2015 WL 9581754, at *21; cf., ADEC, 540 U.S. at 493-94.

## V.    ORDER

Plaintiffs' motion to amend their complaint (Doc. No. 11) is **GRANTED**.  Plaintiffs shall file and serve the amended complaint within ten (10) days.  Defendant's motion to dismiss on grounds of lack of jurisdiction, abstention, and failure to state a claim (Doc. No. 7) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 15th day of July, 2016.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr., Magistrate Judge
United States District Court

73