**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Casey Voigt and Julie Voigt, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **ORDER GRANTING SUMMARY** |
| vs. | ) | **JUDGMENT OF DISMISSAL** |
| | ) | |
| Coyote Creek Mining Company, LLC, | ) | |
| a North Dakota Corporation, | ) | |
| | ) | Case No. 1:15-cv-00109 |
| Defendant, | ) | |

Before the court are two motions. One is defendant's motion for summary judgment of dismissal, which is supported by amicus briefs from the State of North Dakota and the Lignite Energy Council ("LEC").[1] The other is plaintiffs' motion for partial summary judgment as to certain issues of liability.

The court previously denied defendant's motion to dismiss for lack of jurisdiction, abstention, and failure to state claim. Voigt v. Coyote Creek Mining Company, LLC, No. 1-15-cv-00109, 2016 WL 3920045 (D.N.D. July 15, 2016) ("Voigt"). For purposes of convenience, portions of the court's earlier decision will be repeated as appropriate.

I.  **GENERAL BACKGROUND**

A.  **The parties**

Defendant is a coal mining company. At the time of the filing of this action, it had commenced construction of the Coyote Creek Mine in rural Mercer County, North Dakota. During the pendency of this action, construction was completed and mining commenced.

---

[1] The LEC is a regional trade association that advocates on behalf of the development of North Dakota's lignite coal resources.

1

Plaintiffs are ranchers. They own or lease some 5,637 acres in rural Mercer County, a significant portion of which either underlies or is in close proximity to defendant's mine. Plaintiffs' primary claim in this action is that defendant did not obtain the correct type of Clean Air Act permit for the construction of its mine, contending it needed a "major source" construction permit instead of the "minor source" permit it sought and received.

The relationship between plaintiffs and defendant has been a contentious one. Plaintiffs have contested other state and local permits that defendant needed either for construction or operation of its mine.

B.    **The Coyote Creek Mine**

The Coyote Creek Mine is a surface mine that mines lignite, which is a low grade coal, *i.e.*, it generates less BTU's on a per ton basis than higher grade coals. Because of its low grade, lignite is typically consumed near the mine because other coals (as well as other fuels) are more economical if they have to be transported any significant distance.

At this point, the only customer for defendant's mine is the Coyote Station, a coal-fired electric generating plant owned by a consortium of electrical utilities. The Coyote Station is a "mine mouth" plant, *i.e.*, it is located in close proximity to the coal fields that are the source of its fuel, including defendant's coal reserves and mine. The Coyote Station as been in operation for more than three decades and previously had been supplied with lignite coal from another nearby mine.

The Coyote Creek Mine is not the only lignite mine in North Dakota. There are several other lignite mines that similarly supply other "mine-mouth" electric generating stations, and, in one instance, a commercial coal gasification plant.

In addition to removing the lignite coal from the ground and transporting to it to the Coyote

Station, the Coyote Creek Mine crushes the mine-run coal down to a smaller size before it makes delivery to the Coyote Station. The mine facilities that "process" the coal in this fashion are the particular focus of this action because of the additional regulatory requirements that apply to coal processing facilities under the Clean Air Act.

### C.     The Clean Air Act and North Dakota's implementation of the Act

Under the Clean Air Act ("Act" or "CAA") as amended, EPA has established national ambient air quality standards (NAAQS) for six pollutants: (1) particulate matter; (2) sulfur dioxide; (3) nitrogen oxides (with sulfur dioxide as the indicator); (4) carbon monoxide; (5) lead; and (6) ozone. E.g., Utility Air Regulatory Group. v. E.P.A., __ U.S. __, 134 S.Ct. 2427, 2435 (2014). Those areas of the country that meet the standards are classified as "attainment" areas and those that do not are "nonattainment" areas. Id. North Dakota is an attainment area for all of the regulated pollutants.

An important part of the CAA's scheme to achieve and maintain the NAAQS is its New Source Performance Standards (NSPS) program. The NSPS provisions require EPA to implement technology-based performance standards to limit emissions from new major sources of pollution, including newly constructed facilities and modifications of existing ones that increase emissions. E.g., Sierra Club v. Otter Tail Power Co., 615 F.3d 1008, 1011 (8th Cir. 2010).

Congress later concluded that the NSPS program and the NAAQS were not enough because they did not prevent against the degradation of air quality in those areas of the country, like North Dakota, where the pollutant levels are lower than the NAAQS. For this reason, Congress amended the CAA to include provisions for the prevention of significant deterioration of air quality (the "PSD" provisions) that are set forth in Part C of Subchapter I of the Act, codified at 42 U.S.C. §§

7470-7492.  Id.

Among the PSD provisions is a requirement that a "major emitting facility" may not be constructed until it obtains a permit to construct that complies with certain requirements of Part C, including the source's use of best available control technology ("BACT") for each regulated pollutant emitted from the facility. 42 U.S.C. §§ 7475(a) & 7479(1)-(3).  The Act defines a major emitting facility as any stationary source with the potential to emit ("PTE") 250 tons per year ("tpy") of any air pollutant, except for certain listed sources for which the threshold limit is 100 tpy.  42 U.S.C. § 7479(1); see generally Alaska Dep't of Environmental Conservation v. E.P.A., 540 U.S. 461, 470-73 (2004) ("ADEC") (discussing the PSD program and the BACT requirement).  For purposes of the discussion that follows:  (1)  a major emitting facility may be referred to simply as a "major source," which is the term the State of North Dakota uses; (2) the requisite threshold for qualifying as a major emitting facility may be referred to as the "major source threshold;" and (3) the construction permit required for a major emitting facility under the federal and state PSD provisions may be referred to as the "major source construction permit" or simply "major source permit."

The CAA places primary responsibility upon the states for formulating detailed air pollution control strategies and carrying out the Act's provisions.  To accomplish this, the CAA requires that each state adopt and submit to EPA for approval a "State Implementation Plan" ("SIP") to implement and carry out the policies and goals of the Act.  ADEC, 540 U.S. at 470.

North Dakota has an approved SIP for much of the CAA's requirements, including administration of its PSD provisions.  See 40 C.F.R. §§ 52.1820 - 52.1837.  Thus, the State is the permitting authority for new facilities that require a major source construction permit.  In addition,

4

North Dakota has adopted regulations that impose its own requirements for new facilities that do not need a major source construction permit and for these it issues its own "minor source" construction permit. See generally N.D.A.C. Art. 33-15 (North Dakota's air pollution control regulations).

The North Dakota Department of Health ("NDDOH") is the state agency charged with the administration and enforcement of the CAA and North Dakota's air quality laws. N.D.C.C. §§ 23-25-02 & 23-12-03. This includes the responsibility for reviewing construction permit applications and determining whether a major or minor source permit is required. Id.

### D. NDDOH's issuance of a minor source construction permit

Defendant applied for and received a minor source construction permit from the NDDOH for the Coyote Creek Mine. Prior to issuing the permit, the NDDOH did not give public notice of the filing of defendant's application for the construction permit nor did it invite public participation in the permitting process. (Doc. No. 1-3). What the NDDOH considered or failed to consider in processing the permit application will be addressed in more detail later.

### E. This case

Plaintiffs make two claims in their Amended Complaint. The primary one is that defendant needed a major source construction permit for its Coyote Creek Mine rather than the minor source permit it was granted. Plaintiffs argue this is because the mine's coal processing facilities (*i.e.*, the part of defendant's coal mine that does the crushing) has a PTE for particulate matter ("PM") of 250 tpy or more, which is the requisite threshold in this instance for needing a major source construction permit. And, if a major source construction permit is required, this would subject not only the mine's coal processing facilities but also the entire mine to the CAA's and the NDDOH's more onerous requirements for major sources. Why the entire mine would be considered a major source

and not just the coal processing facilities will be returned to later.

Plaintiffs contend for their second claim that defendant is in violation of the CAA's NSPS requirements by operating an open storage coal pile without a fugitive dust control plan as required by 40 C.F.R. § 60.254(c). As explained later, a § 60.254(c) dust control plan is only required if the open storage coal pile is deemed to be part of defendant's coal processing facilities.

Plaintiffs bring this action pursuant to the "citizen suit" provisions of 42 U.S.C. § 7604(a)(3) as well as 28 U.S.C. § 1331 (federal question jurisdiction). Plaintiffs seek:

(1)     a declaration that the Coyote Creek Mine is a major source and that it violated the CAA by constructing the mine without first obtaining a major source construction permit;

(2)     a declaration that defendant is in violation of the CAA by operating a new source in violation of a NSPS performance standard (*i.e.*, the standard requiring a fugitive dust control plan that complies with 40 C.F.R. § 60.254(c));

(3)     an injunction prohibiting any further construction or operation of the Coyote Creek Mine so long as it is not compliant with the CAA;

(4)     assessment of civil penalties in the amount of $37,500 per day for each day defendant has been in violation of the Act after January 12, 2009, with allocation of $100,000 of the penalties to a beneficial mitigation project that will provide a local environmental and public health benefit to plaintiffs and other North Dakota residents pursuant to 42 U.S.C. 7604(g);

(5)     an award of attorney's fees and costs pursuant to 42 U.S.C. § 76049d); and

(6)     a grant of such other and further relief as the court deems proper.

Defendant denies that it needed a PSD major source construction permit. Defendant contends that the NDDOH correctly determined that the PTE for PM from the coal processing facilities embedded within its mine is negligible and, in any event, not anywhere close to 250 tpy. Consequently, according to the defendant, it needed only a minor source permit to satisfy the State's separate air pollution control requirements and not a PSD major source permit.

As for the NSPS claim, defendant contends that, while it does have a fugitive dust control plan for the entire mine to meet other regulatory requirements, it does not need one that meets NSPS performance requirements for the coal pile because, according to it, the coal pile is not part of its coal processing facilities to which only the NSPS standards apply.

**F. Defendant's and amicii arguments re lack of jurisdiction and abstention**

There has been much hand-wringing in this case - both by defendant in its prior motion to dismiss and now by the LEC and the State - that this action is an unwarranted collateral attack on a state-issued minor source permit. The court rejected this argument in its earlier order denying defendant's motion to dismiss and rejects it again for the same reasons. Voigt, 2016 WL 3920045, at **4-18.

Nevertheless, it is worth emphasizing that this case would have come here in a much different posture had defendant requested the NDDOH follow a more formal process in the handling of its application for the construction permit, including providing notice to the public and inviting their participation. Had that process been followed, plaintiffs would have had the opportunity to make the arguments they are now making to the NDDOH; the NDDOH could have addressed them; and then, if either plaintiffs or defendant were disappointed in its decision, there would have been the right of an appeal (first to a state district court and then to the North Dakota Supreme Court) and

that appeal could have been resolved based upon a formal administrative record.

Likewise, to the extent the NDDOH may be concerned about federal court second-guessing of its permit decision, it easily could have justified the use of more formal procedures. NDDOH's regulations not only provide for, but arguably require, use of its "public participation procedures" for "[s]ources for which a significant degree of public interest exists regarding air quality." N.D. Admin. Code § 33-15-14-02(6)(a)(6). For facility as large as defendant's coal mine, which over its life will impact several thousands of acres and generate substantial fugitive dust - particularly from its haul roads, it would hardly be a reach to conclude there may be significant public interest, which, arguably, is different from active opposition. The court remains puzzled why the NDDOH did not seek public input for an operation of the size and character of defendant's mine.

## II.     SUMMARY JUDGMENT STANDARD

The law governing summary judgment is well known to the court and need not be repeated here. E.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Lonesome Dove Petroleum, Inc. v. Holt, 889 F.3d 510, 514 (8th Cir. 2018).

## III.    CAA REQUIREMENTS GOVERNING THE MAJOR SOURCE DETERMINATION

### A.     Surface coal mines generally do not have to obtain a major source construction permit because "fugitive emissions" of PM from coal mines are not counted

To reset the table, the CAA's PSD provisions require that any new major emitting facility obtain a permit to construct. 42 U.S.C. § 7475(a). Under the PSD provisions, a major emitting facility includes certain listed types of industrial sources that have a PTE of 100 tpy for any air pollutant. 42 U.S.C. § 7479(1); 40 C.F.R. §§ 51.166(b)(1)(i)(a) & 52.21(b)(1)(i)(a). For example, the list includes fossil fuel fired steam electric generating plants, petroleum refineries, steel mills, and copper smelters. Surface coal mines are not on the list. Id.

In addition to the listed types of sources, any other source that has a PTE of 250 tpy for any air pollutant is also a major emitting source. 42 U.S.C. § 7479(1); 40 C.F.R. §§ 51.166 & 52.21(b)(1)(i)(b) & 52.21(b)(1)(i)(b). If there was no other limiting factor, defendant's coal mine would undoubtedly be a major source under this provision. This is because "[m]ost surface coal mines of economically viable size have the potential to emit more than 250 tons of dust." Natural Resources Defense Council, Inc. v. U.S. E.P.A., 937 F.2d 641, 643 (D.C. Cir. 1991) ("NRDC v. EPA") (citing EPA, Requirements for Preparation, Adoption and Submittal of Implementation Plans, 49 Fed. Reg. 43211, 43212 (1984)).

EPA concluded quite sometime ago, however, that it was bound by a court decision holding that the definition of a major emitting facility under 42 U.S.C. § 7479(1) is subject to the generic definitions of "major stationary source" and "major emitting facility" under § 7602(j), which, in turn, were construed to exclude "fugitive emissions" from the threshold calculation of whether a plant is a major source unless EPA has decided by rulemaking that fugitive emissions should be included for the particular source. NRDC v. EPA, 937 F.2d at 643 (discussing the holding of Alabama Power Co. v. Costle, 636 F.2d 323, 369-70 (D.C. Cir. 1979)). And, while EPA has promulgated a list of categories of sources for which fugitive emissions must be counted, it has not added surface coal mines to the list. See 40 C.F.R. §§ 51.166(b)(1)(iii) & 52.21(b)(1)(iii).

As recounted in NRDC v. EPA, EPA had at one point considered adding surface coal mines to the list for which fugitive emissions would have to be counted but decided against it, recognizing that the decision "not to consider fugitive emissions means that few, if any SCM's [surface coal mines] will be classified as major sources or major modifications." 937 F.2d at 643. EPA concluded that the costs of requiring fugitive emissions from coal mines to be counted were in excess of the

potential benefits, particularly after considering that fugitive dust emissions were already subject to regulation by the Department of Interior under the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. ch. 25.  See EPA, Requirements for Implementation Plans: Surface Coal Mines and Fugitive Emissions; Approval and Promulgation of Implementation Plans, 54 Fed. Reg. 48870 (1989) ("Requirements for Implementation Plans: Surface Coal Mines").  In reaching this conclusion, EPA considered, among other things, that:  (1)  a major percentage of the fugitive dust emitted by coal mines comes from haul roads and that alternatives to the dust suppression measures already required by SMCRA, such as paving haul roads, would be impracticable; (2) "the relatively low ambient particulate matter contribution from SCM's nationally;" (3) "the low background particulate matter concentrations around SCM's;" (4) "the limited distance from SCM's that ambient impacts occur;" and (5) "the general absence of populations exposed to SCM particulate matter," given the remoteness of most mine locations to population centers.  Id. at 48873-79.   In NRDC v. EPA, the D.C. Circuit upheld EPA's decision not to count fugitive emissions from coal mines, including the permissibility of it having weighed the costs versus the benefits when making the decision.  937 F.2d at 649.

The point here, which will be returned to later, is that EPA made a policy choice - one based on weighing benefits versus costs - when it decided not to adopt a rule that would require consideration of fugitive emissions of PM from coal mines for the purpose of determining whether coal mines are major sources and the consequences flowing from that determination.

**B.     Fugitive emissions from defendant's coal processing facilities must be counted**

While fugitive emissions from coal mines generally do not have to be counted toward determining whether they are major sources, fugitive emissions must be counted for coal processing plants.  This is because EPA has included within the list of categories of sources, for which fugitive emissions must be counted, "[a]ny other stationary source category which, as of August 7, 1980, is being regulated under section 111 or 112 of the Act." 40 C.F.R. §§ 51.166(b)(1)(iii)(aa) & 52.21(b)(1)(iii)(aa).

As noted earlier, Section  111 of the CAA established the NSPS program for new sources.  And, while NSPS performance standards have not been established for coal mines, they have for coal processing plants that process more than 200 tons of coal per day.  The governing regulations are set forth in 40 C.F.R. Part 60, Subpart Y--Standards of Performance for Coal Preparation and Processing Plants (herein "Subpart Y").  In this case, defendant's facilities that crush the coal prior to delivery to the Coyote Station fall within the definition of a "coal preparation and processing plant" that is subject to regulation under Subpart Y because defendant's crushing facilities  "process" the coal and are capable of handling more than 200 tons of coal per day.  Defendant does not dispute that its coal processing facilities are subject to Subpart Y; rather, the dispute is which mine facilities are considered coal processing and subject to Subpart Y and which are not.

Coal preparation and processing plants (herein "coal processing plants") are not something unique to coal mines nor do all coal mines necessarily have them.  A number of industrial facilities that use coal either for fuel or as a feedstock may have coal processing plants, including, for example, power plants, coke plants, Portland cement plants, synfuels plants, etc.  See, e.g., EPA, Model Plant Control Costing Estimates for Units Subject to the NSPS for Coal Preparation Plants

11

(40 C.F.R. Part 60, Subpart Y) (Memo to Coal Preparation Docket EPA-HG-QAR-2008-0260) by Christian Fellner, April 2008) ("Model Plant Control Costing Estimates Memo"). (Doc. No. 38-4). In fact, in this case, the owners of the generating station and defendant undoubtedly could have structured their commercial relationship differently so that the only coal delivered by defendant would be unprocessed mine-run coal and the generating plant would do its own crushing.

Also, some coal processing plants are more elaborate and physically larger than defendant's coal crushing facility. For example, unlike defendant's facility, some coal processing plants may include a number of different structures and processes between which might run conveyors or haul roads within the processing plants. Some also have elaborate facilities for loading the processed coal onto train cars, ships, etc. See id.

As noted earlier, the consequence of defendant's mine having a facility for crushing coal is that, if the PTE for fugitive emissions of PM from the coal crushing facility meets or exceeds the 250 tpy threshold, then a major source permit is required not just for it but for the entire mine - even though one would not have been required if the mine did not have a coal processing facility and even though the mine in this case is clearly the primary enterprise.[2] This point is not disputed by the

---

[2] EPA has stated that the result of requiring a coal mine to be subject to major source requirements if fugitive emissions from the mine's coal processing plant meet the major source threshold is dictated by its other regulations that require regulated operations be aggregated as a single source if they have the same SIC two digit code, are located on adjacent or contiguous properties, and are under common control. Requirements for Implementation Plans: Surface Coal Mines, 54 Fed. Reg. at 48880-882 (discussing the applicable regulations). While acknowledging that a strict construction of these same regulations might suggest that fugitive emissions from both sources should then be considered in determining whether the major source threshold is reached, EPA has stated it applies a "primary activity test" to determine which of the two is primary and, if it is the coal mine, which is an unlisted source, then fugitive emissions would continue not to be counted. Id. at 48,881 In particular, EPA stated the following:

> Under this primary activity test, EPA or the permitting authority should review all the facts and circumstances of the particular case to determine what is the main purpose and function of the overall operation, and make an applicability determination based on the status (listed vs. nonlisted) and tonnage threshold (100 tons per year vs. 250 tons per year) of the primary activity. Thus, as SCM's continue to be a nonlisted source category, where coal mining is the primary activity, a mine's fugitive emissions are not considered in determining threshold applicability for a source consisting of the mine

defendant.

## IV. THE OVERRIDING ISSUE UPON SUMMARY JUDGMENT AND ADDITIONAL BACKGROUND RE THE COAL PILE AND UNLOADING OF COAL TO IT

### A. Introduction

Defendant's minor source permit application and the permit that was issued pursuant to it appear to include only the equipment that actually does the crushing as part of the designated coal processing facilities subject to regulation under Subpart Y of the NSPS provisions. Further, neither the permit application nor the permit contain numerical estimates of PTE for PM for any of the equipment that are considered to be part of the coal processing facilities. Rather, the application and permit simply state that the PTE for fugitive emissions is negligible.

Plaintiffs contend that defendant failed to include as part of its designated coal processing facilities all of the facilities and equipment that it should have under Subpart Y, including the haul road from the mine pit to where the coal processing takes place and an open coal storage pile that sits adjacent to where the coal is crushed and that supplies the coal for processing. Plaintiffs also

---

and some other collocated activity. In both of the final determinations cited above, EPA concluded that the coal mine was the primary activity, and EPA anticipates that this would be the case in most, if not all, future examples involving coal processing activities. In terms of both the purpose of the enterprise and the economic value of the newly mined coal as compared with the processed coal, it is the mining that is the focus of the overall effort.

Id. While this may make some sense as far as it goes, what is puzzling is EPA's explanation for why the entire mine should be considered a major source based simply upon the secondary activity of the coal processing plant - particularly given EPA's policy choices for not considering fugitive emissions from the coal mine in the first instance. That explanation was simply the following:

The EPA believes that the structure and function of its regulations in the above examples are reasonable and appropriate under the Act. *Indeed, industry commenters have presented no evidence of adverse practical consequences from this view, because coal preparation plants and coal cleaning plants apparently do not usually exceed major source size thresholds.*

Id. (italics added). Since that was written, EPA has concluded in a 2009 rulemaking discussed in more detail later that it would not establish PM emission limits for coal stockpiles and haul roads within coal processing plants because of the excessive costs of monitoring and the fact that the fugitive dust from these facilities are subject to dust suppression requirements imposed by SMCRA and the individual states. With that, it arguably makes even less sense to subject a surface mine to major source requirements simply because the coal processing facility may be a major source.

contend that, even for the equipment defendant did include, its claim that emissions would be negligible was erroneous. Plaintiffs have proffered calculations of PTE for PM for the facilities and equipment they claim are properly part of defendant's coal processing facilities under Subpart Y. When these calculated amounts are totaled, the estimated PTE for PM exceeds the 250 tpy major source threshold.

Defendant disagrees with plaintiffs' contention that it did not include all of the necessary facilities and equipment but proffers PTE estimates from it own experts for all of the facilities and equipment that plaintiffs claim should have been included except for its mine haul road, which it contends is clearly not subject to Subpart Y. These estimates in almost all cases are substantially less than those of plaintiffs' expert. Defendant also contends that, if the haul road and the coal pile are deemed not to be part of its coal processing facilities under Subpart Y, then the 250 tpy major source threshold is not reached even accepting the much higher PTE estimates of plaintiffs' expert for the remaining equipment and facilities that plaintiffs' claim are part of the coal processing facilities.

In the prior order denying defendant's motion to dismiss, the court expressed doubt about whether the mine haul road is part of defendant's coal processing facilities under Subpart Y. And, as discussed later, the court concludes that it is not after considering certain EPA guidance. Consequently, the overriding issue for purposes of summary judgment is whether defendant's open coal storage pile is part of defendant's coal processing facilities and subject to regulation under Subpart Y. This is because, as set forth in detail later, it would be the tipping point in terms of whether the 250 tpy threshold can be reached, even assuming plaintiffs' higher PTE estimates.

If plaintiffs cannot prove that 250 tpy threshold is reached (and they have the burden), that

disposes of their primary claim that a major source permit was needed. Also, if the coal pile is not subject to Subpart Y regulation, that also disposes of their NSPS performance standard claim since defendant is only required to have a fugitive dust control plan that satisfies 40 C.F.R. § 60.254(c) if the coal pile is part of its coal processing facilities under Subpart Y, of which § 60.254(c) is a part.

Consequently, the primary focus of what follows will be upon whether the coal pile is part of defendant's coal processing facilities and subject to Subpart Y or not. In addressing this issue, the court will consider the governing Subpart Y regulations and discuss why, in this court's view, they do not provide a clear answer. The court will also address various EPA guidance and discuss why that guidance also does not provide a clear answer with respect to the coal pile but does with respect to the haul road.

However, before proceeding down this pathway, it is necessary first to provide more context by summarizing what defendant presented to the NDDOH in its application for its minor source permit and then consider what the record reflects about defendant's open coal storage pile.

**B.      Defendant's minor source permit application**

**1.      The description of the mine facilities**

Defendant's application for its minor source construction permit described the mine facilities it proposed to construct, starting with the facilities and equipment at the "mine face," *i.e.*, where the coal is physically removed from the ground. (Doc No. 1-1, p. 5). The nearest point of the mine face is some three to four miles southwest of the Coyote Station. (Id. at p. 4).

The application then recited that the mined coal would be transported from the mine face over a haul road several miles to an open storage pile that would be located just outside of and

15

physically adjacent to where defendant would construct a coal crushing facility, which, in turn, would be located next to the site of the Coyote Station. The open storage pile would store approximately 180,000 tons of coal, have a base area of roughly 700 feet by 500 feet, and cover a surface area of approximately 350,000 square feet, or approximately eight acres. (Id. at p. 5).

According to the application, the stockpiled coal would be pushed into a "receiving pocket and apron feeder" by dozers operating on top of the pile "where it enters the coal processing facility." From there, the coal would be conveyed by the apron feeder a short distance to where it would then undergo both primary and secondary crushing. After the coal is crushed, it would fall onto a "conveyer belt" owned and operated by the Coyote Station "at which point it is no longer considered part of the CCMC permit." (Id.)

The application stated that specially designed enclosures surrounding its coal processing and conveying equipment would control the fugitive dust, with fogging if necessary. In air pollution control parlance, the enclosures are referred to as PECS ("passive enclosure containment system"). The application stated that no measurable emissions of PM to the atmosphere were expected with the use of these control systems. Hence, the estimate of PTE for PM from its coal processing facilities was that it would be "negligible." (Id. at 13).

According to the application, defendant expected to produce approximately 2.5 million tons of coal annually with the capability of being able to produce up to 3.2 million tons per year - the highest amount that it stated it would process without seeking additional approval from the NDDOH. (Id. at 4).

In its prior order, the court incorporated the following diagram taken from one of the

defendant's briefs. (Doc. No. 38-6). While obviously not-to-scale, it does illustrate the flow of the coal and layout of the mine facilities relative to each other as well as the point where defendant initially contended the coal processing plant begins (labeled as the "Beginning of NSPS Applicability"). Hence, the diagram is set forth again for the same purpose.



### 2. The application's explanation for why a major source permit was not required

Defendant's application provided an explanation for why the coal mine would not be a major source and, for that reason, only a minor source permit to construct was required to satisfy North Dakota's separate air pollution control requirements. Generally speaking, the application worked its way through the applicable federal statutes and regulations previously described, noting in particular

that: (1) the only pollutant that would be emitted from the coal mine is PM; (2) the only emissions that would need to be counted for purposes of determining whether the mine is a major source would be those from the mine's coal crushing facilities; (3) the only emissions of PM from defendant's coal processing facilities would be fugitive emissions because no emissions would be mechanically vented; and (4) the fugitive emissions from defendant's coal crushers and conveying equipment were expected to be negligible based on the control imposed by the PECS. (Doc. No. 1-1, pp. 7-10).

As for the PTE for fugitive emissions of PM from the coal pile and the unloading of coal onto it, the application stated that these were not counted because the coal pile and the unloading of coal to it were considered not to be part of the coal crushing facilities subject to regulation under Subpart Y. In support of this conclusion, the application referenced the definition of "coal processing and conveying equipment" in 40 C.F.R. § 60.251(g) as well as what defendant contended is the applicable guidance from EPA. According to the application, EPA had taken the position that the beginning of a coal processing plant is the point where coal is first loaded into an apparatus that receives coal for processing ("first hopper"). The application stated that, in this instance, this would be the point where coal enters a "receiving pocket" after being pushed into it by a dozer from the coal pile where it is conveyed a short distance to the crushers and that this point is downstream from the coal storage pile. (Id. at pp. 11-13).

### C.     The coal pile

Depending upon how one interprets the relevant parts of Subpart Y and EPA's various guidance, the location, size, and functions of the coal pile may be relevant to determining whether it is a part of defendant's coal processing facility and subject to Subpart Y.

### 1. The location and physical layout of the coal pile

The coal pile and the adjacent facilities that crush the coal are located immediately adjacent to the Coyote Station plant site, some three to four miles from the active mining area. Connecting the active mining area to the coal pile and the adjacent crushing facilities is a mine haul road that is located within a narrow ribbon of mine permit area. Set forth below is a mine facilities location map (Doc. No. 85-5, p. 27) that visually depicts the location of the coal processing facilities relative to the active mining area and the Coyote Station.



As noted by the earlier schematic showing the flow of the mined coal, the coal pile abuts up to a concrete retaining wall that separates the coal pile from the crushing equipment and the conveyor that conveys the coal after it is crushed to the Coyote Station. The apron feeder that conveys the coal to the crushing equipment extends out from the concrete wall into the coal pile. Set forth below is a photograph of the retaining wall and the structure surrounding the apron feeder (Doc. No. 94-2) taken prior to the coal pile being established.



The next photograph (Doc. No. 85-18, p. 2) is an aerial shot taken after the coal pile was established and the mine operating.



Two points are particularly notable about this photograph. One is the size of the coal pile relative to the point where coal is pushed from the pile into the apron feeder, as depicted by the location of the apron feeder in the first photograph as well as in succeeding photographs. The other is the line drawn on the photograph that encircles the area of the coal pile, the retaining wall, the crushing equipment, parts of the haul road, and a portion of the conveyor leading to the Coyote Station. Plaintiffs' position is that most, if not all, of the encircled area is part of defendant's coal processing facilities. This includes the haul road (particularly after it reaches the general area of the coal processing facilities), the coal pile, the retaining wall, the crushing equipment, and the conveyor (even that part extending beyond the encircled area and onto Coyote Station property).

### 2. Unloading of coal at the coal pile and loading into the apron feeder

As noted by the diagram set forth earlier, once coal is removed from the earth at the mine

face, it is hauled directly to the coal pile over the mine haul road and is deposited onto the coal pile by belly-dump trucks that have a capacity of carrying 240 tons of coal. (Doc. No. 90-8, p. 22).

The record reflects that, once the coal pile was established, quite frequently the coal from the mine is dumped in the immediate area of the apron feeder and bulldozed into or on top of the apron feeder for fairly immediate conveyance for crushing. Less often coal will be pushed from the rest pile to the apron feeder during periods when coal is not being hauled from the pit. Also, coal may occasionally be pushed from the other areas of the pile to the immediate area of loading into the apron feeder if necessary to even out the quality of the coal being delivered. (Doc. Nos. 83-2, pp. 2-3; 90-1, pp. 14-18, 111-12; 90-4, pp. 19, 58-59; 90-8, p. 8).[3]

Set forth below is a screen shot (Doc. No. 117-2) from a video taken of a belly-dump truck unloading coal.



The next photograph (Doc. No. 94-3) is one of defendant's two dozers bulldozing coal over the top

---

[3] For the deposition testimony, the cited page numbers are those of the deposition transcript and not the numbers assigned to the document during filing by CM/ECF.

of the area of the buried apron feeder.



The primary dozer has within it equipment that allows the operator to control the operation of the apron feeder, including its speed, which, in turn, controls the rate defendant's equipment processes the coal and dumps it onto the conveyor for delivery. Further, the operator of the dozer has the ability to communicate with the Coyote Station to coordinate the operation of the conveyor belt, which it controls. In short, under normal operations, one person - the dozer operator - is able to control the operation of the coal processing equipment from on top of the coal pile. (Doc. No. 90-1, pp. 29-35, 49-79).

The next photograph (Doc. No. 90, p. 35) is taken from the coal pile with the structure surrounding the apron feeder and the apron feeder exposed. The wheel-like piece of equipment at the end of the short run of the conveyor part of the apron feeder is the primary crusher. As discussed later, the apron feeder is actually a "feeder breaker." Also, as discussed later, defendant contends that most of the time (but not necessarily all) the apron feeder and breaker are completely covered

23

by the coal pile as coal is being loaded into it.



### 3.    Other points re the coal pile

As noted earlier, defendant's permit application states that the open storage pile may store upwards of 180,000 tons of coal and have a base area of roughly 700 feet by 500 feet (*i.e.*, 350,000 square feet), which  is approximately eight acres.  The record developed in this case reflects that, within the first few month of mining, the coal pile was built up to the point where it stored more than 100,000 tons of coal, and has been consistently maintained above that level since that time. According to mine officials:  (1) from mid-2016 when the mine began commercial operation to August 2017 (just prior to the filing of the motions in this case), the coal pile never fell below 101,000 tons and it reached that level only once following a long holiday coupled with a snowstorm; (2) the more or less steady delivery of coal as it is being mined replenishes the storage pile as coal is removed for crushing and delivery with some fluctuation for short periods when mining is not

taking place or the power plant is down or running at reduced load; and (3) the desired inventory during normal operations is between 130,000 to 145,000 tons, which represents about a three week supply; and (4) the purpose for that inventory is to provide a source of supply in the event of an emergency or other unexpected halt of mining in the pit for an extended period. (Doc. No. 83-2).

These points have not reasonably been controverted by plaintiffs. While one of their experts contends that the coal pile is nothing more than a "surge pile" that exists to even out short-term fluctuations in delivery, the evidence set forth above does not bear this out. In fact, the graph showing the fluctuations in inventory level of the coal pile that plaintiffs themselves submitted as part of their brief demonstrates that roughly 2/3's of the inventory (at least in terms of quantities of coal) during the time frame considered was unaffected by daily operations. (Doc. No. 90, p. 18).



Hence, to the extent it is material, the bulk of the coal is in the pile is for longer than "temporary storage" - a term that EPA has used in at least one of its guidance, as discussed later.

The same plaintiffs' expert also expresses the opinion that defendant's coal pile is needed for the loading of the coal into the receiving structure for processing. While it is true that the coal pile does facilitate loading, it is readily apparent that most of the pile is not required for that purpose based on the foregoing, including particularly the aerial photograph showing the large size of the pile relative to the retaining wall and the immediate area where coal is dumped into the apron feeder. Further, there is nothing that required defendant to locate its coal storage pile at its present location. Defendant could have placed it elsewhere in the mine and then conveyed the coal by truck or conveyor to the point where it would undergo crushing. In addition, it would have been possible to build a ramp to the apron feeder or possibly use a much smaller coal pile to facilitate loading. (Doc. Nos. 90-1, p. 47; 94-1). Most likely, however, the receiving facilities would have been configured differently had the coal pile been located elsewhere.

Finally, two other things may be relevant to whether defendant's coal pile should be considered a part of its coal processing facilities or simply another part of the mine. One is that defendant's coal pile is compromised only of mine-run, unprocessed coal. The Coyote Station has its own enclosed storage of processed coal that is of much smaller capacity and provides for about a three day supply. (Doc. Nos. 70-1, p. 19; 83-2, pp. 2-3; 90-2, pp. 53-54 90-4, pp. 63-64). The other is that, if defendant delivered only mine-run coal and the Coyote Station did its own processing, defendant would have needed a storage pile of the same size to maintain its contractual commitments for delivery during periods when active mining is not taking place or there is an

unexpected mine outage.

## V.    GOVERNING SUBPART Y REGULATIONS

### A.    Introduction

In addressing the question of whether the coal pile is part of defendant's coal processing facilities, the court starts first with EPA's formally promulgated regulations governing coal processing plants. In this case, neither party contends that EPA's regulations are contrary to the CAA. Rather, the primary question is one of interpretation of the regulatory language and its application to the particular circumstances of this case.

### B.    Subpart Y of 40 C.F.R. Pt. 60

Subpart Y of 40 C.F.R. Pt. 60 (§§ 60.250 through 60.256) contains most of the regulations governing coal processing plants, including setting performance standards for purposes of the CAA's NSPS program. Subpart Y includes the following definition of coal processing plants:

> (e) *Coal preparation and processing plant* means any facility (excluding underground mining operations) which prepares coal by one or more of the following processes: breaking, crushing, screening, wet or dry cleaning, and thermal drying.

40 C.F.R. § 60.251(e). In addition, Subpart Y also refers to "affected facilities" that are specifically listed as being the following:

> Thermal dryers, pneumatic coal-cleaning equipment (air tables), coal processing and conveying equipment (including breakers and crushers), coal storage systems, transfer and loading systems, and *open storage piles*.

40 C.F.R. § 60.250(d) (italics added).[4]

---

[4] The term "affected facility" is defined at the beginning of Part 60 in § 60.2 as follows:
*Affected facility* means, with reference to a stationary source, any apparatus to which a standard is applicable.

The reason for the separate definition of "affected facilities" is that Subpart Y only imposes performance standards on "affected facilities" of the coal processing plant and not on the entire plant. As will be addressed in more detail later, the list of "affected facilities" was expanded in 2009 when Subpart Y was amended to include, amongst other things, specific provisions dealing with "open storage piles." But, to be clear, for the issue of whether the PTE for PM emissions reaches the 250 tpy major source threshold, any emissions point that is part of the coal processing plant must be considered, not just affected facilities.  See, e.g., Letter from C. Newton, Acting Dir. of EPA's Air and Radiation Div. to J. McCabe, Ass't Comm'r of the Ind. Dept of Env. Management (March 9, 2003) (http://www.epa.gov/sites/production/files/2015-08/documents/20030306.pdf) (last accessed June 30, 2018).

.    In addition to the definition of a coal processing plant and the list of affected facilities, several additional Subpart Y definitions are relevant.  They are:

> (f) *Coal processing and conveying equipment* means any machinery used to reduce the size of coal or to separate coal from refuse, and the equipment used to convey coal to or remove coal and refuse from the machinery.  This includes, but is not limited to, breakers, crushers, screens, and conveyor belts.  Equipment located at the mine face is not considered to be part of the coal preparation and processing plant.

> (h) *Coal storage system* means any facility used to store coal except for open storage piles.

> * * * *

> (m)  *Open storage pile* means any facility, including storage area, that is not enclosed that is used to store coal, including the equipment used in the loading, unloading, and conveying operations of the facility.

40 C.F.R. § 60.251(f),(h), (m).

Finally, there is the following provision that leads off Subpart Y:

(a)   The provisions of this subpart apply to affected facilities *in* coal preparation and processing plants that process more than  . . . . (200) tons of coal per day.

40 C.F.R. § 60.250(a) (italics added).

## C.   <u>Contentions of the parties based on the Subpart Y language</u>

Plaintiffs contend this court need look no further than the language of Subpart Y in determining whether the coal pile is part of defendant's coal processing facilities given:

•   The specific inclusion of open coal storage piles in Subpart Y.

•   The location of the coal pile, including that: it is physically adjacent to where the crushing takes place; it is located at the terminus of the haul road over which coal is hauled from the "mine face;" and it is located on the same graded area that includes the apron feeder and crushing equipment.

•   The fact that the coal pile is intertwined, both physically and operationally, with the crushing activity in that it: (1) provides storage for the coal processing (the coal in the pile goes nowhere else and much of it is bulldozed almost immediately after dumping on the pile into the apron feeder); (2) the pile provides physical support for the loading activity; and (3) the primary dozer working the coal pile controls the operation of the apron feeder during normal operation.

•   The dozers operating on the coal pile and the apron feeder extending into it are both, arguably, "equipment used to convey coal to . . . .  the machinery" within the definition of "coal processing and conveying equipment." Hence, the coal pile is not "upstream" of the point where equipment conveys coal to the coal crushers as

29

defendant contends; rather, it is integral part of the processing facilities.

• There is nothing in the regulations which requires that the coal processing plant be a physical structure or even a single point of activity. Rather, it can be an area in which several operational activities taken place. Given the particular situation here, the outer perimeter of the coal processing plant - at least on the upstream side - would include all of the graded area beginning at the terminus of the haul road. This would include the coal storage pile and is consistent with the coal pile being "in" the coal processing plant within the meaning of § 60.250(a) if that is a critical distinction as defendant contends.

• EPA concluded it was necessary that "open" coal storage piles be included with the definition of "affected facilities" so that the considerable emissions of fugitive PM from open piles would be subject to the controls imposed on affected facilities by Subpart Y. Plaintiffs contend that excluding defendant's coal pile in this instance would be an overly cribbed reading of Subpart Y's language.

Plaintiffs also contend that not only do the PTE for PM emissions from the coal pile need to be considered for purposes of the 250 tpy major-source threshold but also the PTE for the unloading of the coal onto the pile, including the emissions from the truck traffic on the haul road at least after it crosses the boundary of what is the geographic scope of the coal processing facility if not all the way back to the "mine face." Plaintiff argues this is because all of this activity takes place "in" the coal processing plant as they have defined it and also because the definition of "open storage pile" in § 60.251(m) includes "equipment used in the loading, unloading, and conveying operations of the

30

facility."

Defendant's argument for why the coal pile in this case is not part of its coal processing facilities that are subject to Subpart Y is based more upon EPA guidance as well as the overall context of EPA's regulatory scheme of which Subpart Y is a part than it does the actual text of Subpart Y. The court will address EPA guidance separately. In terms of the text of Subpart Y and the need to put it in context, defendant makes the following arguments:

- Under § 60.250(a), Subpart Y only applies to facilities and equipment that are "in" the coal processing facility.

- The exclusion of mine facilities at the "mine face" in § 60.251(f) reflects an intent on the part of EPA to draw a line between those facilities and equipment that are needed for coal processing from the other mine facilities and equipment that would exist even if there was no coal processing. In this case, according to defendant, the coal pile is not an essential part of the coal processing activity since it stores only mine-run unprocessed coal and there would be a coal pile to enable defendant to meet is contractual commitments even if the Coyote Station did its own processing. Further, defendant could have located the pile at a different location within the mine and transported the coal to the crushing facilities by truck or conveyor.

- EPA defined coal processing equipment in § 60.251(f) to include, in addition to the equipment that does the processing, only equipment that conveys the coal for processing. Defendant suggests that this language supports the conclusion that EPA arrived at in certain guidance discussed later that the beginning of the coal processing

plant is the first unloading of coal into "receiving equipment (such as a hopper)" for conveyance to the machinery that processes the coal. Defendant contends that a coal pile is not "equipment" in the ordinary use of the term, so the beginning point of its coal processing facilities is downstream from its coal storage pile.

- The exclusion of storage piles of unprocessed coal in surface coal mines that also do coal processing does not render meaningless the reference to open storage piles in the Subpart Y regulations. This is because some coal processing plants do have coal piles that are within the plant (*i.e.*, after the point of first unloading onto equipment used for conveying coal for processing) that are used for storage of processed coal or even temporary storage prior to processing.

- EPA made a policy decision not to regulate fugitive emissions of PM from coal mines and recognized in the adoption of Subpart Y the need for drawing lines so that, for coal processing plants located within a surface coal mine, the activity regulated under Subpart Y should be narrowly confined to what is strictly coal processing and not other mine operations that would exist even if there was no processing.

- Drawing the line between the coal processing activity and the rest of the mine after the coal pile is not an unreasonable interpretation as claimed by the plaintiffs given EPA's policy choice not to regulate fugitive dust emissions in surface coal mines for the reasons previously articulated, including that the emissions are already subject to control under both SMCRA and often, like in North Dakota, a state's own separate

air quality requirements that apply to minor sources.

Relying upon these points, defendant contends that the upstream boundary of its coal processing facilities is the point where the coal physically comes into contact with apron feeder, which it contends is the "first hopper" where coal is unloaded onto equipment that directly conveys the coal for processing. For reasons discussed later, this may be somewhat of a change from what defendant claimed at the time its permit application was being processed. But, even if so, its current position still excludes the coal pile.

### D.   **The governing regulations do not provide a clear answer**

After careful consideration of the generality of Subpart Y's provisions in light of the arguments of the parties and EPA's past decision not to subject to NSPS regulation fugitive emissions from surface coal mines, it appears the Subpart Y regulations do not themselves provide a clear answer as to whether the coal pile in this case is in or out. As discussed next, there is some EPA guidance that provides more direction, but, even that, is subject to interpretation and is equivocal with respect to the coal pile in this case.

## VI.   **EPA GUIDANCE**

### A.   **Introduction**

The EPA guidance that defendant made specific reference to in its permit application for why the coal pile is not part if its coal handling facilities (and what the NDDOH appears to have relied upon when it agreed) is a selected portion of EPA's response to comments it received about coal unloading when Subpart Y was most recently amended in 2009. That response quotes, in part, earlier guidance that EPA gave in 1998 about coal unloading at coal processing facilities.

Plaintiffs claim that defendant and the NDDOH have "cherry picked" the portion of the 2009 response to comments that supports their conclusions and have ignored more broadly what EPA said about coal unloading. They contend that what EPA said generally about coal unloading together with the specific reference to open coal storage piles in the 2009 amendments to Subpart Y make clear EPA would consider the coal pile in this case to be a facility subject to Subpart Y.

Given the contentions of the parties, it is necessary for purposes of context to start with the the guidance that EPA offered in 1998 with respect to coal unloading and then what else EPA had to say as part of the 2009 rulemaking.

**B.      1998 EPA guidance re coal unloading at coal processing plants**

In an attachment to a letter to Congresswoman Barbara Cubin dated October 3, 1997, the EPA Office of Enforcement and Compliance Assurance addressed two questions bearing upon the issue of whether coal unloading at coal processing plants is regulated under Subpart Y.[5] (Doc. No. 27-1). The next year EPA published the text of that attachment in the Federal Register as formal guidance. EPA, New Source Performance Standards (NSPS) --Applicability of Standards of Performance for Coal Preparation Plants to Coal Unloading Operations, 63 Fed. Reg. 53288 (Oct. 5, 1998) (hereinafter "1998 Coal Unloading Guidance"). Following that publication, the Office of Enforcement and Compliance Assurance issued a memorandum dated November 26, 1998, advising the EPA regional offices of the guidance that had been issued and the fact of its publication in the Federal Register. (Doc. No. 27-1). For purposes of this order, the court will refer to the guidance

[5] Available at https://www.epa.gov/sites/production/files/2015-08/documents/barbcubi.pdf. (last accessed June 30, 2018).

as published in the Federal Register as the <u>1998 Coal Unloading Guidance</u>, keeping in mind that some subsequent references to the guidance by EPA and others is to the original letter written to Congresswoman Cubin in October 1997.

The first question addressed in the <u>1998 Coal Unloading Guidance</u> was whether coal unloading at a coal processing plant falls within the definition of "coal processing and conveying equipment" (an "affected facility" under the definitions set forth above) so that emissions from coal unloading would be subject to Subpart Y's performance standards. EPA answered this question by stating that coal unloading would generally fall within the "definition of coal processing and conveying equipment," but not if the coal was unloaded for storage. More specifically, EPA stated in relevant part:

> EPA concludes that coal unloading that involves conveying coal to plant machinery fits within the definition of "coal processing and conveying equipment." 40 CFR 60.251(g) defines "coal processing and conveying equipment" as "any machinery used to reduce the size of coal or to separate coal from refuse, and the equipment used to convey coal to or remove coal and refuse from the machinery. This includes, but is not limited to, breakers, crushers, screens, and conveyor belts." *The key phrases are "the equipment used to convey coal to * * * machinery" and "but is not limited to." While the "equipment" involved in coal unloading varies from plant to plant (the definition is written broadly enough to accommodate the differences), what is important is that the equipment perform the function of conveying. It should be noted that if the coal is unloaded for the purpose of storage, then the unloading activity is not an affected facility under NSPS Subpart Y. The coal must be directly unloaded into receiving equipment, such as a hopper, to be subject to the provisions of NSPS Subpart Y.*
>
> \* \* \* \*
>
> In light of the above information, EPA concludes that coal unloading that involves conveying coal to machinery at coal preparation plants is an affected facility under the NSPS for coal preparation plants (40 CFR part 60, subpart Y) and is subject to all requirements applying to "coal processing and conveying equipment." EPA recognizes that past determinations on the applicability of Subpart Y to coal unloading varied from Region to Region. Therefore, we will notify all Regional Offices of this conclusion. In the Regions that have been exempting coal unloading from NSPS Subpart Y, no penalties will be sought for past violations. We expect that coal preparation plants will be able to control emissions

from such coal unloading in the future through use of add-on controls.

1998 Coal Unloading Guidance, 63 Fed. Reg. at 53289-90 (italics added).

While the focus of the question was whether coal unloading was part of the "affected facility" of "coal processing and conveying equipment," so that the performance standards imposed by Subpart Y would apply to coal unloading, necessarily encompassed in EPA's answer is the conclusion that coal unloading is considered to be a part of the coal processing plant based on the definitions of "coal processing plant" and "coal processing and conveying equipment." The possible exception according to what EPA stated is when coal is unloaded for storage.

In the second question addressed by the 1998 Coal Unloading Guidance, EPA addressed the question of whether fugitive emissions from coal unloading into a coal processing plant must be counted in determining whether it is a major source. EPA concluded that the emissions would generally need to be counted, stating:

> EPA has determined by rule that fugitive emissions count towards the major source threshold for all sources that belong to the source category regulated by NSPS Subpart Y. 49 FR 43202, 43209 (October 26, 1984). Under the definition of source used in the 302(j) rulemaking, all types of coal unloading at coal preparation plants are covered. Coal unloading normally belongs to the same industrial grouping as other activities at coal preparation plants, is located on contiguous or adjacent property, and is under common control. Therefore, EPA concludes that all coal unloading at a coal preparation plant is part of the source belonging to the source category for coal preparation plants.

> *Coal unloading of all types also fits within the NSPS source category. A survey of EPA Regional Offices indicated that the majority of the Regions treat coal unloading at a coal preparation plant as being within the NSPS source category. Coal unloading that is regulated under Subpart Y is clearly within the source category. Common sense would dictate that coal unloading for temporary storage be treated no differently. It is performed at the same facility and is an integral part of the operations at that facility. The latter type of coal unloading is simply an optional first step in the coal preparation process.*

> *EPA concludes that fugitive emissions from coal unloading must be counted in*

*determining whether a coal preparation plant is a major source subject to Title V permitting requirements.*

63 Fed. Reg. at 53290 (italics added). In the italicized language, however, EPA continued to distinguish coal unloading for storage, but stated here that coal unloading for "temporary storage" should be treated no differently than coal unloading more directly into the equipment that does the coal processing.[6]

In the briefing here, both parties address the significance of the <u>1998 Coal Unloading Guidance</u>. Plaintiffs rely primarily upon the italicized language in the discussion of the second question, contending that coal unloading of "all types" must be considered and that, in this instance, this would be the unloading of coal onto the coal pile. Plaintiffs further contend that the statements about unloading for storage being an exception have no applicability to the coal pile here for two reasons. Plaintiffs primary argument (and one that has some traction) is that, in this particular instance, the coal pile is actually a part of the coal processing facilities given its physical location and interconnectedness with the crushing equipment, both operationally and physically, with the apron feeder extending into the pile and the pile providing support for the loading into the apron

---

[6] The parties have not cited to any further use by EPA of a distinction between storage that is temporary versus that which is for a longer term in this particular context. However, in a cost study memorandum prepared in connection with the 2009 rule-making for the amendments to Subpart Y, EPA did differentiate between "short-term" and "long-term" coal storage piles and all of the coal piles described as being short-term in the study were of 0.5 acres in size or less and those that were described as being long-term were more than an acre in size with the smallest of the piles labeled long-term being 3 acres in size. <u>Model Plant Control Costing Estimates for Units Subject to the NSPS for Coal Preparation Plants (40 C.F.R. Part 60, Subpart Y)</u> (Memo to Coal Preparation Docket EPA-HG-QAR-2008-0260 by Christian Fellner, April 2008) (Doc. No. 38-4) (also available by search under the referenced EPA docket number at www.regulations.gov). As noted earlier, defendant's application states that the coal pile in question in this case will be approximately 8 acres in size. The size of the coal pile may not be the only relevant factor, however, for purposes of determining what is temporary versus longer term storage. Arguably, the capacity of the coal processing plant would also be a factor in terms of how long the coal would remain in the storage pile.

feeder. And, if that is the case, EPA has made clear by the inclusion of coal piles as "affected facilities" in the 2009 Amendments to Subpart Y that all coal piles that are part of a coal processing plant, short term or long term, are subject to Subpart Y, as referenced later. Plaintiffs second argument that the coal pile is only for temporary storage is not reasonably supported by the facts as discussed earlier.

Defendant in its briefing points primarily to the italicized language in EPA's consideration of the first question, particularly EPA's statement that: "The coal must be directly unloaded into receiving equipment, such as a hopper, to be subject to the provisions of NSPS Subpart Y." Defendant contends this alone supports its contention that Subpart Y does not apply to the coal pile in this case because the coal pile is neither a piece of equipment nor a hopper. According to the defendant, this language is consist with its claim that the beginning of its coal processing facilities is when the coal from the pile comes into physical contact with apron feeder, which it contends is downstream of the coal pile.

While this beginning point appears to be a slight shift upstream from what it suggested to the NDDOH during permitting and what the NDDOH appears to have adopted as discussed later, what is clear is that both defendant and the NDDOH have ignored the general thrust of what EPA had to say about coal unloading since their beginning point - whether the most recent or an earlier one - does not take into account any equipment or activity associated with coal unloading. But, whether that necessarily means the coal pile needs to be included as a Subpart Y facility is a subject that will be returned to after the remainder of the guidance is considered.

**C.** **The 2009 Amendments to 40 C.F.R. Part 60 and EPA's guidance during that rulemaking**

In 2008, EPA began the formal process of amending Subpart Y by publishing in the Federal Register proposed amendments. EPA, Standards of Performance for Coal Preparation Plants: Proposed Rule, 73 Fed. Reg. 22901 (April 28, 2008). As a result of the comments it received, EPA published a supplemental proposal in May 2009. EPA, Standards of Performance for Coal Preparation and Processing Plants: Supplemental Proposal, 74 Fed. Reg. 25304 (May 27, 2009). After comments were received to the supplemental proposal, final amendments were adopted on October 8, 2009. EPA, Standards of Performance for Coal Preparation and Processing Plants; Final Rule, 74 Fed. Reg. 51950 (Oct. 8, 2009) ("2009 Coal Processing Plant Amendments").

As part of this rule-making process, EPA provided detailed responses to the comments it received as a result of the April 2008 and May 2009 proposals. Some of the responses are in the preamble of the publication of the final amendments. Others are set forth in a separate summary that EPA prepared and made a part of the docket for the rulemaking for the 2009 Subpart Y amendments. EPA, Standards of Performance for Coal Preparation and Processing Plants (40 C.F.R. 60 Subpart Y), Response to Comments Received on Proposed Amendments and Supplemental Proposal (September 2009) ("EPA Responses to Comments to Proposed 2009 Amendments").[7]

**1.** **EPA's response to comments about coal unloading**

The coal industry and other commenters urged EPA during the 2009 rule-making to formally

---

[7] This document was not published in the Federal Register but is filed in this case at Doc. No. 38-5. It is also available on the EPA's website. In referencing this document below, the court will cite to the page number of the document and not the page number assigned during docketing, which is different from the court's earlier order.

abandon its position that coal unloading at a coal processing facility should be deemed a part of the facilities subject to regulation under Subpart Y as set forth in the <u>1998 Coal Unloading Guidance</u>, contending that the 1998 guidance was misplaced. As noted in the prelude, while defendant and the NDDOH both rely upon selected portions of EPA's response to the comments that EPA received on that subject, the full text needs to be considered.

### 3.4.1.1 Coal Unloading Activities - Subpart Y Proposal Contrary to EPA Policy

**Comment:** Many commenters (085, 086, 088, 095, 107, 108, 112, 115, 117, and 120) stated that Subpart Y should not be applicable to coal unloading activities because of previous EPA applicability determinations and current EPA policy. Commenters disagree with EPA's rationale for its proposal to amend Subpart Y to include coal unloading activities. EPA concluded that coal unloading, in general, and truck dumps, in particular, are NSPS affected facilities at coal preparation plants based on (1) an "exceptionally strained" interpretation of the term "conveying equipment," (2) a guidance manual for agency inspection of coal unloading at coal preparation plants, and (3) a document that did not specifically address coal unloading but nevertheless assumed that activity was regulated by Subpart Y. Review of the record shows evidence that EPA never intended for coal unloading activities to be an affected facility at coal preparation plants when Subpart Y was promulgated. Specific EPA determinations cited by commenters concerning EPA's intentions for regulating coal unloading activities under Subpart Y include the following.

■ In 1980, EPA's first review of Subpart Y concluded that that coal unloading was not a Subpart Y affected facility.

■ In 1995, EPA Region VIII advised the Wyoming Department of Environmental Quality that "truck coal dump operations are not affected facilities subject to the NSPS Subpart Y regulations."

■ In 1998, EPA Headquarters published an interpretative ruling in the Federal Register stating that "coal unloading that involves conveying coal to plant machinery is regulated under Subpart Y" (63 FR 53288, dated October 05, 1998). EPA Headquarters "use[d] the term "coal unloading¨ to encompass "coal truck dumping" and "coal truck unloading¨ as well as dumping or unloading from trains, barges, mine cars, and conveyors." EPA explained its reasoning behind that 1998 interpretation, as follows: section 60.251(g) defines "coal processing and conveying equipment" as "any machinery used to reduce the size of coal to or remove coal and refuse from the machinery. This includes, but is not limited to, breakers, crushers, screens, and conveyor belts." The key phrases are "the equipment used to convey coal to . . . machinery" and "but not limited to." Although the equipment involved

in coal unloading varies from plant to plant (the definition is written broadly enough to accommodate the differences), what is important is that the equipment performs the function of conveying. It should be noted that if the coal is unloaded for the purpose of storage, then the unloading activity is not an affected facility under Subpart Y. The coal must be directly unloaded into receiving equipment, such as a hopper, to be subject to the provisions of Subpart Y (63 FR 53289).

- ■ Subpart OOO explicitly excludes truck dumping from NSPS control requirements (section 60.672(d)). Subpart OOO was just recently revised, 74 FR 19294 (April 28, 2009), and it continues to contain that NSPS-exclusion for truck dumping. Thus, in the absence of (1) representative data for achievable levels of controlled emissions from coal unloading and (2) associated documentation that the costs of such controls are reasonable, the obvious inference is that coal unloading should also remain excluded from NSPS.

**Response:** As commentators noted, in 1998 EPA issued an interpretative ruling that states that "coal unloading" operations (which include both truck and rail car dumping) are regulated by Subpart Y. *This interpretative ruling has not changed in intervening years and thus remains, in effect.* In the interpretative ruling, EPA concluded:

> …that coal unloading that involves conveying coal to plant machinery fits within the definition of "coal processing and conveying equipment." 40 CFR 60.251(g) defines "coal processing and conveying equipment" as "any machinery used to reduce the size of coal or to separate coal from refuse, and the equipment used to convey coal to or remove coal and refuse from the machinery. This includes, but is not limited to, breakers, crushers, screens, and conveyor belts." The key phrases are "the equipment used to convey coal to * * * machinery" and "but is not limited to." While the "equipment" involved in coal unloading varies from plant to plant (the definition is written broadly enough to accommodate the differences), what is important is that the equipment perform the function of conveying…*The coal must be directly unloaded into receiving equipment, such as a hopper, to be subject to the provisions of NSPS Subpart Y.* (see 63 FR 53288.)

*Thus, EPA interprets coal unloading into the first hopper "downstream" from any form of transportation to be the beginning of the "coal preparation plant."*

As the standards under Subpart Y are based on data obtained from subject facilities, the comparisons with subpart OOO have no meaning. As discussed below in response to comment 3.4.2.1, the central question is whether the standard set in this rule is appropriate not whether a standard set in a different rule was appropriate. Much of commenters' reasoning is based upon past applicability determinations that said unloading were not subject to Subpart Y. Such determinations were based on interpretations of the current rule language at the time. Thus, the determinations do not speak to Agency intent or policy regarding whether such regulation would be appropriate. Further, as noted, they were superseded by the 1998 interpretation, which was published in the <u>Federal Register</u>.

EPA Responses to Comments to Proposed 2009 Amendments, at 77-79 (italics added).

As EPA's response makes clear, it rejected the suggestion by the coal industry and others that it abandon its 1998 Coal Unloading Guidance, stating it remains in effect. EPA did repeat, however, in the italicized language the statements from the 1998 Coal Unloading Guidance that it considers the beginning of the coal preparation plant to be where coal is unloaded "into the first hopper 'downstream' from any form of transportation to be the beginning of the 'coal preparation plant.'" Also, while EPA did not repeat what it had said previously about coal unloading for storage being excluded from regulation under Subpart Y (at least that which is more than temporary), it did not state that this part of the 1998 Coal Unloading Guidance was no longer operative.

### 2. The "first hopper" as the beginning of Subpart Y regulation

As the foregoing reflects, EPA's statements about the coal processing plant beginning at the point where coal is unloaded into a "hopper" date back to the 1998 Coal Unloading Guidance and continued with its responses to comments during the 2009 rulemaking. In addition to the reference to "first hopper" in the response to the comments about coal unloading just discussed, there are similar references in a couple of other responses, including ones discussed further below. Also, there is another reference to "first hopper" in the preamble to the final rule adopting the 2009 amendments to Subpart Y. 2009 Coal Processing Plant Amendments, 74 Fed. Reg. at 51952.

Defendant contends that EPA intends "first hopper" to refer to a physical piece of equipment that is capable of receiving coal and is involved in conveying the coal directly for processing. In support, defendant relies upon that portion of the above 2009 response by EPA to comments about coal unloading (which is a quote from the 1998 Coal Unloading Guidance) that the "coal must be

directly unloading into receiving *equipment*, such as a hopper, to be subject to the provisions of NSPS Subpart Y." (italics added)  Defendant also points to the particular use of the term "hopper" as suggesting a piece of equipment or a physical structure.[8]

While there is substantial force to defendant's reading, "hopper" is not a term used by Subpart Y and EPA has also referred to "hopper" or "first hopper" parenthetically as being a "drop point" in several of its responses to comments, including those set forth below as well as in its preamble to the final amendments. 2009 Coal Processing Plant Amendments, 74 Fed. Reg. at 51952 ("A coal preparation and processing plant begins at the first hopper (i.e., drop point) used to unload coal").

Given the references to "drop point" along with the 2009 Amendments to Subpart Y, a equally plausible reading of EPA's guidance is that a coal pile could be a "first hopper" or "drop point." Also, there is plaintiffs' other argument that the coal pile is physically a part of the "hopper," given (1) the fact that it is connected (both physically and operationally) to the structure containing the apron feeder as it extends into the coal pile and (2) provides the platform for the unloading of coal into it.  This also is plausible application of EPA's "first hopper (drop point)" guidance to the particular circumstances of this case.

---

[8] See, e.g., Oxford English Dictionary Online (last accessed May 28, 2016) ("3. In a corn or other grinding mill: a receiver like an inverted pyramid or cone, through which grain or anything to be ground passes into the mill.  4. Applied to similar contrivances for feeding any material to a machine, and, generally, to articles resembling a mill hopper in shape or use."); Random House Unabridged Dictionary (2d ed. 1993) ("5. a funnel-shaped chamber or bin in which loose material, as grain or coal, is stored temporarily, being filled through the top and dispensed through the bottom."); Webster's New World Dictionary (Third College Ed. 1988) p. 650 ("3 [so called from making the material "hop"] a box, tank, rail car, etc., often funnel-shaped from which the contents can be emptied slowly and evenly *[the hopper of an automatic coal stoker]* ").

Also, possibly lending support to plaintiffs' arguments is EPA's response to commenters who contended that EPA did not have the authority to regulate coal storage piles under 40 C.F.R. Pt. 60 because a coal pile is not a building, structure, facility, installation, or apparatus within the meaning of what they contended are applicable statutory and regulatory provisions because coal piles have no walls, floor surfaces, or dedicated equipment.  In rejecting this contention, EPA stated, in relevant, part:

> The commenters do not offer a definition of "apparatus" but appear to suggest that to be an "apparatus" a coal pile would need to have "walls, floor surfaces, or equipment associated with their use."  The commenters, however, offer no support for this assertion, and EPA does not believe such a limited definition of "apparatus" would be reasonable or consistent with the plain English meaning of the word.  Further, the Courts stated "In designating what will constitute a facility in each particular industrial context, EPA is guided by a reasoned application of the terms of the statute it is charged to enforce."  ASARCO Inc. v. EPA, 578 F.2d 319, 324 n.17 (1978).  In this case, because coal storage piles are significant sources of emissions and are physically located at coal preparation and processing plants, EPA believes it is reasonable in this context, to determine that they are facilities that can be subject to regulation.

> The dictionary definition of the word "apparatus" also supports EPA's approach.  The word "apparatus" has a very broad meaning and can include tangible items such as equipment, tools and materials as well as intangible items such as activities and functions.  The Random House College Dictionary: Revised Edition defines the word "apparatus" as follows:
>> 1. a group or aggregate of instruments, machinery, tools, materials, etc. intended for a specific use. 2. any complex instrument or machine for a particular purpose. 3. any system of activities, functions etc directed toward a specific goal: the apparatus of government. 4. a group of structurally different organs performing a particular function.
> Because a coal pile constitutes "a group or aggregate of . . . materials . . . intended for a specific use," it qualifies as an "apparatus" under the first definition of the word.  Furthermore, given the broad meaning of the term "apparatus," EPA believes it would not be reasonable to interpret this term to limit the scope of the definition of "affected facility" to exclude a significant part of the coal preparation and processing plant that may have significant emissions.

EPA Responses to Comments to Proposed 2009 Amendments, at 80.  Also, EPA stated that coal pile

could be viewed as an "installation" or "structure" given that terms "are very broad and not limited to things that have walls, floor surfaces or dedicated equipment.  Id.

### 3.    EPA's references to "mine face," "active mining area," and haul roads

As noted earlier, Subpart Y specifically states in § 60.251(f) that "[e]quipment located at the mine face is not considered to be part of the coal preparation and processing plant."  In at least two responses to comments during the 2009 rulemaking, EPA made reference to either the "mine face," "active mining area," or both, in the context of drawing a line between a coal processing plant and the rest of a mine.

One was EPA's response to comments that it should adopt subcategories for its Subpart Y requirements that would differentiate between coal "producers" (*i.e.*, coal mines) from industrial "users" (*e.g.*, power plants, cement manufacturers, and coke ovens).  EPA Responses to Comments to Proposed 2009 Amendments, at 56-59.  One of the reasons that the commenters gave for why there should be different requirements is the likelihood of different regulations applying to users because they are often major sources while producers generally are not.  Another reason is the fact that surface coal mines are separately regulated by SMCRA with respect to controlling fugitive dust, including that from any embedded coal processing facilities.  In response, EPA rejected the request for the differing treatment of "producers" and "users" under Subpart Y for several reasons.  As relevant here, part of its response was:

> In addition, the regulation of fugitive dust from surface coal mines under SMCRA by the Department of Interior does not, as commenters suggest, result in a "conclusion that concurrent regulation with similar CAA requirements would not be appropriate."

> The October 1974 Background Information Document stated that "Coal

preparation" is a segment of the coal industry that encompasses operations between the mining of raw coal and the distribution of product coal. (See "Background Information for Standards of Performance: Coal Preparation Plants; Volume 1: Proposed Standards. October 1974. p. 1.) The support document for the April 1981 NSPS review states that "[t]he first step in the coal preparation process is the delivery of ROM [run of mine] coal to the plant site." (See "A Review of Standards of Performance for new Stationary Sources – Coal Preparation Plants. December 1980. p. 2-3.)

> *EPA's Office of Water has included the following definitions in their regulations for the coal mining industry (at 40 CFR 434.11).*
>
> *(b) The term "active mining area" means the area, on and beneath land, used or disturbed in activity related to the extraction, removal, or recovery of coal from its natural deposits. This term excludes coal preparation plants, coal preparation plant associated areas and post-mining areas.*
>
> *(e) The term "coal preparation plant" means a facility where coal is subjected to cleaning, concentrating, or other processing or preparation in order to separate coal from its impurities and then is loaded for transit to a consuming facility.*

*Thus, EPA, in both the air and water offices, has maintained a distinction between the "active mining area" and the "coal preparation plant." The process of "coal preparation" generally involves, among other things, separation of coal from impurities (i.e., "breaking" or "crushing"). As discussed in the response to comment 3.4.1.1.1 in the Response to Comments Document, EPA interprets the "beginning" of the "coal preparation plant" to be the first hopper (i.e., "drop point") for receipt of coal from any form of transportation.*

Id. at 58-59 (italics added). Considering this language in isolation, it arguably supports plaintiffs' contention that the first "drop point" for the "receipt of coal from any form of transportation" from the "active mining area" is when coal is unloaded at the coal pile following its delivery over the haul road from the mine pit several miles away.

Defendant, however, points to another response that EPA made to comments seeking clarification with respect to haul roads in which EPA made reference to "mine face" and in parentheses to "active mining area." The concern of the commenters was that haul roads located outside of the coal processing plant should not be subject to Subpart Y regulation. In addition, the

commenters believed that EPA needed to more clearly define the beginning of the coal processing plant to make clear which haul roads would be subject to Subpart Y and which would not. The following is the full text of EPA's summary of the comments and its response:

### 3.4.1.3 Coal Preparation Plant Roadways

**Comment:** Many commenters (082, 085, 086, 087, 088, 093, 095, 107, 109, 112, 114, 115, 120, 123, and 126) requested clarification regarding the plant roadways to which EPA intends Subpart Y to apply. EPA does not clearly explain what it means for a roadway to be "associated" with a preparation plant. Nor does EPA define the term "haul road." EPA should clarify that "roadways" such as haul roads that do not leave the plant property are not subject to Subpart Y. EPA needs to clearly define where the coal preparation plant begins and where the coal mine ends. Subpart Y is applicable only to affected facilities of a coal preparation plant. EPA should clarify that no facilities at a coal mine, even if the mine is contiguous to the property of the preparation plant, are covered under the provisions of Subpart Y. EPA must clearly define the term "haul roads" and should not, regulate under Subpart Y any roadways outside of the preparation plant. Other commenters (096 and 113) disagree with EPA's proposal to exclude roadways that do not leave the property (e.g., haul roads at coal mines) from being subject to Subpart Y for the following reasons with specific examples cited: (1) road wetting can be accomplished in a manner that is easy to adjust with the re-routing of haul roads, including the use of water trucks and temporary sprayers; (2) certain coal preparation plants are already required to abate dust on their internal haul roads; (3) some states currently impose dust suppression requirements on all roads associated with coal preparation plants.

**Response:** As noted in the response to Comment 3.2 above, EPA, in both the air and water offices, has historically maintained the concept that *activities undertaken at or near the active mine face ("active mining area") would not be part of the "coal preparation plant" and that "coal preparation" involves separation of coal from impurities (i.e., "breaking" or "crushing"). As discussed in the response to the comment in section 3.4.1.1.1 above, EPA interprets the "beginning" of the "coal preparation plant" to be the first hopper (i.e., "drop point") for receipt of coal from any form of transportation. Thus, any haul roads between the "active mining area" and the first hopper of the "coal preparation plant" would not be subject to Subpart Y; rather they would be subject to the requirements of SMCRA or the specific State.* Similarly, roads occurring after the coal has been loaded for distribution would not be subject to Subpart Y.

Under the definition of "surface coal mining operations" contained in 30 CFR 70.5 (SMCRA), operations conducted within a coal preparation plant are covered under SMCRA:

> [quotations to specific SMCRA regulations that govern control of fugitive dust under SMCRA including those portions of coal mines that process or prepare coal]

47

Thus, SMCRA covers fugitive dust emissions from roads at coal preparation and processing plants at mine sites and requires a fugitive dust plan and other requirements to control air pollution from such sources (through similar measures as were included in the supplemental proposal for Subpart Y). *EPA believes that coal moving operations, once the coal enters the "coal preparation plant," will be by conveyor rather than by truck.* Therefore, EPA believes that the requirements of SMCRA are sufficient to address air emissions from *roadways that may be found within a coal preparation and processing plant at mine sites. For coal preparation and processing plants at end-user facilities, EPA believes that, again, once the coal enters the "coal preparation plant," coal moving operations will be by conveyor rather than by truck*. Therefore, EPA is withdrawing its proposed requirements for roadways.

Where fugitive coal dust emissions control plan requirements under Subpart Y for open storage piles overlap requirements under SMCRA or State regulations, those sources may submit the more stringent of the required monitoring plans to the Administrator or delegated authority as required by the final rule.

EPA Responses to Comments to Proposed 2009 Amendments at 93-95 (italics added).

Defendant contends that the above response is significant in several respects. First, there is again the reference to the beginning of the coal preparation plant being the first hopper, albeit also the parenthetical of "drop point." Second, EPA appears to distinguish between haul roads that lead up to but are outside of the coal processing plant, which would not be subject to Subpart Y, and those within a coal processing plant (*i.e.*, located after the coal "enters the 'coal preparation plant'"), which would be subject to Subpart Y. Defendant argues that the same concept applies to coal piles. That is, a coal pile for mine run, unprocessed coal within a surface coal mine that is located outside of the mine coal processing facilities (even if just outside) would not be subject to Subpart Y but a coal pile located after the coal enters the coal processing plant would be.

But, again, this begs the question of what comprises defendant's coal processing facilities in the first instance. If the coal pile is deemed to be an integral part, then the first entry of coal would be when it is unloaded onto the coal pile. Also, there is the separate issue of EPA's guidance stating

that coal unloading of all types into a coal processing plant is subject to regulation under Subpart Y and whether, in this instance, that would be unloading onto the coal pile given EPA's comment about unloading for storage not being counted unless possibly the storage is only temporary.

### 4. The court's conclusions re the EPA guidance

#### a. Deference owed to EPA's guidance

Under what is generally referred to as <u>Auer</u> or <u>Seminole Rock</u> deference, EPA's guidance is controlling with respect to the interpretation of its regulations unless the guidance is plainly inconsistent with the regulations. The Eighth Circuit recently summarized the <u>Auer</u> doctrine as follows:

> We apply the <u>Auer</u> (also known as <u>Seminole Rock</u>) standard in cases involving an agency's interpretation of its own regulations. <u>See</u> <u>Auer v. Robbins</u>, 519 U.S. 452, 461–63, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). An agency's interpretation of its own regulations is controlling unless "plainly erroneous or inconsistent with the regulation." <u>Id.</u> at 461, 117 S.Ct. 905 (quoting <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945) ). We must defer to a permissible interpretation even if it is not the "best" interpretation. <u>Decker v. Nw. Envtl. Def. Ctr.</u>, 568 U.S. 597, 613, 133 S.Ct. 1326, 185 L.Ed.2d 447 (2013).

<u>Sisseton–Wahpeton Oyate of the Lake Traverse Reservation v. United States Corps of Engineers</u>, __F.3d __, 2018 WL 1936356, at *11 (8th Cir. April 25, 2018).

#### b. The mine haul road

Plaintiffs claim that the PTE for PM from the mine haul road, as well as the activity of hauling coal over it from the active mining area to the coal pile, is subject to Subpart Y. Essentially, their argument is that the transportation of the coal by truck ("equipment") over the haul road and away from the "mine face" is part of the process of "conveying" of the coal to the equipment that does the processing within the meaning of 40 C.F.R. § 60.251(f).

Given the literal language of Subpart Y, including § 60.251(f), plaintiffs' argument that the haul road and the hauling of coal over it are part of defendant's coal processing facilities is a plausible one. Further, there is support from a factual standpoint, given the physical layout of defendant's facilities, *i.e.*, the mine face being located some three to four miles from the coal handling facilities and tethered to them by the narrow corridor containing the haul road.

Nevertheless, it is clear enough from the foregoing guidance that EPA does not consider a haul road from the mine face to the first drop point to be a part of a coal processing facility subject to Subpart Y. For this reason, the court concludes the haul road in this case is not included.

### c.        The coal pile and unloading of coal to it

In the 1998 guidance addressing coal unloading at a coal processing plant, which was reaffirmed in 2009, EPA made clear (1) that coal unloading is subject to Subpart Y regulation, and (2) that, as a consequence, the PTE for PM emissions from coal unloading must be counted in making the required PTE calculation for determining whether the coal processing plant is a major source.[9] As discussed in more detail below, it appears that neither defendant in its minor source permit application nor the NDDOH in granting the minor source permit considered the PTE for PM resulting from coal unloading. This is problematic in light of EPA's guidance.

But, whether the failure to take into account coal unloading makes a difference in terms of the coal pile being in or out may depend upon: (1) whether there is any other logical point to draw

_____

[9] Defendant in this case has not argued that EPA's guidance on coal unloading is contrary to its Subpart Y regulations or otherwise unlawful. Rather, it simply contends the coal unloading guidance does not apply in this situation, but the arguments for that are contrary to what EPA clearly concluded in the <u>1998 Coal Unloading Guidance</u> and again in 2009.

a line between it and the rest of the coal processing facilities which includes coal unloading that is other than the unloading of coal onto the coal pile; and/or (2) whether the unloading is for longer than temporary storage. Further, apart from that, there is the question of whether the coal pile itself is "in" defendant's coal processing facilities for reasons articulated by plaintiffs, so the first point of entry (first "drop point") would be the unloading of coal onto the coal pile. Or, to put it another way, truck dumps for unloading coal would normally be considered part of the coal processing facilities and subject to Subpart Y regulation  EPA Responses to Comments to Proposed 2009 Amendments, at 77-79, 97.  One possible view here is that the coal pile is nothing more than a big open-air truck dump that uses equipment (including dozers and the embedded apron feeder) to feed coal to the crushers.

As to these points, the court concludes that EPA's guidance does not provide a clear answer. Plaintiffs' reading of EPA guidance is plausible, but so also is defendant's - at least up to the point where it turns a blind eye to EPA's coal unloading guidance.

## VII.  DEFERENCE TO WHAT THE NDDOH CONCLUDED IN GRANTING THE MINOR SOURCE PERMIT

### A.  What deference may be owed

In its amicus brief, the State argues that Eighth Circuit precedent requires this court to give "considerable deference" to the NDDOH's permitting decision. After pointing out the CAA gives States the primary responsibility for implementing the NAAQS through EPA-approved SIP's and the NDDOH is the regulator charged with determining whether or not the Coyote Creek Mine qualifies as a major source, the State goes on to argue:

> Even though this is not a direct appeal of NDDH's permitting decision, NDDH plays a starring role in this proceeding. Under these circumstances, NDDH respectfully requests the Court follow controlling precedent and give considerable deference to NDDH's permitting decision. See Comfort Lake Ass'n, Inc., 138 F.3d at 357. Moreover, because NDDH rationally exercised its authority in determining the Mine is a minor source, this Court should adhere to that decision and hold the Mine has obtained the proper permit. See Dubois, 820 F.2d at 947.

(Doc. No. 92, pp. 10-11). Not surprisingly, defendant agrees with the State's "considerable deference" formulation.

The court believes, however, that the State and defendant paint with too broad a brush and the precedent they cite is not on point. The issue in Comfort Lake was the amount of deference to be accorded a settlement agreement entered into by the state agency as the permitting authority. This is substantially different from the NDDOH's determination of whether or not defendant's mine is a major source, a threshold determination of quasi-jurisdictional significance for which the NDDOH arguably has less discretion.[10]

Unfortunately, there is not a lot of case law addressing what deference, if any, should be accorded to determinations made by a state permitting agency that lead up to a conclusion that a source is not a major one in a citizen's suit under the CAA. Perhaps, the only case to have squarely addressed the issue is Northwest Environmental Defense Center v. Cascade Kelly Holdings, 155 F. Supp. 3d 1100 (D. Ore. 2015) ("Cascade Kelly Holdings"). In that case, the court discussed whether granting deference was appropriate and ultimately afforded deference to a critical factual determination by the state agency that a condition imposed by defendant's minor source air permit

---

[10] The State also cites to Dubois v. Thomas, 820 F.2d 943 (8th Cir. 1987), which also is not on point.

did limit the PTE for VOCs to an amount less than the major-source threshold. More particularly, the issue was whether a capture efficiency of 98.7% for VOCs could be assumed for marine vessels carrying crude oil when a 3.7% reduction down to 95% would push the PTE well over the major source threshold. Id. at 1123-26. There was conflicting expert testimony on the point of whether the higher assumed capture efficiency could be reached. And, while stating it was a "close call" and recognizing it was dispositive of the case, the court concluded:

> Giving DEQ the deference due a state agency charged with implementing a federal statute that has made technical determinations within its area of expertise, the Court finds that DEQ reasonably approved the use of 98.7 percent capture efficiency.

Id. at 1126. In reaching this conclusion, the court stressed it should not be construed as an abandonment or abdication of the court's responsibilities. Id. at 1125. In fact, the court deferred to the expertise of the state agency only after carefully scrutinizing the evidence and finding that the state agency's conclusion on this point was not inconsistent with either EPA's governing regulations or what it set forth in "AP-42," an EPA publication that sets forth protocols and emissions factors for use in making emissions estimates. Id. at 1125-26.

A more recent case addressing what deference should be accorded the determinations of a state agency in a CAA citizen's suit - albeit not involving the issue of major source - is Grand Canyon Trust v. Energy Fuels Resources (U.S.A.) Inc., 269 F. Supp. 3d 1173 (D. Utah 2017) ("Grand Canyon Trust"). In that case, plaintiff sued a uranium mill for alleged violations of Subpart W of 40 C.F.R. Part 61, which sets forth the standards for radon emissions from operating mill tailings. The court discussed at some length the issue of deference, noting "[w]hether a state agency is entitled to deference when administering federal law is not well settled." Id. at 1194. Ultimately,

the court concluded that the determinations by a state are "entitled to some deference because it is applying federal regulations pursuant to Congress's express authorization in a manner that is not inconsistent with federal law and is reasonable." Id. at 1196.

Then, in working through the issues in the case, the court in Grand Canyon Trust afforded deference to one point decided by the state agency but not as to another. The issue for which the court afforded deference had to do with whether one of defendant's evaporation ponds was an "operational tailings impoundment" within the meaning of Subpart W. As to this issue, the court deferred to the conclusion of the state agency that it was not and expressed three reasons why. The first was that the state agency was authorized by EPA to be the implementing and enforcing agency. The second was that the state agency's conclusion was based on a plausible reading of Subpart W. The third was that the state agency's conclusion was otherwise reasonable in terms of its impact on the operations of the mill relative to what Subpart W intends to accomplish. Id. at 1196-98.

The court refused, however, to grant deference to the state agency's determination that another cell at the plant was subject to Subpart W. The court concluded that the state agency's determination on that point directly contradicted the plain language of Subpart W. The court added this was "a legal issue for the court to resolve, especially where it does not require the expertise of the agency as do some of the other issues presented in this action." Id. at 1202.

Still more recently, the federal district court in the Western District of Virginia addressed the question of whether it should give deference to the state permitting agency's determination that reclaimed fills and associated "underdrains" in a coal mine were not "point sources" for which a permit is required under the Clean Water Act ("CWA"). Red River Coal Company v. Sierra Club,

Case Nos. 2:17-cv-00021, 2:17-cv-00028, 2018 WL 491668 (W.D. Vir. Jan. 19, 2018) (Red River Coal"). This case involved two consolidated actions, one an action for declaratory relief by the mining company and the other a suit by two environmental groups that in part was a citizen's suit under the CWA.

In contending the reclaimed fills were point sources requiring a permit, the environmental groups in Red River Coal pointed to a 2001 letter that EPA had sent to the enforcement agency in another state stating the issue was an open one along with a show cause letter EPA issued to the mining company in the present matter alleging CWA violations based on a lack of a permit for the drainage from the reclaimed fills. The mining company, on the other hand, pointed to notes on EPA's website that it claimed suggested that abandoned mine drainage is not a point source. Also, the mining company stated it had met with EPA over the issue and EPA had not taken further action, the implication being that EPA was satisfied with its explanations. Finally, the mining company submitted a sworn declaration from a representative of the permitting agency setting forth the position of the agency, which was that it had never treated the reclaimed fills as point sources. Id. at **2-3, 7-9.

After considering these and other points, the court in Red River Coal denied a motion to dismiss based on agency deference that was brought by the mining company. The court stated it was concerned about whether the position taken by the state agency in its declaration was the result of any formal regulatory or adjudicatory process. The court was also concerned that it did not yet know whether EPA stood by what it claimed in its show cause letter to be CWA violations. Id. at *9.

Prior to concluding it was premature to resolve the question of deference, the court discussed

55

at some length the appropriateness of giving deference to a state agency determination in a citizen's suit under the CWA. This included quoting from a Ninth Circuit decision discussing the tension in a CWA citizen's suit between enforcing the requirements of the CWA if EPA has failed to do so and affording agency deference to what EPA decided and citing to two cases in which courts had refused to give deference to either the state permitting agency or EPA when to do so would be contrary to the requirements of the CWA. Id. at *8. After reviewing this and other precedent, the court in Red River Coal appears to have concluded that deference may be appropriate provided that the determination by the state agency is not inconsistent with EPA's requirements and there is otherwise a rational basis for it. Id. Also, what is apparent from the court's discussion is that, like the courts in Grand Canyon Trust and Cascade Kelly Holdings, it would not unquestioningly afford deference simply because the state agency is the authorized permitting authority.

The court concludes that the courts in Grand Canyon Trust, Cascade Kelly Holdings, and Red River Coal struck the right balance between giving appropriate respect to the determinations of the state agency and yet fulfilling the court's responsibilities under the CAA's citizen's suit provisions. That is, deference is appropriate so long as it appears after careful consideration that the state agency determination is consistent with EPA's requirements and is otherwise rationale.[11] Cf. ADEC, 540 U.S. at 485-94; North Dakota v. U.S.E.P.A., 730 F.3d 750, 760-61 (8th Cir. 2013) (citing ADEC).

In other words, it is not enough in this case that the NDDOH has been delegated the authority to make the major source determination and that its decision standing alone appears to be rational.

---

[11] If a label is required for the deference owed, the court would choose "some deference," keeping in mind this is more a characterization of the fact it is appropriate only in certain circumstances than one of weight.

What the NDDOH decided must also be consistent with the CAA's requirements and any governing EPA regulations before deference can be afforded to this very important threshold determination.[12] Further, given the nature of the CAA's regulatory scheme, there is no principled reason why the NDDOH would not also be required to afford the same deference to appropriate EPA guidance that this court is required to give.

**B.      What the NDDOH was required to consider**

Relevant to this case, the NDDOH had to do two things in reviewing defendant's minor source permit application for the Coyote Creek mine. One was to determine which of the mine facilities are part of defendant's coal processing facilities and subject to regulation under Subpart Y for the purposes of insuring that the NSPS performance standards are met as well as for identifying what emissions points need to be considered in determining whether the source is a major one for purposes of the PSD program. The other was to determine whether the PTE for PM from all of the emission points within the coal processing facilities collectively reached the 250 tpy major source threshold or not.

In terms of the latter, it necessary to keep in mind that PTE is a theoretical, regulatory construct that EPA uses to provide a benchmark for distinguishing between major and minor sources.

---

[12]   There are points in the State's amicus brief where it appears to suggest the issue here is one of interpretation of its own regulations and it is sufficient if that interpretation is a rational one. To the extent this is its argument, it is contrary to the conclusions reached in the above cases. While the State has an important role to play in administering and enforcing the CAA, that role is cabined by Congress's conclusion that there needs to be federal standards as well as some measure of uniform enforcement to insure that individual States do not become islands of polluted air that is not confined to geographic boundaries and that individual states are not able to obtain an economic advantage in attracting industry by adopting lesser standards or being lax in their enforcement. See, e.g., ADEC, 540 U.S. at 485-86; cf. North Dakota v. U.S.E.P.A., 730 F.3d at 760-61.

See, e.g., Ala. Power Co. v. Costle, 636 F.3d 323, 352 (D.C. Cir. 1979); In re: Peabody Western Coal Co., 12 E.A.D. 22, 30 (E.P.A.), 2005 WL 428833, at *6 (EPA Envir. App. Bd. Feb. 18, 2005). EPA defines PTE to mean:

> (4) *Potential to Emit* means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable. Secondary emissions do not count in determining the Potential to Emit of a stationary source.

40 C.F.R. §§ 51.166(b)(4) & 52.21(b)(4). "At its core, potential to emit relates to a source's inherent capacity to emit air pollutants. That is, PTE reflects the maximum capacity of a source to emit any given air pollutant, based on the source's physical design and operational limitations." Peabody Western, 2005 WL 428833, at *6.

PTE is not to be confused with actual emissions, which may be significantly lower. Id. ("Given the relatively broad scope of PTE, a source's PTE may be significantly higher than its typical actual emissions."). Further, even though physical and operational design are to be considered, operational promises or conditions that lack criteria to provide an objective basis for a calculated numeric reduction or permit effective enforcement are likely not sufficient. See, e.g., EPA, Guidance on Limiting Potential to Emit in New Source Permitting (Memorandum to Terrell Hunt and John Seitz, June 13, 1989) ("1989 PTE Guidance") (Doc. No. 38-3).

## C. **What the NDDOH determined**

### 1. **Introduction**

While it does appear the critical issue upon summary judgment is whether the coal pile in this

instance is part of defendant's coal processing facilities, some discussion of what the NDDOH determined or failed to determine with respect to other matters is necessary to address plaintiffs' argument that the NDDOH's alleged failures to properly address other issues is symptomatic of it not having conducted a meaningful review of defendant's minor source permit application.  As discussed later, this is one of plaintiffs' arguments for why nothing of what the NDDOH decided is entitled to deference.

When this litigation commenced, there was no formal administrative record reflecting what the NDDOH decided in reaching its ultimate conclusion that defendant needed only a minor source permit for the Coyote Creek Mine.  After the court denied defendant's motion to dismiss, the defendant went about assembling contemporaneous evidence of what the NDDOH considered. Through an open records request, defendant secured a handful of paper documents.  Principally, these are:

(1)     defendant's permit application (Doc. Nos. 1-1; 85-5, pp. 3-30);

(2)     an "Air Quality Effects Analysis" ("AQEA") (Doc. No. 85-6, pp. 8-12);

(3)     several emails exchanged with the defendant while the permit application was under review (Doc. No. 85-8, pp. 2-4); and

(4)     the minor source permit that was issued (Doc. Nos. 1-2; 85-6, pp. 3-11).

The  AQEA is a four and one-half page document that contains a short description of the mine facilities, a listing of the potentially applicable NDDOH Rules, a summary of the potential emissions, a summary of what the defendant proposed in terms of meeting the applicable rules, and a recommendation that the permit should be granted.  In short, it appears to be the working document

for the analysis of defendant's permit application.

In addition to obtaining the few agency documents that existed, the defendant deposed: the NDDOH's environmental engineer who had primary responsibility for evaluating the permit application, including preparation of the AQEA; the Director of the NDDOH's Air Quality Division who signed defendant's minor source permit; and the Chief of Environmental Section of the NDDOH.

The court will start first with what it appears the NDDOH decided was included in defendant's coal processing facilities and subject to Subpart Y. Then, the coal pile will be addressed specifically.

2. **What the NDDOH determined to be the Subpart Y coal processing facilities**

If appears from what follows that the NDDOH substantially relied upon what defendant contended was its coal handling facilities subject to Subpart Y. For that reason, the court starts with that first.

a. **What defendant claimed to be its coal processing facilities at the time of permitting**

What was presented in defendant's permit application has been set forth in some detail above. In terms of defining precisely what equipment and facilities were deemed to be part of the coal processing facilities, the application was somewhat vague. While clearly the primary crusher, the secondary crusher, and the transition from the secondary crusher to the conveyor that transports the coal to the Coyote Station were included, there appears to be some uncertainty whether anything else was. Also, the application did not delineate any separate emission points. Rather, it simply labeled

all of the coal processing equipment under the category of "FUG 1" and represented that the emissions from that equipment would be negligible because of the surrounding enclosures (*i.e.*, the PECS) along with fogging should that be necessary.

In terms of the upstream boundary of the coal handling facilities, the application stated:

> CCMC plans to transport raw mined lignite coal from the mine face to a separate location nearer to the Coyote Station for processing. The raw lignite is placed onto a storage pile and is subsequently pushed by a dozer or equivalent device into a receiving pocket. *This receiving pocket constitutes the beginning of the coal preparation plant subject to Subpart Y in accordance with EPA's interpretation.*

(Doc. No. 1-1, p. 12) (footnote to EPA's guidance omitted).  Also, in another part, the application stated:  "From the pile the coal is pushed via dozer into a receiving pocket and apron feeder where it enters the coal processing facility."  (Id. at p. 5).  But, what exactly is the "receiving pocket"?  Is it the structure surrounding the apron feeder or is it the opening in the retaining wall through which the coal passes?

In response to three questions posed by the NDDOH engineer who did the primary analysis of defendant's permit application, the defendant stated:

> 1.   How will the coal be transferred to the open coal storage pile?  Will there be a truck dump and conveyor? If so, what is the capacity of the truck dump (in tons) and the conveyor (in tons/hour) and how will emissions be controlled?
>
> Coal will be transported from the mine to the open coal storage pile via large coal trucks utilizing the coal haul road shown on Sheet 1 of Appendix B. The trucks will drive onto the pile and unload the coal. The pile is situated adjacent to a concrete wall, and features an apron feeder (see attached photos for example from another facility). The coal pile will be maintained by rubber tire dozer which pushes the coal onto the apron feeder. *The apron feeder draws the coal through the wall to the coal preparation plant where it is sized with a primary crusher and secondary sizer as shown on Sheet 3 of Appendix B. As described in Section 2.1.1 of the application, the coal pile itself and the associated apron feeder are not subject to NSPS Subpart Y, rather NSPS Subpart Y applicability begins once coal enters the coal preparation*

*plant, thus emission controls are not required for the storage pile nor the apron feeder that draws the coal into the preparation plant.*

2.  There appears to be an apron feeder to transfer coal to the coal processing equipment. If so, what is the rated capacity of this unit and how are emissions controlled?

    The apron feeder is rated for a maximum of 2,000 tons per hour and will operate in the range of 1000 to 2000 tons per hour as addressed in Section F of the application form in Appendix A. As provided in the application, the facility will be limited to an annual throughput of 3.2 million tons. *As described above, the apron feeder is the device that draws the coal from the pile into the coal preparation plant and is not itself a separate source of emissions.*

3.  A fugitive coal dust emissions control plan must be submitted. The plan must meet the requirements outlined in 40 CFR 60.254(c).

    *As described in Section 2.1.1, the coal storage pile is not subject to NSPS Subpart Y* and thus a fugitive dust control plan as described in 40 CFR 60.254(c) is not required for this facility. We understand that pursuant to NDAC 33-15-17, state-issued fugitive dust control plans are common to coal mines in North Dakota and as such this may be a provision in the permit to construct for the Coyote Creek Mine.

(Doc No. 85-8, pp.2-3) (italics added).

As indicated by that portion of the responses set forth in italics, defendant more precisely stated that the apron feeder, like the coal pile, is not part of the coal processing facilities and is excluded from Subpart Y regulation. Based on this, it appears defendant's position at the time of permitting was that the upstream boundary of the coal processing facilities was the retaining wall or the backside of it. This is consistent with defendant's claim in its application that emissions from its coal processing equipment were controlled by the PECS, since there are no PECS-type enclosures that come close to totally surrounding the conveying portion of the apron feeder as it extends out into the coal pile. Also, this is consistent with what defendant stated in an internal Preliminary Feasibility Evaluation for the coal processing facilities: "The coal haulers will dump the coal and build an open

62

stockpile on the *mine side* of the concrete retaining wall around the feed end of the feeder breaker." (Doc. No. 90-5, p. 4) (italics added). Further, it is consistent with the diagram that defendant submitted to the court in connection with the motion to dismiss as set forth earlier, which shows the backside of the retaining wall as being the beginning of Subpart Y regulation. (Doc. No. 38-6).

Also, complicating what was presented is the fact that the "apron feeder" and "primary crusher" as installed are one piece of equipment, known as a "feeder breaker." (Doc. No. 90-5, pp. 4-5). As the photograph set forth earlier indicates, the conveying portion of the "feeder breaker" conveys the coal a short distance to the "breaker," which is the primary crusher.

In its most recent briefing in this case, defendant makes no effort to claim that the apron feeder, as it extends out into the coal pile, is not part of its coal processing equipment. Rather, defendant now claims that the upstream boundary of the coal processing facilities is the point where the coal comes in physical contact with apron feeder after the coal has been unloaded from the coal pile. Most probably, this switch came about because the contention that the apron feeder is not part of the coal processing equipment subject to Subpart Y is untenable given that it and the primary crusher are one piece of equipment, *i.e.*, a "feeder breaker." Also, under the more mechanical-oriented language that defendant selects from EPA's guidance for its argument that the upstream boundary of its coal processing facilities excludes the coal pile, the feeder part of the feeder breaker directly and immediately conveys the coal to the crushing equipment (*i.e.*, the breaker) within the meaning of that guidance. Further, the feeder breaker is located downstream of the structure surrounding it, which clearly is "hopper-like" in appearance within defendant's literal construction of EPA's guidance.

63

In terms of the downstream or exit point of the coal handling facilities, defendant's application stated that the Subpart Y regulated facilities end at the point where the coal is transferred to the belt of the conveyor that conveys the coal to the Coyote Station. But, what was not disclosed - at least not in the application - is that, while the belt of the conveyor is owned by the Coyote Station at the point of loading onto it, the conveyor structure itself is still owned by defendant for the first 750 feet, or so, until it crosses onto the property owned by the Coyote Station and permitted for its power plant. This may create an issue whether at least that portion of the conveyor that the defendant owns is part of defendant's coal processing facilities and subject to regulation under Subpart Y.

In addition to the problem of what defendant represented as being part of its coal handling facilities, it also appears that defendant's statements about the crushing equipment being more or less enclosed within the PECS is somewhat misleading - at least from the undersigned's reading of the application - as it applies to the primary crusher or breaker. The photograph set forth earlier showing the exposed feeder breaker makes it clear that the breaker would be exposed to air as coal is fed into it unless at all times the feeder breaker is either buried by the coal pile or the structure surrounding it is completely full of coal when the coal is being crushed.

There may also be a similar issue at the back end. If some portion of the conveyor should be included as part of defendant's Subpart Y facilities, only 3/4's of it is enclosed. Defendant's application was silent on that point.

Finally, even putting aside the ambiguity of the foregoing, what is clear is that defendant's application did not include any equipment or activity for the unloading of coal into the facilities,

despite EPA's guidance with respect to coal unloading.

### b. The NDDOH's apparent acceptance of what defendant represented to be the facilities subject to Subpart Y

While not entirely clear, it appears the NDDOH accepted defendant's arguably too narrow representation of what constituted the beginning or upstream boundary of the coal processing facilities subject to Subpart Y that excluded not only any equipment or activity for the unloading of coal but also the apron feeder as it extends out into the coal pile, which now even defendant does not attempt to justify. This is because both the NDDOH's AQEA and the minor source permit it issued list only one emission unit ("FUG-1") as being subject to Subpart Y regulation that is described as being:

Coal Processing equipment consisting of primary and secondary crusher and conveying with a rated capacity of 2,000 tons/hour.

(Doc. Nos. 1-2, p. 2; 85-6, p. 8). And, while the above description references "conveying," most likely this was intended at the time to include only the conveying between the two crushers and the drop point onto the conveyor that conveys the coal to the Coyote Station.

After the NDDOH issued its minor source permit, this litigation commenced and the court issued its prior order denying the motion to dismiss. Since that time, NDDOH personnel have made various statements about where the upstream boundary of the coal processing plant begins. For example, a label placed on one of several pictures taken at an inspection of defendant's coal processing facility after it commenced operation describes the coal processing facilities that are part of emission unit "FUG-1." The description mentions only the equipment that does the primary and secondary crushing and the transition from the secondary crusher down to the point where the coal

65

is loaded onto the conveyor that conveys the coal to the Coyote Station. (Doc. No. 83-10, p. 35). On another picture, however, there is a note stating that the coal processing facilities subject to Subpart Y regulation start after the coal is pushed onto the apron feeder from the pile. (Id. at p. 36). Also, the primary reviewing engineer for the NDDOH stated at one point in his deposition the same thing, but it is not clear from his testimony whether this was what the NDDOH concluded at the time the permit was issued or simply his current opinion as to where the boundary line would be. (Doc. No. 85-4, pp. 60-61, 99-100).

The court suspects that what happened is that the NDDOH adopted what defendant represented to be the facilities and equipment it considered to be part of its coal processing facilities subject to Subpart Y, which apparently excluded the apron feeder as it extends out into the coal pile, and that any expression of opinion now about precisely where the upstream boundary is located is after-the-fact and a consequence of the focus now being placed upon the issue.

The same sorts of issues *may* exist with respect to the back end or downstream boundary of defendant's coal processing facilities. As noted earlier, defendant in its permit application represented that the downstream boundary was the point where the coal was dumped onto the conveyor belt owned by the Coyote Station. What was not specifically mentioned was that the defendant would still own and control the remainder of the conveyor for the first 750 feet before it crosses onto the Coyote Station plant site. After the commencement of this case, the NDDOH's reviewing engineer testified in his deposition that he guessed that the conveyor as it is on defendant's property would be an emission unit under "FUG-1." (Doc. No. 85-4, pp. 75, 86-87). In addition, the person who signed defendant's permit application said the same thing. (Doc. No. 90-4, p. 34-

35).

The court again suspects the NDDOH accepted what defendant represented at the time of permitting the downstream boundary to be, which is the point where the coal is unloaded onto the belt of the conveyor, particularly since that is the point where any control of emissions by the PECS would appear to end.

Finally, what is clear is that NDDOH's determination of what constitutes the coal handling facilities subject to Subpart Y excluded any equipment and activity associated with coal unloading into the facilities. And, the reason for that appears to be the lack of any consideration of EPA's guidance on that point. Nowhere in the contemporaneous record is there any specific discussion about coal unloading at defendant's facilities having to be included. Further, it is apparent from the NDDOH's reviewing engineer's deposition testimony that he was not familiar with EPA's guidance on that point. (Doc. No. 85-4, pp. 101-105).

### c.     The potential significance of what the NDDOH appears not to have considered

When defendant represented that the PTE for its coal processing facilities would be negligible because of the PECS, this representation appears likely not to have extended to the PTE for emissions from the apron feeder as it extends into the coal pile. And, there is no evidence that the NDDOH made its own PTE calculation for this emissions point. Also, there is a question (particularly now after the facilities have been constructed) whether the PTE for emissions from the breaker (*i.e,*, the primary crusher) could properly have been assumed to be negligible based on the

67

representation that the primary crushing would take place within the PECS.[13]

 In an attempt to address the apparent problems of both the feeder and the breaker part of the feeder breaker, defendant in its most recent briefing states that the PTE for emissions from the feeder breaker would be negligible because it is partially enclosed by surrounding structures and enclosed the rest of the way by the coal pile, as illustrated by one of the photographs set forth earlier.  The problem with this for purposes of the PTE determination, however, is twofold.

First, the mine employees who were deposed or who have given affidavit testimony have not claimed that the feeder breaker is always completely covered by the coal pile, even during normal operation.  For example, defendant's production manager attested in an affidavit that during normal operations the apron feeder is "rarely" visible and "typically" is covered by the coal pile.  (Doc. No. 94-1, p. 2).  Also, one of defendant's dozer operators testified:

> Well, sometimes when you push [coal] into the side, you know, the crusher, you know, and say it gets empty, you create a little dust that flies up out of there . . . .

(Doc. No. 90-1, p. 97).  A permissible inference from this evidence is that there are times when the feeder, as well as the breaker, may be exposed or partially exposed as coal is being processed.

Second, in terms of the required PTE calculation, there is nothing in the permit that was issued which states that the feeder breaker will only be operated when the coal pile completely covers this equipment or even that the equipment will be covered a certain percentage of the time.

---

[13]   The same holds true for "fogging."  Defendant represented in its application that fogging would be used if the PECS were not sufficient to mitigate dust formation and the NDDOH repeated that representation in the minor source permit it issued.  (Doc. Nos. 1-1, p.5; 1-2, p. 2). Defendant, however, has not installed the equipment required to do fogging. (Doc. No. 90-8, pp.75-76).  Further, the individual who signed the permit application for the defendant advised the engineering firm preparing the application that fogging would not work in defendant's facilities because of the cold temperatures. (Doc. No. 90-4, pp. 66-68).

Consequently, for purposes of the PTE calculation (and keeping in mind EPA's requirements for making the calculation, the fact that PTE differs from actual emissions, and the restrictions upon when operational controls can be used to limit the calculated PTE), the correct PTE estimate may have required an estimate for the operation of the feeder breaker as being only partially enclosed by the surrounding structures and without considering any coal coverage.

Some of the same issues may exist with respect to the back end of defendant's coal processing facilities, whatever that might be. If part or all of the conveyor is part of defendant's coal processing facilities for purposes of Subpart Y regulation, it is clear that neither defendant nor the NDDOH made any estimate of PTE from the partially enclosed conveyor contemporaneous with the issuance of the minor source permit.[14]

Finally, apart from the issues with respect to the PTE for emissions from the feeder breaker on the upstream end and the conveyor on the downstream end, it is clear neither the defendant nor the NDDOH gave any consideration to, much less calculated, a PTE for unloading of coal into what was assumed to be the coal unloading facilities. Even now, defendant and apparently also the NDDOH take the position that the upstream boundary of defendant's coal processing facility is when the coal comes in physical contact with the apron feeder thereby excluding the PTE for emissions

---

[14] The court reaches no conclusion at this point as to where the downstream boundary is. There is an argument to made that the downstream boundary is the point where the coal is unloaded onto the conveyor as defendant initially contended and that the conveyor after that point is simply another piece of mine equipment. Also, as will become clear when the PTE estimates for the conveyor set forth later are considered, the calculated PTE's are very small. Consequently, for purposes of this case where the primary issue is whether the major source threshold has been reached, the PTE for emissions from the conveyor are of little or no significance. That does not mean, however, that the NDDOH could simply ignore the question of whether part or all of the conveyor is subject to Subpart Y because of the separate NSPS performance requirements that have to be satisfied. The same is true on the front end for the apron feeder.

from the dropping of the coal onto the apron feeder as well as that resulting from the dozers pushing the coal into or on top of the structure surrounding the apron feeder.  Arguably, EPA's coal unloading guidance would require that one or both of these emission points be considered even if the entire coal pile is excluded.[15]  In fact, what also may need to be considered, even if the entire coal pile is excluded, is the PTE for emissions resulting from the unloading of coal from the haul trucks when that dumping is for the purpose of contemporaneous loading into the apron feeder for processing as opposed to simply maintaining the size of the pile for longer term storage.

Because of the questions that exist with respect to the feeder breaker, the back end of defendant's coal processing facilities, and the lack of consideration of any coal unloading, what appears to have been the NDDOH's too narrow determination of what is included in defendant's coal processing facilities subject to Subpart Y regulation is not entitled to deference in this case. Likewise, the same is true for the NDDOH's conclusion that the PTE from defendant's coal processing facilities is negligible.  While it may be that properly made estimates of PTE from the emissions points not considered would not materially change that, the point is the determinations appears never to have been made.[16]

---

[15]  While for reasons discussed later the court has not considered  the competing opinions of the experts in terms of what constitutes the facilities subject to Subpart Y, an expert retained by defendant for purposes of providing PTE calculations for this case stated that, if he had prepared the application, he would have considered the dropping of the coal onto the apron feeder as an emissions point.  (Doc. No. 70-2, p. 10).

[16]  In so concluding, the court is fully appreciative of the benefits of hindsight, the complexity of the issues, the generality of Subpart Y's language, and the lack of clarity in  EPA's guidance.  In fact, the conclusion upon appeal might very well be that the only one who has failed in properly interpreting and applying Subpart Y and EPA's guidance is the undersigned.

### 3.      What the NDDOH concluded about the coal pile

While there are substantial questions about what exactly the NDDOH concluded with respect to both the upstream and downstream boundaries of defendant's coal processing facilities, it did consider whether the coal pile should be included and determined it need not be.  Both the NDDOH's AQEA and the minor source permit specifically list defendant's "open coal storage pile" as part of the general mine facilities that, for purposes of regulated emissions, was classified as part of "FUG-2" and not part of the coal processing facilities under "FUG-1" and subject to Subpart Y. (Doc. Nos. 1-2, p. 2; 85-6, p. 8). And, while the NDDOH appears not to have contemporaneously expressed in the AQEA, the minor source permit, or any other record why it reached that conclusion, a fair assumption is it relied upon the explanation given by defendant in both its application and its response to the three questions posed by the NDDOH's reviewing engineer, as set forth earlier.

In fact, with respect to the latter, the NDDOH reviewing engineer testified during his deposition that he initially assumed in posing the third question in the email exchange set forth above that a fugitive dust emission control plan for the coal pile was required by 40 C.F.R. § 60.254(c), which is a part of Subpart Y.  Then, when he received defendant's response stating that the coal storage pile fell outside of what would be considered the coal processing plant under Subpart Y according to EPA guidance, he reviewed the guidance referenced and concluded the coal storage pile was not subject to Subpart Y and, for that reason, no § 60.254(c) fugitive dust emission control plan for the coal pile was required.  (Doc. No. 85-4, pp. 20-22).

Later, after the NDDOH issued its minor source permit to construct, plaintiffs' counsel wrote a letter to officials at EPA's Region VIII offices in Denver in which it was argued that defendant's

coal pile should have been considered a part of its coal processing facilities under Subpart Y and the PTE for emissions from the coal pile counted in determining whether the mine was a major source. (Doc. No. 35-1, pp. 3-7). Following this letter, several Region VIII officials had a conference call with the NDDOH. During the call, the NDDOH discussed why it had reached the conclusions it did with the Region VIII officials not expressing any opinions or conclusions one way or the other according to the NDDOH personnel who participated in the call. (Doc. Nos. 85-4, pp. 64-44, 116-17; 85-11, pp. 55-61). After the phone conference, the NDDOH sent Region VIII a followup letter, enclosing a copy of EPA Responses to Comments to Proposed 2009 Amendments, and then quoting from that guidance:

> The guidance specifically states that "The coal must be directly unloaded into receiving equipment, such as a hopper, to be subject to the provisions of Subpart Y" (see page 78).

(Doc. No. 35-1, pp. 2-8).

Finally, the NDDOH engineer who did the primary work on defendant's application testified during his deposition that he still believed the coal pile is not subject to Subpart Y based upon the EPA guidance referenced in the letter to Region VIII. Also, the upper management of the NDDOH testified that they stood by staff's determination, although acknowledging they had not personally studied the issue. (Doc. No. 96-3, pp. 14, 20, 43-44; 83-8, pp. 8-13, 19, 31).

In short, the record reflects that the NDDOH considered the question of whether the coal pile is subject to Subpart Y at the time it issued defendant's minor source permit and, since that time, has stood by that determination.

### D.    Deference to the NDDOH's determination re the coal pile

Plaintiffs make several arguments for why the court should not give deference to the NDDOH's determination that the coal pile is not part of the coal processing plant under Subpart Y. One is that it is based upon an erroneous construction of both EPA's Subpart Y regulations as well as its controlling guidance.  These issues have already been addressed, with the court concluding that plausible arguments can be made both ways under Subpart Y and EPA's guidance with respect to whether the coal pile is part of defendant's coal processing facilities or not.

Plaintiffs also contend that the NDDOH's determination that the coal pile is out is not entitled to deference because it never articulated contemporaneous with the issuance of the permit any reasons for why that should be the case.   As for the NDDOH's post-issuance explanations to EPA and later in the deposition testimony of the primary reviewing engineer, plaintiffs dismiss these as nothing more than *post hoc* justifications attempting to protect what was decided rather than fair and reasoned consideration of the issues.  While this court's task would have been easier had the NDDOH contemporaneously expressed its reasoning for the why the coal pile was out, it does appear to have considered the issue in light of the language of Subpart Y and the 2009 EPA guidance at the time it issued the permit.

 Finally, plaintiffs contend that the NDDOH's determination should be afforded no deference because it uncritically accepted what defendant represented were its coal processing facilities subject to Subpart Y based upon "cherry-picked" statements from EPA's 2009 guidance spoonfed by defendant.  In other words, according to plaintiffs, the NDDOH likely would have looked at the issue of the coal pile differently had it reviewed EPA's guidance on coal unloading; considered the fact

that the apron feeder as it extends physically into the coal pile is part of the facilities subject to Subpart Y (a point defendant now concedes); and considered other points, including the degree to which the coal pile is integrated physically and operationally with the coal processing equipment. In fact, according to plaintiffs, the initial inclination of defendant's reviewing engineer was that the coal pile was part of defendant's coal handling facilities and needed a fugitive dust control plan compliant with Subpart Y's requirements, and it was only after the defendant pointed him in the other direction with selected references from the 2009 EPA Guidance that he changed his mind.

While the NDDOH's apparent too narrow determination of what facilities are subject to Subpart Y and its lack of consideration of EPA's guidance on coal unloading are problematic, the court will, nevertheless, afford deference to the NDDOH's determination that the coal pile can be treated as simply another mine facility and not part of the coal processing facilities that are subject to Subpart Y regulation. The reasons why are the following:

First, in this court's view, neither the Subpart Y regulations nor EPA's guidance provide a clear answer. And, while plaintiffs' arguments for why the coal pile and the unloading to it are part of defendant's coal processing facilities subject to Subpart Y are plausible, there is a plausible basis for excluding the coal pile based upon one or more of the following:

- Drawing the line between what is defendant's coal processing facilities and what is the rest of mine at the point where the facilities exist only for coal processing is consistent with EPA's policy decision not to regulate fugitive emissions of PM from coal mines. And here, it does appear the coal pile would be needed even if defendant did no coal processing.

- There is a beginning point of the coal processing plant that is consistent with EPA's "first hopper (drop point)" guidance that does take into account coal unloading and yet is "downstream" of the coal pile, even if there are other plausible beginning points that would include the coal pile. That is the point where the process begins to load coal into the hopper-shaped structure surrounding the apron feeder. At the very least, this would be the point where coal is pushed into the structure surrounding the apron feeder from the coal pile, such that PTE emissions from the dozer activity of pushing the coal into the structure surrounding the apron feeder and from the drop of the coal onto it would have to be included. Also, it might include the unloading of coal by the haul trucks onto the pile after it was established. This is because of the evidence which suggest that, under normal operation, most often the coal is unloaded in the vicinity of the apron feeder and soon thereafter pushed into it for processing.

- The fact that the pile contains only mine-run, unprocessed coal.

- The bulk of the pile provides storage that is more than "temporary" for reasons discussed in detail earlier.

- The exclusion of the storage pile in this instance does not eviscerate the Subpart Y provision that makes clear that open storage piles are "affected facilities." Similar to what EPA stated with respect to haul roads, Subpart Y would still regulate coal piles within a coal processing facility, particularly those that contain processed coal.

Second, to the extent it is a prerequisite, the NDDOH did rely upon portions of the 2009 EPA Guidance that do provide support for its conclusion, even if it did not fully consider all of the

relevant guidance. Cf., North Dakota v. U.S.E.P.A., 730 F.3d at 768 (stating the court would uphold an agency decision that is not a "model of clarity" if the court could nonetheless discern the pathway that was followed).

Third, excluding the coal pile in this instance is not such an arbitrary or unreasonable result that this could not have been what EPA contemplated, either in its adoption of the Subpart Y regulations or its later guidance. For one thing, as already observed, EPA decided for policy reasons not to count fugitive emissions of PM from coal mines in determining whether they are major sources based on the policy considerations addressed earlier. As a consequence, there is a need for line drawing for coal processing plants embedded within mines that, in the general scope of things, may be somewhat arbitrary. For example, it appears clear enough that EPA would not require that the haul road in this instance need be counted as part of the Subpart Y facilities even though by far it would be the largest source of fugitive PM emissions as EPA noted earlier and as reflected by the PTE estimates in the next section.

Further, even for coal piles and haul roads that are undisputedly within a coal processing facility and clearly subject to Subpart Y, EPA has decided not to impose the numerical emission limitations of PM that Subpart Y imposes on certain types of coal processing equipment or even the opacity standards that it requires be met by most of the rest of the coal processing plant. Rather, for coal piles, it has limited the controls to imposing "work practice standards" for controlling fugitive dust that, for the most part, appear to be comparable to those already being imposed by SMCRA and

the NDDOH[17] for all coal piles located within a mine, including those within a mine's coal processing facility. And, for dust from haul roads that are clearly within a coal processing facility, EPA decided not to go even that far, electing instead to simply rely upon the controls imposed by the DOI under SMCRA and by the individual states in their air pollution control programs. See 40 C.F.R. §§ 60.252 - 60.254; EPA Responses to Comments to Proposed 2009 Amendments at 81, 85, 89-90, 94-96. In fact, one of the reasons that EPA gave for not imposing numerical limits on emissions or opacity standards for the coal piles and haul roads was that, "[a]t the current stage, EPA believes it difficult and prohibitively expensive to measure actual PM emissions from individual open storage piles or roadways." Standards of Performance for Coal and Processing Plants; Final Rule, 74 Fed. Reg. at 51954.

But to be clear, the court's decision that the coal pile is not subject to Subpart Y should not be viewed as anything more than the court having given deference to the NDDOH's determination as the tie-breaker based on the record before the court that potentially could be incomplete with respect to EPA's views on the matter. Further, to put a finer point on it, the court's decision is not required by the language of Subpart Y. Thus, it may be possible for EPA to avoid a similar result in the future for similarly situated coal piles by providing clarifying guidance.

---

[17] N.D.A.C. ch. 33-15-17 sets forth North Dakota's regulations on fugitive emissions. Pursuant to the authority granted by that chapter, the NDDOH set forth a number of specific requirements for control of fugitive dust in defendant's minor source permit, including, when necessary, such things as frequent watering, addition of dust palliatives, etc. (Doc. No. 1-2, pp. 2-3). Plaintiffs do have the ability to seek recourse from the NDDOH if these permit conditions are violated. Also, plaintiffs may have other remedies, such as a common law claim of nuisance.

## VIII. WHAT THE RECORD REFLECTS WITH RESPECT TO THE PTE OF PM AND WHY PLAINTIFFS CANNOT SUCCEED IF THE COAL PILE IS NOT CONSIDERED

### A. Introduction

Both parties have retained experts who have calculated PTE's for the emissions points at issue for purposes of the pending motions and in the event they are needed for trial. In addition, each side's experts dispute the calculations of the other side's experts. Further, the disputes are highly technical in nature and include such things as: (1) whether certain emission factors and protocols that have been developed and published by EPA's Office of Air Quality Planning and Standards, Emission Factor and Inventory Group in AP-42, Compilation of Air Pollutant and Emission Factors should be used or not; (2) whether the formulas used by the experts are appropriate for the particular activity; (3) whether the correct inputs to the formulas have been used for such things as wind speed, silt content of the coal, and moisture of the coal (including whether total moisture should be used or only the "sorbed" moisture); (4) whether for certain of the inputs it should be the maximum value, an average, or the mean; and (5) assumptions relating to operations, including the hours of operation of certain equipment, the speed of the equipment, whether the apron feeder is constantly full or not, etc.

What follows are the PTE estimates that have been made by the experts of the respective parties.

### B. The haul road from the mine pits to the area of the open coal storage pile

The following are the record estimates of PTE related to the haul road.

| Mine activity | | Plaintiff PTE tpy | Defendant PTE tpy |
|---|---|---|---|
| Haul road from active mining area to coal storage pile - coal hauling | PM PM10 PM2.5 | 1,4905.5 424.8 42.5 | No estimate made |
| Haul road from active mining area to coal storage pile - wind erosion | PM PM10 PM2.5 | 66.8 31.4 10.0 | No estimate made |

(Doc. No. 69-2, p. 12). As already discussed, the court concludes the PTE for the haul road need not be considered based on the EPA guidance set forth earlier. However, if the court is wrong, the defendant might very well have needed a major source construction permit, even assuming the criticisms leveled by defendant's experts to plaintiffs expert's calculation, or, at the very least, a "synthetic" minor source permit.

**C.** **The open storage coal pile and the unloading of coal to it**

The following are the estimates of PTE for the coal pile and the unloading of coal to it:

| Mine activity | | Plaintiff PTE tpy | Defendant PTE tpy |
|---|---|---|---|
| Coal unloading at storage pile | PM PM10 PM2.5 | 25.1 5.7 0.5 | 0.16 - 0.27 0.08 - 0.09 0.01 - 0.01 |
| Coal storage pile wind erosion | PM PM10 PM2.5 | 209.0 104.5 15.7 | 16.7 - 18.45 8.4 - 9.22 1.3 - 3.69 |

| Storage pile maintenance by bulldozer[18] | PM<br>PM10<br>PM2.5 | 42.9<br>10.2<br>0.9 | 21.01- 45.0<br>5.0 - 10.7<br>0.46 - 1.3 |
|---|---|---|---|
| Truck traffic through and around coal storage pile | PM<br>PM10<br>PM2.5 | 49.8<br>14.2<br>1.4 | No estimate made |

(Doc. Nos. 69-2, p. 12; 71, p. 31;70-2, pp. 25-28).

The court has concluded it will give deference to the NDDOH's determination the coal pile is not part of defendant's Subpart Y facilities. For that reason, the PTE for the coal pile and the unloading of coal onto the pile that is for storage and not for contemporaneous loading into the apron feeder need not be considered. Here, this would include not having to count plaintiffs expert's

[18] With respect to this emissions point as well as several others, the experts for both parties have taken into account the permit limitation on coal production of 3.2 million tpy. One of defendant's experts has offered alternative estimates based on continuous operation of certain of the equipment (8,760 hours) at the maximum rated capacity of the crusher (2,000 tons per hour). If the court's math is correct, this represents a total throughput of 17.52 million tpy. For purposes of storage pile maintenance by the bulldozers, the expert's alternative calculations were 89.98 tpy for PM, 21.41 tpy for PM10, and 1.98 tpy for PM2.5. (Doc. No. 70-2, pp. 23-28).

Most likely, the alternative estimates were made to address a potential objection that the 3.2 million tpy permit limitation should not be relied upon for purposes of calculating the required PTE, at least at the outset, because it is a legal limitation and not one based on the physical or mechanical operation of the equipment. See, e.g., Wildearth Gaurdians v. Lamar Utilities, Bd., 932 F. Supp. 3d 1237, 1242, 44-45 (D. Colo. 2013); In re Peabody Western Coal Co., 2005 WL 428833, at **7-8 & n.20. In this case, given what the court has excluded, it appears the 250 tpy threshold would not be reached even if the 3.2 million tpy production limit had not been relied upon.

This is not to say that agreed upon production limits cannot be used. If the cumulative PTE for all emissions points exceeds 250 tpy afer using the maximum capacity of the coal processing equipment when appropriate, the permit applicant can agree to a federally enforceable permit limit on production, which likely would be coupled with production reporting requirement. Then, if the cumulative PTE with that adjustment is less than 250 tpy, the permit applicant would be entitled to what in CAA parlance is as "synthetic" minor source permit. See id; see also United States v. Marine Shale Processors, 81 F.3d 1329, 1352 (5th Cir. 1996); Voigt, 2016 WL 3920045, at *33; In re Peabody Western Coal Co., 2005 WL 428833, at **7-8 & n.21. In this case, defendant contends that the permit it was granted is a "true" minor source permit and not a "synthetic" one. The State in its amicus brief agrees. In fact, if defendant had applied for a synthetic minor source permit, that would have triggered N.D. Admin. Code § 33-15-14-02(6)(a)(7), which requires the NDDOH to use its "public participation procedures" for "sources which request a federally enforceable permit which limits the potential to emit."

estimates for wind erosion and truck traffic through and around the coal storage pile.

If the court has erred in concluding that the coal pile and the unloading of coal to it for longer term storage need not be considered, there would have to be further proceedings to determine whether the PTE of PM reaches the 250 tpy threshold given the disputed estimates of the parties with respect to the foregoing as well as the other disputed emissions points discussed next.

### D. The other potential emissions points

The following are the record PTE estimates for the remaining emissions points whether disputed or undisputed in terms of whether they need be included.

| Mine activity | | Plaintiff PTE tpy | Defendant PTE tpy |
|---|---|---|---|
| Coal unloading onto the apron feeder from the coal pile by dozer | PM PM10 PM2.5 | 25.1 5.7 0.6 | 0.00 - 0.25 0.00 - 0.08 0.01 - 0.01 |
| Primary crushing | PM PM10 PM2.5 | 32.0 7.2 0.6 | Negligible because of coal coverage |
| Secondary crushing | | Negligible because of PECS | Negligible because of PECS |
| Loading from the secondary crusher onto the conveyor | PM PM10 PM2.5 | 25.1 5.7 0.5 | Negligible because of PECS |
| Wind erosion from the entire length of the conveyor including Coyote Station | PM PM10 PM2.5 | 15.6 ??[19] 7.3 2.3 | *** |

[19] Plaintiff's expert acknowledged in his deposition that he made a math error in this calculation (he inputted for one of the factors used in this equation the number 50 instead of .50) resulting in these estimates being high by a factor of 100.  (Doc. No. 89, p.134).

| Wind erosion from 750 ft of conveyor on defendant's property | PM PM10 PM2.5 | *** | 0.5 0.03 0.00 |
|---|---|---|---|

(Doc. Nos. 69-2, p. 12; 70-1, p. 15; 70-2, pp. 26-30). What is clear from the foregoing is that, even if plaintiff experts' estimates are accepted with respect to the disputed emission points, plaintiff will be unable to prove that the 250 tpy threshold has been reached so long as the PTE for emissions from the coal pile and the haul road are not considered. Further, this is true even if all of the unloading of coal onto the coal pile is counted based upon a conclusion that, under normal operations, much of it is unloaded at the immediate location of the apron feeder and processed within a short time, *i.e.*, any "storage" of such coal is only "temporary."

## IX.   ADDITIONAL POINTS

### A.   Plaintiffs' demand for a jury determination if the court does not conclude the coal pile is a Subject Y facility

Plaintiffs contend that, if the court concludes they are not entitled to summary judgment that the coal pile is subject to Subpart Y based upon the facts they claim are undisputed, there needs to be a jury trial. In addition to the facts that plaintiffs claim are relevant that have already been discussed (*i.e.*, the physical location of the coal pile, the facts demonstrating the physical and operational relationship between the coal pile and the equipment that does the crushing, etc.), they point to the opinion of one of their experts that the coal pile is part of the coal processing facilities and subject to Subpart Y. They contend this alone creates a question of fact if the court disagrees with their position that no reasonable factfinder could conclude the coal pile is not part of the coal processing facilities and if the opinions of the competing experts on this issue should be considered

82

by the court as defendant contends.

The court disagrees based on its conclusion that, even construing the material and admissible facts most favorably for plaintiffs, there is a plausible basis under the language of Subpart Y and EPA's less than clear guidance for the coal pile not being considered a Subpart Y regulated facility. But, even if the court is wrong and if the question of whether the coal pile is part of defendant's coal processing facilities is one of disputed fact, the court likely would not allow the jury to consider the competing opinions of the experts since, in each instance, they do nothing more than parse the language of Subpart Y and the EPA guidance in arriving at their respective conclusions.[20]

---

[20] Earlier, the court had ordered the parties to submit briefing on the issue of whether the court is required to conduct a jury trial on or more of the issues. (Doc. No. 50). Rather than briefing the issue, the parties came back with a stipulation agreeing that plaintiffs were entitled to jury trial on the issue of liability, citing <u>Tull v. United States</u>, 481 U.S. 412 (1978). . (Doc. No. 82). The parties further stipulated to a bifurcation of the trial with the issue of liability to be first tried to the jury and then, if liability is found, there would later be a separate bench trial to determine what equitable relief and other remedies would be appropriate, including the amount of any fines. This part of the stipulation is in keeping with what generally is required when there must be a jury trial with respect to some claims but not others. <u>See generally</u> C. Wright and A. Miller, 9 <u>Federal Practice and Procedure: Civil 3d</u> §§ 2302.1 & 2305 (2008). Following this stipulation, the present cross-motions for summary judgment were filed.

Quite frankly, conducting a jury trial on the issue of liability would be a challenge, particularly if the issue of whether the coal pile is in or out must tried. Does the court read just the relevant parts of Subpart Y to the jury and let it decide based on that alone? What about EPA's not entirely clear guidance? What about deference to any subsidiary matter decided by the NDDOH or, if we get to a jury trial, has the time for giving deference passed?

The same holds true for looking to the jury to resolve what the PTE from the various facilities may be. For example, one of the issues is whether certain published EPA emissions factors are appropriate, including what EPA stated in what may be an ambiguous footnotes to a certain section of AP-42, which might have significant consequences. Another example, is the question of whether the total moisture content of the coal can be considered or only "sorbed" moisture, including cautionary statements made by EPA about that subject. Further, how much discretion does the person making the estimation have to consider an average or mean number for an input to a formula over a worst case numbers? Does the court try and instruct on some of these matters, not allow certain opinions if the court concludes that they conflict with EPA guidance, or simply throw up its hands and let the jury fill in numbers after listening to the conflicting testimony of the experts on all of the issues, including how they might apply EPA guidance. A review of the expert reports in this case reveals that the complexity of the PTE issues is on par with those that the courts had to deal with in <u>Grand Canyon Trust</u> and <u>Cascade Kelly Holdings</u> as well as with what EPA Board of Review addressed in <u>In re: Peabody Western Coal Co.</u>, <u>supra</u>.

The real answer to the court's concern about having to conduct a jury trial with respect to these issues may be that, for this action where the threshold question is whether defendant's mine is a major source (which is quasi-jurisdictional in nature), there is an argument for distinguishing <u>Tull</u> , *i.e.*, the appropriate analogue at common law is not a public nuisance action or an action in debt) and that, in this instance, it would be permissible to have a court trial first on the issue of whether defendant is a major source. But, now that defendant has stipulated to the jury trial and that

**B.      EPA's silence**

As noted earlier, plaintiffs' attorneys sent a letter to EPA's Region VIII in which they lodged complaints about the action taken by the NDDOH in granting the minor source permit to construct, including their argument that defendant needed a major source permit based on the PTE for emissions from the coal pile that they stated the NDDOH failed to consider.  Following that letter, the Region VIII officials had a conference call with NDDOH personnel during which they discussed the issues raised by plaintiffs, including the reasons for why the coal pile was not considered to be subject to Subpart Y.  According to the deposition testimony, the Region VIII officials mostly listened.  After the call, the NDDOH wrote a followup letter to Region VIII providing a written explanation for its position.  Finally, notice of this action was provided to the EPA Administrator as required by 42 U.S.C. § 7604(a)(3).  (Doc. No. 37-1).

In reaching the decision set forth above, the court has not placed any reliance upon EPA's silence and inaction following the conference call, the letter sent by the NDDOH, and formal notice of this action.  There are too many reasons for EPA' silence and lack of action that to allow the court to draw an inference with respect to its position or interpretation one way or the other, including higher priorities, lack of resources, the fact plaintiffs filed this action and EPA possibly deciding to see how it played out, etc.

**C.      The results of any inspections and testing since the mine went operational**

The defendant has tendered evidence that, during an inspection of the mine prior to the NDDOH granting defendant its minor source operating permit, NDDOH personnel observed no

_____

it being conduct first, this may be a moot issue.

visible emissions of PM from the coal pile, the operations being conducted on the coal pile, the crushing equipment, or the conveyor. The court has not taken this evidence into account. As explained earlier, what is relevant in terms of the major source issue is the PTE from the emissions points of defendant's facilities that are subject to Subpart Y, not actual emissions.

The same holds true for the opinion of one of plaintiffs' experts that there must be significant emissions from the area where coal is crushed as well as from the conveyor based on the amount of coal dust and fines he observed on the ground on the back side of the retaining wall, which he documented by photographs during an on-site inspection. (Doc. No. 70-3, pp. 18 & 26). While the photographs do show a significant amount of obviously black material, there is no evidence as to how it got there. For example, it could have been from an upset condition. But, even putting that aside, the issue is PTE and not actual emissions. If defendant has been operating its equipment in in a manner that violates its permit or other NDDOH minor source requirements, that is an enforcement issue.

**D. The evidence of defendant and the Coyote Station structuring their arrangements to avoid PSD review**

Plaintiffs offered evidence that the Coyote Station and defendant did a fair amount of planning and structuring of their contractual arrangements to avoid any PSD consideration of the coal processing facilities under either the air permit defendant sought to obtain or the Coyote Station's existing air permit. This appears to have included the shifting of tentative locations of the coal handling facilities off the Coyote Station Plant site, the dividing up of ownership of the conveyor, and the adjustment of delivery points of the coal. (Doc. No. 90-2, pp. 22-52, 62-69). The

court's view of this evidence is that there is nothing wrong with defendant and the Coyote Station structuring their affairs to their maximum advantage.

**E.     Defendant's draft permit applications that included the coal pile as a Subpart Y facility and the PTE estimates that were made in the draft applications**

Plaintiffs have also offered evidence that defendant's consulting engineers had included the coal pile as a Subpart Y regulated facility in an initial draft of defendant's permit application that offered an explanation for why the coal pile was included that mirrors some of the arguments now being made by plaintiffs.  More particularly, a draft application dated July 2013 included an open storage pile capable of storing 180,000 tons that provided the following explanation for why the coal pile would be subject to Subpart Y:

> Fugitive emissions from the open storage pile associated with coal preparation and processing plant near to Coyote Station (designated FUG-1) are included as they are subject to NSPS Subpart Y and thus qualify [as] fugitive emissions required to be included in the determination of stationary sources under § 52.21(b)(1(iii)(aa).  By contrast, fugitive emissions from the mine face are not regulated by NSPS Subpart Y, and thus are not included in the facility potential to emit calculations for purposes of determining major source status. * * * *

(Doc. No. 85-13, p. 5).  Notably, there is no mention in this draft about processed coal potentially being returned to the coal pile.  (Id. at 3-20).  The PTE estimates that were included in "FUG-1" as a consequence of the coal pile being considered subject to Subpart Y were: 16.18 tpy PM; 8.09 tpy PM10; and 8.09 tpy PM2.5.  (Id. at p. 13).

Another draft application dated August 2014 similarly included the coal pile as a Subpart Y regulated facility. (Doc. No. 85-14, pp. 6-27).  In this application, there was a detailed explanation for why, if the open storage pile contained only unprocessed coal, it would not be subject to Subpart Y because the beginning point of the coal processing facility would be the "receiving pocket"

downstream of the coal pile - the same explanation offered in the application that was finally submitted and discussed in detail earlier. But, with that being said, the August 2014 draft stated that some of the processed coal might be returned to the coal stockpile as additional storage, which, from all appearances, is the reason why the size of the proposed coal pile was increased in this draft to 260,000 tons. The draft then went to state that, because processed coal might be returned to the storage pile, it would be subject to Subpart Y because it would receiving coal after it had already passed through the upstream boundary of the coal processing facilities. (Id. at 13-17). Hence, the August 2014 draft included the following PTE estimates for the coal pile in "FUG-1": 23.02 tpy PM; 11.51 tpy PM10, and 11.51 tpy PM2.5. (Id. at 18).

Following this draft, a final draft was prepared in late August 2014 that excluded the possibility of returning processed coal to the coal pile, returned the proposed size of the coal pile to 180,000 tons, and removed the coal pile as a Subpart Y facility. (Doc. No. 85-21, pp. 4-30). This was after defendant stated in an email to its consulting engineer that it would not return processed coal to the coal pile and inquired whether that would change the emissions calculation. (Doc. No. 85-15, p. 2).

Defendant contends in its briefing that the reason for the inclusion of the coal pile in the draft applications was because it was contemplated that processed coal would be returned to the coal pile. While that might be true for the August 2014 draft, there is no evidence this was the reason for the July 2013 draft, which plaintiffs contend reflects what defendant's consulting engineers actually believed was required were until they were persuaded to come up with something different.

Plaintiffs further contend that another reason for the shifting views and the decision not to put processed coal back into the coal pile was because defendant and its consulting engineers were concerned about what might be deemed the correct PTE estimate for the coal pile. Plaintiffs point to a spreadsheet of estimated PTE's for the coal pile made by defendant's consulting engineer. Based on one methodology, the estimates were those set forth in the August 2014 draft application of: 23.02 tpy PM; 11.51 tpy PM10, and 11.51 tpy PM2.5. However, the other estimate using an EPA emission factor ("0.72u") from AP-42, Table 11.9.1 for Western Coal Mining resulted in an estimated PTE for PM of 259.4698 tpy. (Doc. No. 85-14, p. 38). Notably, this is the same emissions factor used by plaintiffs' expert when he arrived at a PTE estimate in excess of 200 tpy PM for the somewhat smaller coal pile of 180,000 tons. (Id.; Doc. No. 69-2, p. 19).

While the court has reviewed all of this evidence, what is relevant here in terms of whether defendant needed to obtain a major source permit is the final arrangement of facilities that defendant proposed and constructed as well as what EPA has said nor not said that is relevant to the coal pile in Subpart Y and its various guidance. The fact that defendant's consulting engineers may have changed their view on the issue may simply be the result of their having taken more time to fully study the matter. That being said, if the court is wrong in granting summary judgment and if the issue of whether the coal pile is in or out needs to be tried, then the foregoing is likely grist-for-the mill in the cross-examination of defendant's principals and consulting engineers as well as possibly direct evidence in support of plaintiffs' case.

**F.    Defendant's request for the "single source" determination and the NDDOH's granting of that request**

Before proceeding with its application for a minor source permit, defendant had one or more meetings with NDDOH officials, the subject of which was whether the Coyote Station and the Coyote Creek mine had to be treated as a "single source" for purposes of permitting and compliance with CAA requirements.   During one of the meetings, the NDDOH officials apparently expressed concern that EPA would deem the Coyote Station and the mine to be a single source, particularly given the proximity of the mine and that the Coyote Station being its only foreseeable customer. Because of this, the NDDOH urged the defendant to do a full PSD review.  (Doc. No. 85-17).

Instead, defendant sought a separate source determination from the NDDOH by letter dated February 13, 2013. (Doc. No. 85-9, pp. 6-19).   The NDDOH approved the separate source determination two months later in a letter to defendant dated April 11, 2013.  (Doc. No. 85-9, pp. 3-5).   Then, in defendant's application for its minor source permit, defendant relied upon that determination as one of the reasons why its proposed facilities did not constitute a major source (*i.e.*, its emissions did not have to be aggregated with those of the Coyote Station) and only a minor source permit was required.  (Doc. No. 1-1, p. 9).

While plaintiffs concede that whether or not the NDDOH made the right decision with respect to its separate source determination has not been raised in this case, they claim that what is relevant are several statements made by the defendant to the NDDOH with respect to the facts bearing upon the three criteria that EPA uses for determining whether sources should be  considered

a single source.[21]

Without getting into all of the complexities of a "single source" determination, one of the criteria is whether the sources are on adjacent property. In its letter to the NDDOH, the defendant represented its mine would not be located on property adjacent to the Coyote Station, but rather would be some three to four miles away, except for the possibility of the facilities being connected by a haul road or conveyor for the transportation of the mined coal, and depicted the physical separation by a map. (Doc. No. 85-9, pp. 14-17).

As the mine was permitted and constructed, however, there is no physical separation if the coal pile and the coal handling facilities are deemed to be part of the mine, as defendant contends. While the mine face is located some three to four miles from the Coyote Station, the eight-acre coal pile capable of holding up 180,000 tons and the crushing equipment, which defendant claims in this case are embedded within and part of its coal mine, are located on property that is immediately adjacent to the Coyote Station. And, while this is only one of the three criteria that have to be met for a source to be considered a "single source," there do appear to be questions with respect to the other criteria, despite defendant's protestations to the contrary. Further, it is clear from the NDDOH's separate source determination that it placed significant reliance upon the fact that the sources would not be adjacent to each other when it stated in the conclusion of its separate source

[21] For example, plaintiffs contend that defendant failed to disclose facts material to whether there was common control over both the Coyote Station and the Coyote Creek Mine. The material facts according to plaintiffs are that the Coyote Station has control over the Mine's capital expenditures and overall mining plan as indicated from excerpts from its coal sales agreement between the parties. However, the court's understanding is that there is no relationship in the corporate structures between the owners of the Coyote Station and the owners of the Mine and the rights of approval that the Coyote Station may have to approve budgets and an overall mining plan may only be for controlling the costs of coal, but not a grant of control over operation of the Mine. Anyone deciding this issue would need to review the entire contract.

determination:

> The Coyote Creek Mine and the Coyote Station do not appear to be under common control and it is unclear if the two sources should be considered under the same SIC code. However, the two sources are not located on contiguous or adjacent properties. Since the two sources are not located on contiguous or adjacent properties, the sources are considered separate sources for purposes of determining whether the sources are subject to the requirements of the above programs.

(Doc. No. 85-9, p. 5).[22]

Plaintiffs also contend that defendant failed to disclose information about the amount of direction and control that the Coyote Station exerts over the mine. While defendant did allude to some of the Coyote Station's financial controls in its letter, which it stated were a function of the cost-plus nature of the coal supply agreement between the parties, plaintiffs claim that defendant withheld more detailed information about those controls that would have led the NDDOH to reach a different conclusion.

Defendant's response to plaintiffs' proffer of this evidence is that it is not material to the issues in this case and that it would prevail on the "common control" and SIC code issues. Further, with respect to the adjacent property issue, it states that the NDDOH was always aware there would be conveying equipment or a haul road on adjacent property, ignoring the coal pile and the coal processing facilities.

While not entirely clear, plaintiffs appear to contend that this evidence is material in two respects. First, the representation that the mine facilities would be some three or four miles away

---

[22] The author of the NDDOH's separate source determination testified he was unaware at the time he wrote it that defendant's coal processing facility would be located on property adjacent to the Coyote Station. (Doc. No. 85-4, p. 131).

is consistent with defendant having initially considered the coal pile and the coal processing facilities as being associated with each other and distinct from the mine face, as suggested in the July 2013 draft permit application, with all of this being evidence that the coal pile is part of defendant's coal processing facilities.   Second, plaintiffs contend that defendant's representation about the fact its facilities would not be on adjacent property was materially false when made and is relevant for purposes of defendant's credibility.  Plaintiffs contends the same is true for the lack of full disclosure with respect to facts bearing upon common control.

While the court agrees the "single source" issue is collateral to what has to be decided in this case given the scope of the complaint, the representation that there would be no mine facilities on adjacent property is troubling - at least on its face.  If the court has erred in granting summary judgment and there needs to be a trial, what also might be fodder for cross-examination is how defendant can claim that the coal pile is a mine facility when it previously represented to the NDDOH there would be no mine facilities on adjacent property.  Also, to the extent credibility is an issue, it might be admissible for that purpose.  In either case, defendant would have the opportunity to provide whatever explanation it has for the representation that was made.[23]

---

[23]   There is some indication that:  (1)  the very early plans called for the coal processing facilities to be located at the Coyote Station and this changed when the Coyote Station did not want the facilities there because of implications it might have for its air permit; and (2) the location of the coal processing facilities had not yet been determined (or at least not finalized) when the representation was made.  In other words, it was not, to put it bluntly, a "bait and switch." But, what is not clear is whether other alternatives were contemporaneously being considered that placed the coal pile and coal crushing facilities on adjacent or contiguous to the Coyote Station, such that defendant should not have made the blanket representation it did.  Notably, within a few months of defendant's letter to the NDDOH, its draft mine permit application dated July 2013 (which likely was not written in one or two days and probably had been the basis of discussion for some time) stated that the mined coal would be transported from the principal area of mining some three to four miles away from the Coyote Station "to a location closer to the Coyote Station where it will be further prepared for sale."  (Doc. No. 85-14, p. 9).

**G.**     **The NDDOH's hiring of an employee of defendant's consulting engineering firm and his involvement post-issuance of the minor source permit**

One of the employees of defendant's consulting engineering firm who was involved in putting together defendant's minor source permit application, including having input on whether the coal pile was a Subpart Y regulated facility or not, went to work for the NDDOH shortly after it issued the minor source permit. Plaintiffs contend that the court should give no deference to what the NDDOH did or concluded after the permit was issued because of his subsequent involvement. The evidence is that he participated in the conference call initiated by Region VIII and prepared the draft of the followup letter that was signed by NDDOH management. (Doc. No. 85-11, pp. 55-60). Further, he was part of the inspection team that inspected the facilities prior to the issuance of defendant's operating permit and the author of one of the earlier referenced statements on a photograph taken during the inspection that references the beginning point of the Subpart Y facilities and that defendant points to in its briefing as being the official position of the NDDOH. (Doc. No. 85-4, p. 59-61).

The court need not wade into the thicket of the propriety of the involvement by the former employee of defendant's consulting engineer as it bears upon the issue of deference. The NDDOH decisions to which the court gives deference were made prior to his becoming an NDDOH employee.

**H.**     **The evidence of the other surface mines in the State being minor sources**

The suggestion has been made by defendant and the State that the NDDOH reached the right conclusion because all of the other surface mines in the State, most of which are larger, have been determined to be minor sources. For one thing, it is not clear that all of the coal mines do coal

93

processing.  Second, even for those that do, it appears from the evidence that at least two of the mines utilize some form of truck dump (Doc. No. 90-8, p. 29), which likely is deemed to be a Subpart Y facility.  And, as already observed, one argument here is that defendant's open coal storage pile is simply a *de facto* substitute.  Also, there is evidence that at least one of the mines that is much larger and processes approximately 16 million tpy obtained a "synthetic" minor source permit.  (Doc. No. 85-11, pp. 42-48).  And, what that may suggest is that the estimated PTE for that mine exceeded the major source permit threshold, but the mine agreed to operational or emission limits that reduced the calculated PTE below the threshold, thereby allowing it to obtain the "synthetic" minor source permit.  In this case, defendant and the State agree that defendant's permit is not a "synthetic" minor source permit but rather is a "true" minor source permit.[24]

In short, without knowing a lot more, it is not possible to draw any conclusions from the other mines about how they compare in terms of making the required PTE calculations for the major source determination.  That being said, it does bear upon the observations that the court makes next.

### I.     This case from 20,000 feet

If a more formal process had been followed here (such that plaintiffs would have arguably needed to participate) and if plaintiffs had been able to persuade the NDDOH that the PTE for the 250 tpy threshold had been exceeded or was very close with the PTE from the coal pile being counted, it appears likely defendant would have been able to agree to additional operational controls capable of enforcement on some objective basis or emission limits based on periodic testing that

---

[24]  See note 20, supra, re discussion of synthetic minor sources.

likely would have allowed it to receive a "synthetic" minor source permit, similar to apparently what one or more of the larger surface mines in the State were able to obtain. And, if that had happened, there would have been no PSD review, no need to revise the existing fugitive dust control already mandated by SMCRA and state law to accommodate the particular requirements of Subpart Y (which do not appear to add a lot), and likely no real world impact on actual emissions even with the additional permit conditions or limitations. Further, this coupled with (1) the fact that EPA has chosen not to regulate the larger fugitive dust emitters in surface coal mines (*i.e.*, the haul roads), leaving that to the DOI under SMCRA and to the states if they choose to regulate fugitive dust emissions under their own programs as North Dakota does, (2) EPA's acknowledgment that few, if any surface coal mines, would be major sources even if they do some coal processing, and (3) the fact that a coal pile of the same size could have located elsewhere in the mine and, if it had been, we likely would not be where we are at today, makes one wonder whether somewhere along the line the bigger picture has been lost.

## X.    CONCLUSION AND ORDER

For the reasons set forth above, the court concludes that defendant's haul road and coal pile are not part of its coal processing facilities under 40 C.F.R. Pt. 60, Subpart Y. Given this determination, plaintiffs have not met their burden of demonstrating an ability of being able to prove that the 250 tpy major source threshold can be reached even if the court was to accept the PTE estimates of their expert and resolve the other disputed issues with respect to what emission points need to be included in their favor. Further, the determination that the coal pile is not a Subpart Y regulated facility in this instance disposes of plaintiffs NSPS performance claim for the reasons

already articulated.

Therefore, the court **GRANTS** defendant's motion for summary judgment (Doc No. 83) and

**DISMISSES WITH PREJUDICE** plaintiffs' complaint.   Plaintiffs' cross motion for partial

summary judgment (Doc. No. 85) is **DISMISSED AS MOOT**.

**IT IS SO ORDERED.**

Dated this 3rd day of July, 2018.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court
District of North Dakota